514 F.2d 208
 168 U.S.App.D.C. 312
 UNITED STATES of America
v.
Bernard L. BARKER, a/k/a Frank or Fran Carter, Appellant.
UNITED STATES of America
v.
Eugenio R. MARTINEZ, a/k/a Gene or Jene Valdes, Appellant.
UNITED STATES of America
v.
Frank A. STURGIS, a/k/a Frank Angelo Fiorini, a/k/a Edward
J. Hamilton,a/k/a Joseph DiAlberto or D'Alberto,
Appellant.
UNITED STATES of America
v.
Virgilio R. GONZALEZ, a/k/a Raul or Raoul Godoy or Goboy, Appellant.
 Nos. 73-2185 to 73-2188.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 14, 1974.
Decided Feb. 25, 1975.
 
 Daniel E. Schultz, Washington, D. C., for appellants.
 Robert L. Palmer, Asst. Special Prosecutor, Watergate Special Prosecution Force, with whom Leon Jaworski, Special Prosecutor at the time the brief was filed, Philip A. Lacovara, Counsel to the Special Prosecutor, and Sidney M. Glazer, Kenneth S. Geller, and David H. Kaye, Asst. Special Prosecutors, Watergate Special Prosecution Force, were on the brief, for appellee.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges, sitting en banc.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Appellants challenge denial by the District Court of their motions to withdraw guilty pleas to seven counts of an indictment arising out of the now-famous "Watergate Break-in." We affirm. We find in the court's action a proper exercise of its discretion under Rule 32(d), Federal Rules of Criminal Procedure.[1]
 
 I. THE PROCEEDINGS
 
 2
 Appellants were the foot soldiers of the Watergate Break-in. They came to the affair from the anti-Castro movement, centered in Miami's Cuban-American community, and from a long history of service in the Central Intelligence Agency (CIA) and, apparently, in other official or quasi-official agencies specializing in "clandestine" operations. In the early morning hours of June 17, 1972, District of Columbia police found them inside the headquarters of the Democratic Party's National Committee (DNC) in the Watergate office complex. They had entered surreptitiously, picking the locks; they wore rubber surgical gloves to obscure fingerprints; they had been rifling through the DNC's documents and papers and carried with them devices and tools for electronic "bugging" and "wiretapping."
 
 
 3
 Arrested with them was James McCord,[2] a former CIA agent who was then employed as a security officer by the Committee for Re-Election of the President (Richard M. Nixon) (CRP); the next few days brought the arrest of their immediate supervisors in the bizarre enterprise: E. Howard Hunt,[3] a former CIA agent who was then, or had recently been, employed as a "consultant" to the White House, with an office in that building; and G. Gordon Liddy,[4] a former White House employee who was then employed as General Counsel to the Finance Committee for the Re-Election of the President (FCRP).
 
 
 4
 The purpose of the operation was to gather political information damaging to the Democratic Party and, by consequence, useful to the President's re-election effort. But appellants now claim that, at the time of the break-in, they sincerely, though erroneously, believed the operation to be a "national security" mission, authorized by a "government intelligence agency," to examine alleged financial ties between the Democratic Party and the Castro regime in Cuba; appellants further contend that, at the time they tendered their guilty pleas, they sincerely, though again erroneously, believed that the selfsame "intelligence agency" wished them to maintain silence about the operation and forfeit their right to a trial. Referring to these twin erroneous beliefs, appellants urge that withdrawal of their pleas should be granted because the pleas were entered under circumstances of "fraud" and "duress," and because the break-in was executed, on their part at least, without the "criminal intent" requisite to conviction.
 
 
 5
 Before exploring the legal issues raised by appellants' contentions, it is necessary to recount in rather extensive detail the proceedings as they evolved in the District Court.
 
 A. The Indictment, the Trial, and the Pleas
 
 6
 An indictment issued on September 15, 1972, charging each of the appellants with seven counts, including burglary, illegal electronic surveillance, and conspiracy.[5] McCord, Hunt, and Liddy were also charged in the indictment. The seven defendants pleaded not guilty to all charges, and on January 8, 1973, jury selection commenced for a trial before then Chief Judge John J. Sirica. Appellants were represented by retained counsel, Henry Rothblatt, Jr., a noted criminal trial lawyer.
 
 
 7
 On January 10, 1973, the prosecution made a detailed opening statement to the jury, outlining the evidence and testimony which the Government planned to introduce. The prosecutor alleged that Liddy, Hunt, and McCord had used funds from the FCRP in a systematic program of espionage against the Democratic Party and its presidential candidates. This program allegedly included, among other oddities, an unsuccessful conspiracy to break into and "bug" the Washington headquarters of Senator George McGovern, and two break-ins, to install electronic eavesdropping devices, at the DNC's Watergate headquarters. The prosecutor charged that each appellant participated in the conspiracy to bug McGovern headquarters and in the two Watergate break-ins; that appellant Barker had interviewed ex-CIA personnel for an information-gathering "operation" against the Democratic National Convention and "against certain (Democratic Party) leaders," particularly Lawrence O'Brien, Chairman of the DNC; and that Barker had received from the FCRP, and cashed, five checks totalling $114,000. As to the defendants' motives, the prosecutor stated:
 
 
 8
 Obviously it was a political motive, political campaign. The operation was directed against the Democratic Party, particularly Senator George McGovern, because of his alleged left-wing views. You heard me you (sic) tell you what defendant McCord was primarily interested in on those monitored conversations Mr. Baldwin was hearing (conversations monitored from a wiretap installed at DNC headquarters), whether a sensitive or personal nature.
 
 
 9
 The interests of the persons, the defendants in this case may vary, that is, the motivation of defendant Hunt and defendant Liddy may have been different from the motivations of the four defendants from Miami, and they in turn may have had a different motivation from defendant McCord. Certainly the facts will suggest itself to you based on the information that we produce before you it was a financial motive here, financial motive. At least on the part of those who were arrested inside the Watergate the early morning hours of June 17th.
 
 
 10
 Tr. 62-63. The prosecutor claimed that appellants had been in dire financial straits before joining the conspiracy and that they had been given very large sums of money for their participation.
 
 
 11
 Opening statements were also made by McCord's lawyer and by Rothblatt, appellants' counsel. Both attorneys emphasized the issue of motives. Thus, McCord's lawyer said:
 
 
 12
 I can tell you what the evidence will not show. The evidence will not show that Mr. McCord was present at the Watergate on the night in question for any type of financial reward or gain.
 
 
 13
 We will show that Mr. McCord had no criminal intent. We will show that Mr. McCord was not aware of all of those facts which might make his conduct criminal.
 
 
 14
 He had no evil-meaning mind. He had no evil-doing hand.
 
 
 15
 Tr. 78-79. Rothblatt's opening argument outlined a similar defense.
 
 
 16
 But I ask you on behalf of my clients to pinpoint the evidence as it unfolds on Barker, Sturgis, Gonzalez, and Martinez (appellants here), as to their criminal intent, evil mind, and motives.
 
 
 17
 * * * (W)e underline "motives" and we ask you to concentrate your attention on the motives in this case.
 
 
 18
 The evidence will show that all of these four accused were part of our Government and served our Government during a planned operation on behalf of our Government back in 1951 that Mr. Silbert (the prosecutor) referred to as the Bay of Pigs.
 
 
 19
 These were men who took orders in military fashion and never questioned orders. These were men who were used to serving their Government loyally and following orders.
 
 
 20
 THE COURT: Let me ask you a question. Is it your (d)efense that they were taking orders from somebody, were ordered to go into the Watergate? Is this what you are going to show?
 
 
 21
 MR. ROTHBLATT: I think the evidence even as outlined by Mr. Silbert shows that in part, Your Honor.
 
 
 22
 THE COURT: I wish you would get down to the basic issues here: why did they go into the Watergate? Tell the (j)ury what you think the evidence is going to be.
 
 
 23
 MR. ROTHBLATT: * * * The evidence will show that they were following their instructions in typical military fashion; that they have been trained to follow with no evil motive.
 
 
 24
 Tr. 82, 86, 88. During these opening statements, the judge made clear that he viewed the issue of "criminal intent" as an important one.
 
 
 25
 Of course the Jury is going to want to know why the men went in there. * * * That is one of the crucial issues in the case. Who paid them. Did they get any money to go in there. Was it purely for political espionage. What was the purpose.
 
 
 26
 I think these are the things that might be discussed in a case like this.
 
 
 27
 Tr. 88.
 
 
 28
 Immediately following these opening arguments, Hunt's attorney announced in open court that his client wished to change his plea to guilty with respect to three of the six counts charged against him. The prosecutor stated his acceptance of this compromise plea, but the next day, January 11, 1973, the court rejected the plea offer, noting the Government's apparent ability "to introduce substantial evidence relating to all eight counts of the indictment" "against Mr. Hunt and the other Defendants." Tr. 108. Hunt thereupon recast his plea to encompass all of the counts charged against him, and the court accepted the enlarged plea. The trial then continued, with five Government witnesses appearing on January 11. One of these witnesses testified that Hunt had asked him to join the Democratic campaign organization to gather general political information for the CRP. Another witness testified that he had been hired by Hunt to obtain information on the location of heating ducts and electrical outlets at Muskie and McGovern headquarters.
 
 
 29
 On January 12 appellants wrote an extraordinary letter to their attorney, Rothblatt, which he immediately delivered to the court. The letter read:
 
 
 30
 We have been asking you since Sunday, January 7, 1973 to change our plea from not guilty to guilty. You have not complied with our request. We have made it clear from the beginning that the defense which you presented in your opening statement to the press is not acceptable to us.
 
 
 31
 We respectfully inform you as of this date, January 12, 1973 you will no longer represent us. We intend to pay any reasonable fees presented by you. Please accept our sincere gratitude for your past services.
 
 
 32
 Sealed Tr. 305-306. Rothblatt told the court he had refused, and would continue to refuse, to plead his clients guilty.
 
 
 33
 I indicated to them in no uncertain terms that I would not be their attorney to enter a plea of guilty for reasons that I am aware of, but I couldn't in good conscience as a member of the bar, knowing my professional responsibilities, undertake to do that knowing what I do and I would be derelict in my duty as a lawyer. I would feel I would be subject, from what I know, to the wors(t) kind of professional criticism. If they want to get somebody else, do it, that is all right but I cannot in good conscience get up before Your Honor and tell you my clients have met all Constitutional requirements when they entered a plea of guilty.
 
 
 34
 Sealed Tr. 308-309. Beyond this Rothblatt would not go, even in camera, for fear of "breaching a confidential communication" with his clients. Sealed Tr. 309.
 
 
 35
 The court instructed Rothblatt to confer with his clients on the problem. Several hours later, Rothblatt reported that appellants desired appointment of new counsel, for the purpose of entering guilty pleas. The court then met with appellants in camera to explore their wishes. Each appellant professed his satisfaction with, and gratitude for, Rothblatt's representation, but each stated that an insoluble lawyer-client disagreement existed on the issue of guilty pleas. The court offered to appoint a new, additional counsel to confer with appellants on the issue of pleading, but stressed that Rothblatt would remain their lawyer should they wish to continue contesting the charges. Appellants embraced this proposal. The court immediately appointed Alvin Newmyer, a highly experienced Washington attorney, as appellants' new counsel. The prosecutor and Rothblatt offered Newmyer full cooperation, and the court recessed the trial for the weekend to give Newmyer an opportunity to acquaint himself with the case and with his new clients.
 
 
 36
 The following Monday morning, January 15, 1973, Newmyer informed the court his clients wished to plead guilty. He proclaimed his satisfaction that the pleas would be voluntary and made without coercion, inducement, or promises. The prosecutor informed the court that a compromise plea to three counts would be acceptable to the Government, but the court rejected any notion of compromise. Newmyer then stated his clients were willing to plead guilty to all seven counts charged. At the court's explicit instructions, Newmyer advised appellants that pleading guilty would require them to answer many questions from the bench, and to answer them truthfully. Appellants said they were prepared for this.
 
 
 37
 The judge thereupon examined and educated appellants according to Rule 11, Federal Rules of Criminal Procedure. This was a voir dire of extraordinary thoroughness; it covers more than 50 pages of typed transcript. Throughout, the judge's obvious purpose was to warn appellants' of the gravity of a guilty plea and to root out their precise reasons for wishing to plead guilty. He explained in great detail each of the constitutional rights forfeited by a guilty plea. He made sure appellants were "thoroughly satisfied with the advice Mr. Newmyer had given." He explained each element of each crime charged in the indictment, detailing exactly what the Government would have been required to prove beyond a reasonable doubt. He carefully enumerated the sentences which might lawfully be imposed for each count in the indictment. Most importantly, the court went to great lengths in seeking to uncover appellants' reasons for participating in the break-in and for deciding to plead guilty.
 
 
 38
 Now, it is rather lengthy, but I want to be very careful that all of you understand what you are doing, that is the purpose of these questions, because if I am not convinced after I finish my questions that there is a basis in the alleged evidence in this case as outlined by the Government and any other things you might know, if I am not convinced that you are doing this knowingly, voluntarily, without any coercion, threats or anything like that, I don't have to accept the plea and then you will stand trial.
 
 
 39
 Do you understand that?
 
 
 40
 THE DEFENDANTS: (In chorus) Yes, Your Honor.
 
 
 41
 THE COURT: I want you to be straightforward with these questions. I want you to come forward in a truthful manner, I don't care who they might hurt or help, it doesn't make any difference to this Court who you might mention or who it hurts or helps, just so you don't involve any innocent people.
 
 
 42
 Do you understand that?
 
 
 43
 THE DEFENDANTS: (In chorus) Yes, sir.
 
 
 44
 THE COURT: I want that thoroughly understood. I think I stated my position in this case from the beginning. Don't pull any punches. You give me frank answers. Any people involved that shouldn't be involved, I want to know it and the Grand Jury will want to know it.
 
 
 45
 Do you understand that, is that clear, Mr. Martinez, Mr. Barker, Mr. Sturgis, and Mr. Gonzalez?
 
 
 46
 THE DEFENDANTS: (In chorus) Yes, sir.
 
 
 47
 Tr. 385-386.
 
 
 48
 Under skeptical, repeated, and vigorous questioning, appellants confessed that the Government's opening statement had been substantially accurate, and that it established their guilt on each count. Each separately denied knowing whether anyone other than the indicted defendants had been involved in planning the break-in and related activities. Appellants denied knowing where their expense money had come from. They denied ever having been employed by the CIA. Each appellant stated that he had participated in the break-in in the belief, instilled by Hunt, that it would somehow advance the cause of anti-Communism in Cuba. Beyond this, they insisted, they knew nothing. As to their motives for pleading guilty, appellants denied any outside pressures or inducements. The voir dire touched on this issue again and again; one excerpt conveys the tone:
 
 
 49
 THE COURT: Has anyone promised any of the four of you if you plead guilty to any one or all of the counts that you will serve a short term or get executive clemency or commutation of sentence?
 
 
 50
 THE DEFENDANTS: (In chorus) No, Your Honor.
 
 
 51
 THE COURT: Are you sure of that?
 
 
 52
 THE DEFENDANTS: (In chorus) Yes, sir.THE COURT: Has any pressure of any kind been used on any one or all four of you from any person in any walk of life to keep you from talking in this case?
 
 
 53
 THE DEFENDANTS: (In chorus) No, Your Honor.
 
 
 54
 THE COURT: From telling what happened. Did Mr. Hunt urge any one or all of you to plead guilty in this case?
 
 
 55
 THE DEFENDANTS: (In chorus) No, Your Honor.
 
 
 56
 THE COURT: I think I have asked you this in substance: Have any one of you been promised that your families will be taken care of during whatever time you may have to serve in prison?
 
 
 57
 THE DEFENDANTS: (In chorus) No, Your Honor.
 
 
 58
 THE COURT: Are any of you being paid by anyone for anything?
 
 
 59
 THE DEFENDANTS: (In chorus) No, sir.
 
 
 60
 Tr. 420-421.
 
 
 61
 As noted, the judge's questioning was highly skeptical. For instance, after pressing Barker again and again on the financing of the break-in, the court expressed its exasperation.
 
 
 62
 THE COURT: * * * Where did you get that money that you used to pay those men's expenses?
 
 
 63
 MR. BARKER: Your Honor, I got that money in the mail in a blank envelope.
 
 
 64
 THE COURT: I am sorry, I don't believe you.
 
 
 65
 Tr. 417. It was obvious that appellants were reluctant to tell all they knew about the detailed planning of the break-in. But the facts of their own participation had been laid out by the Government and fully admitted by appellants, and appellants absolutely insisted upon pleading guilty. For the judge to have pushed his inquiries further would not only have delayed the trial of the remaining defendants but also usurped its fact-finding function. Unable to shake appellants' determination to plead guilty, the judge finally accepted the pleas and committed each appellant on $100,000 bond pending receipt of a presentence report.
 
 
 66
 The Watergate trial continued without appellants or Hunt, ending with jury verdicts of guilty, on all counts, against the remaining defendants, Liddy and McCord. On March 23, 1973, the court committed appellants to the custody of the Attorney General, for tentative maximum terms, under 18 U.S.C. § 4208(b) (1970), pending final sentencing.
 
 B. The Motions to Withdraw Guilty Pleas
 
 67
 On September 14, 1973, prior to final sentencing, appellants moved to withdraw the guilty pleas entered eight months earlier. The motion asserted that the pleas "were inaccurate because defendants had and have valid defenses to the charges against them," that the appellants "believed that they had been directed to plead guilty to the charges to avoid the exposure of secret, confidential, and sensitive national security operations of which they were a part," and that the pleas were "the product of a blind and ignorant loyalty fostered in these defendants' minds by deceptions practiced on them by others who purported to act under color of a higher law."
 
 
 68
 The motion was premised on two related contentions: (a) that, at the time of the break-in, appellants believed the affair to be a "national security" operation authorized by a "government intelligence agency", and (b) that, at the time of their guilty pleas, appellants believed "national security" considerations precluded disclosing this Government authorization, and thus precluded defending against the charges. Appellants conceded that "(s) ubsequent events have demonstrated that the June 17, 1972 operation was purely political in nature and was neither sponsored nor approved by any federal government intelligence agency for national security purposes." Appellants further conceded that subsequent events had shown that their silence at trial was not in fact required by "national security" considerations.
 
 
 69
 At the court's request, each appellant submitted a sworn affidavit explaining how his erroneous beliefs had been formed concerning the sponsorship of the break-in and the need for silence at trial. We recount here the gist of these affidavits.
 
 
 70
 Sponsorship: Hunt had hired Barker and, through him, the other appellants. The reputations of Hunt and Barker instilled appellants' belief that the Watergate break-in was an "official" operation. Hunt had been Barker's "supervisor" in the Bay of Pigs Invasion and was widely known in Miami's Cuban-American community as a CIA agent. Martinez had long been on a CIA retainer. Sturgis, after participating in the Bay of Pigs, had continued to work in various unidentified "clandestine operations" against the Castro regime. Gonzalez was aware of the CIA connections of his colleagues.
 
 
 71
 Appellants had worked on other operations for Hunt which appeared to have official authorization. Though Hunt was formally "retired" from the CIA, he had an office at the White House. In August 1971 Hunt engaged Barker to "help him on a matter of national security (which) involved a traitor to this country who had been giving information to the Russian Embassy." As part of this mission Hunt, Liddy, Barker, and Martinez broke into the office of Daniel Ellsberg's psychiatrist. This, Hunt had represented, was at the behest of "a national security intelligence agency that had greater jurisdiction than both the FBI and the CIA." Hunt told Barker that the tools and equipment used in the Ellsberg operation had been furnished by the CIA. Hunt had also asked Barker to provide the names of possible recruits for an information-gathering operation during the Democratic National Convention, and these names were, according to Hunt, subsequently "cleared" by higher officials. Hunt had also arranged for appellants to stand guard at the casket of former FBI Director J. Edgar Hoover during memorial services in Washington.
 
 
 72
 As for the Watergate Break-in, Hunt told appellants that the DNC was receiving money from Castroite sources in Cuba; their mission was to photograph and "secure" documents relevant to this financing, in the interest of "national security." Appellants' phony identification papers were supplied by the CIA. Appellants had "no reason to doubt Mr. Hunt's representations or his authority" because he appeared to have inside information concerning Government affairs e. g., advance notice of the mining of Haiphong Harbor and of the retirement of CIA Director Richard Helms. Appellants' affidavits do not claim that any Government official other than Hunt ever spoke to them about the Watergate operation or vouched for Hunt's "authority" to undertake it.
 
 
 73
 Silence at trial: The affidavits identify several facts and circumstances, following the arrest, which led appellants to plead guilty.
 
 
 74
 When one is apprehended in such an operation one of two things happen. Either you go to jail because the government denies the entire thing or you are not incarcerated because the government makes secret arrangements or publicly acknowledges responsibility for the operation. Those who have been apprehended have no choice in that decision. If the government does not acknowledge responsibility then assistance is provided in the form of expenses, attorneys and financial help for the families.[6]
 
 
 75
 Appellants received funds, through Hunt's wife, for maintaining their families. Lawyers appeared to represent them and were paid from these same funds. Rothblatt told Barker, "at some point prior to our trial," that "we were going to be able to use as our defense that the Watergate operation had been a CIA operation."[7] But McCord objected to using the defense because "the CIA had not approved it (the defense)."[8] At about this time, Hunt entered his guilty plea. From this, each appellant drew a clear inference. Barker's affidavit is representative:
 
 
 76
 After we came to Washington for our trial * * * I was told by Mr. Hunt that he had decided to plead guilty and that we did not have any defense. This represented to me a final decision that there would be no disclosure at the trial as to the true nature of the operation we had engaged in and that the plan which was to be followed was for us to plead guilty and I did so.
 
 
 77
 As for hiding their true concerns from Judge Sirica, Barker's affidavit explains:
 
 
 78
 My belief that this was a government operation which was not supposed to be disclosed was reinforced by the questioning by the Court * * *. In particular, the Court inquired of us whether we had ever worked for the Central Intelligence Agency. For Judge Sirica to ask me to respond in open Court to that question signalled to me that he had not been informed by the government of this fact, was not supposed to know and that I was not supposed to reveal that anymore than I was supposed to reveal the nature of the operation itself. I viewed this matter as being the same as regarding Mr. Ellsburg (sic) and his case. It was not my position to make any disclosure as to this operation to say nothing of revealing the existence of the Fielding office entry (the break-in at the office of Ellsberg's psychiatrist). The government knew about both and the decision as to disclosure was that of the government, not mine.
 
 
 79
 Appellants inferred the continuing necessity to remain silent, after their pleas, from the fact that they and Hunt were "all kept together in jail as a unit." This, appellants concluded, was "so that Mr. Hunt would continue to be in a position to serve as our supervising agent."[9]
 
 
 80
 Appellants do not claim that any Government official approached them with a request to remain silent, for "national security" purposes or any other. Nor do appellants claim to have made their own inquiries on this point, either personally or through counsel.
 
 C. The Court's Ruling and Sentencing
 
 81
 On November 5, 1973, Judge Sirica considered briefs, and heard oral argument, on the appellants' motion and affidavits. Appellants' factual claims were not subjected to an evidentiary hearing. The withdrawal motion was denied on November 7. Though no opinion was filed, the court has filed a statement of reasons for its denial of bail pending sentencing. In this statement the court noted that an extensive voir dire was conducted before the guilty pleas were accepted; that the pleas were based on the Government's contentions in opening argument which furnished "ample evidence to conclude that there existed a factual basis" for the pleas; that appellants had been represented throughout by competent counsel; and that the motion to withdraw came many months after the pleas were entered.[10]
 
 
 82
 Final sentences were imposed on appellants on November 12, 1973. For each appellant, sentences on all counts were imposed concurrently, resulting in a liability of 18 months to 6 years for Barker, and of 1 to 4 years for each of the other appellants.[11]
 
 
 83
 II. THE LEGAL STANDARD FOR WITHDRAWING GUILTY PLEAS
 
 
 84
 A. Applicability of the "Fair and Just" Standard
 
 
 85
 While Rule 32(d)[12] permits post-sentence withdrawal of a guilty plea only to prevent "manifest injustice," the rule lays down no particular standard for deciding withdrawal motions filed prior to sentencing. However, the federal courts, relying on Kercheval v. United States,274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927), have uniformly ruled that presentence motions should be granted wherever such would be "fair and just." E. g., Kadwell v. United States, 315 F.2d 667 (9th Cir. 1963); Gearhart v. United States, 106 U.S.App.D.C. 270, 272 F.2d 499 (1959). See generally, Note, Presentence Withdrawal of Guilty Pleas in the Federal Courts,40 N.Y.U.L.Rev. 759 (1965). Though even presentence motions are addressed to the sound discretion of the District Court, Everett v. United States, 119 U.S.App.D.C. 60, 336 F.2d 979 (1964), with appellate reversal uncommon, see 8A J. Moore, Federal Practice P 32.07(1) (2d ed. 1973), the "fair and just" standard is obviously more lenient than that of "manifest injustice," Gearhart v. United States, supra, 106 U.S.App.D.C. at 273, 272 F.2d at 502. Appellants' motions were filed prior to final sentencing but some months after appellants' commitment to the custody of the Attorney General, under tentative maximum terms, pursuant to 18 U.S.C. § 4208(b).[13] We have concluded that these motions should be judged under the "fair and just" standard normally applicable to presentence withdrawal motions.
 
 
 86
 When Section 4208(b) is invoked, the court in effect sentences the defendant twice, the first time to a provisional full term, to give prison and parole officials a three- to six-month period to compile background information on the defendant, the second time to a shorter term, based on the information compiled. This two-stage process finds no echo in the Federal Rules of Criminal Procedure, which everywhere refer merely to "sentencing," as if this were inevitably a one-stage process. Conforming the Rules to the statute has required considerable ingenuity. See, e. g., United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963), holding that a defendant's Rule 43 right to be present at sentencing applies to final sentencing under Section 4208(b), and Corey v. United States, 375 U.S. 169, 84 S.Ct. 298, 11 L.Ed.2d 229 (1963), holding that appeal of a conviction may be filed after either tentative or final sentencing under Section 4208(b). The Supreme Court has yet to construe Rule 32(d) in the context of the Section 4208(b) sentencing process. Several circuits have left the issue open, e. g., United States v. McCoy, 477 F.2d 550 (5th Cir. 1973), and Callaway v. United States, 367 F.2d 140 (10th Cir. 1966), while the Ninth Circuit has held that a withdrawal motion filed between tentative and final sentencing should be judged against the "presentence" standard of fairness and justice, United States v. Thomas, 415 F.2d 1216, 1218 (9th Cir. 1969), and Sherman v. United States, 383 F.2d 837, 840 (9th Cir. 1967).
 
 
 87
 The Ninth Circuit's position seems to us sensible, and we adopt it. Two reasons of policy have been advanced to explain the near-presumption which Rule 32(d) erects against post-sentence withdrawal motions. The first is that post-sentence withdrawal subverts the "stability" of "final judgments." High v. United States, 110 U.S.App.D.C. 25, 27, 288 F.2d 427, 429, cert. denied, 366 U.S. 923, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), and Kadwell v. United States, supra, 315 F.2d at 670. The second reason is that the post-sentence withdrawal motion often constitutes a veiled attack on the judge's sentencing decision; to grant such motions in lenient fashion might
 
 
 88
 undermine respect for the courts and fritter away the time and painstaking effort devoted to the sentencing process.
 
 
 89
 Kadwell v. United States, supra, 315 F.2d at 670. Concern for the "stability of final judgments" has little application to withdrawal motions filed between tentative and final sentencing under Section 4208(b). The point at which a defendant's judgment of conviction becomes "final" for purposes of appeal whether at tentative or at final sentencing is wholly within the defendant's discretion. Corey v. United States, supra. Concern for the integrity of the sentencing process is, however, another matter. The major point, in our view, is that tentative sentencing under Section 4208(b) leaves the defendant ignorant of his final sentence. He will therefore be unlikely to use a withdrawal motion as an oblique attack on the judge's sentencing policy. The relative leniency of the "fair and just" standard is consequently not out of place. We recognize, however, that application of that standard may require some adjustments in the context of Section 4208(b) sentencing.
 
 
 90
 If such motions had to be routinely granted, trial judges might react by cutting back on use of Section 4208(b) procedures, which would be highly unfortunate. Compare United States v. Youpee, 419 F.2d 1340, 1343 (9th Cir. 1969). Furthermore even tentative sentencing may encourage frivolous motions, for the tentatively sentenced defendant is at least aware that probation or a suspended sentence are unlikely. Finally, a motion filed after tentative sentencing will typically come a rather long time after the guilty plea itself, and granting it may consequently threaten unusual prejudice to the Government or unusual inconvenience for the court or for those who have expended effort preparing presentence reports. But none of these concerns seems to us sufficiently weighty to justify imposing the onerous "manifest injustice" standard on withdrawal motions filed between tentative and final sentencing. Rather, these concerns may be given their appropriate, individual weight by the judge in exercise of his broad discretion under the "fair and just" standard. As we now proceed to explain, that standard is a flexible guide, not a rigid formula, and it is accordingly adaptable to the peculiarities of the Section 4208(b) sentencing process.
 
 B. Meaning of the "Fair and Just" Standard
 
 91
 Needless to say, the terms "fair and just" lack any pretense of scientific exactness. As a Court of Appeals will reverse denial of a withdrawal motion only upon finding an abuse of discretion, the precise " meaning" of the standard lies buried in the unreported actions of federal trial judges. Nevertheless, some rough guidelines have emerged in the appellate cases.
 
 
 92
 Whether the movant has asserted his legal innocence is an important factor to be weighed. United States v. Joslin, 140 U.S.App.D.C. 252, 256, 434 F.2d 526, 530 (1970); Gearhart v. United States, supra. If the movant's factual contentions, when accepted as true, make out no legally cognizable defense to the charges, he has not effectively denied his culpability, and his withdrawal motion need not be granted. Everett v. United States, supra. On the other hand, where the motion does assert legal innocence, presentence withdrawal should be rather freely allowed. E. g., United States v. Joslin, supra, 140 U.S.App.D.C. at 257, 434 F.2d at 531; United States v. Young, 424 F.2d 1276, 1279 (3rd Cir. 1970); Kadwell v. United States, supra; Gearhart v. United States, supra, 106 U.S.App.D.C. at 273, 272 F.2d at 502; Poole v. United States, 102 U.S.App.D.C. 71, 75, 250 F.2d 396, 400 (1957).
 
 
 93
 This is not to say, however, that the mere assertion of a legally cognizable defense is always a sufficient condition for securing withdrawal of a plea. While some decisions have come close to suggesting that a mere assertion of innocence is enough to merit withdrawal, each of these cases involved the additional, and obviously important, consideration that the guilty pleas at issue had been entered under highly questionable circumstances. Thus, in United States v. Young, supra, the defendant had misunderstood the crimes charged; in Kadwell v. United States, supra, counsel was clearly ineffective when the plea was entered; in Gearhart v. United States, supra, there was strong evidence the defendant had been mentally ill when he entered his plea; and in Poole v. United States, supra, the plea had been entered hastily at arraignment, without benefit of counsel.
 
 
 94
 Were mere assertion of legal innocence always a sufficient condition for withdrawal, withdrawal would effectively be an automatic right. There are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal. A guilty plea is very typically entered for the simple "tactical" reason that the jury is unlikely to credit the defendant's theory or story. See McCoy v. United States, 124 U.S.App.D.C. 117, 119, 363 F.2d 306, 308 (1966). Indeed, so long as a factual basis for the plea exists, see Rule 11, Fed.R.Crim.P., a court may accept such a "tactical" guilty plea even from a defendant who continues to assert his innocence. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Surely, such a defendant does not retain a right automatically to withdraw his plea. A guilty plea "frequently involves the making of difficult judgments." McMann v. Richardson, 397 U.S. 759, 769, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); see also Brady v. United States, 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle, but "a grave and solemn act" which is "accepted only with care and discernment." Brady v. United States, supra, 397 U.S. at 748, 90 S.Ct. at 1468. It follows that a court, in addressing a withdrawal motion, must consider not only whether the defendant has asserted his innocence, but also the reason why the defenses now presented were not put forward at the time of original pleading. See United States v. Needles, 472 F.2d 652 (2d Cir. 1973); United States v. Webster, 468 F.2d 769, 771 (9th Cir. 1972), cert. denied, 410 U.S. 934, 93 S.Ct. 1385, 35 L.Ed.2d 597 (1973); United States v. Fernandez, 428 F.2d 578 (2d Cir. 1970); United States v. Thomas, supra; Callaway v. United States, supra; United States v. Giuliano, 348 F.2d 217 (2 Cir.), cert. denied, 382 U.S. 946, 86 S.Ct. 390, 15 L.Ed.2d 349 (1965); Hawk v. United States, 119 U.S.App.D.C. 267, 271 n. 12, 340 F.2d 792, 796 n.12 (1964).
 
 
 95
 The reasons given by the movant for "delaying" assertion of his defenses by means of an intervening guilty plea must be weighed according to the circumstances of his particular case. It should go without saying that the standard is very lenient when the plea was entered unconstitutionally or contrary to Rule 11 procedures. Such pleas should almost always be permitted to be withdrawn, both before and after sentencing, regardless of whether the movant has asserted his legal innocence. See McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). By the same token, however, where the plea itself was properly entered withdrawal is not an automatic right and more substantial reasons for delay must generally be asserted. United States v. Sambro, 147 U.S.App.D.C. 75, 77, 454 F.2d 918, 920 (1971); United States v. Joslin, supra; United States v. Giuliano, supra, 348 F.2d at 222; United States v. Hughes, 325 F.2d 789 (2d Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964).
 
 
 96
 Even where the plea was properly entered, however, the standard for judging the movant's reasons for delay remains low where the motion comes only a day or so after the plea was entered. See United States v. Joslin, supra, and Kadwell v. United States, supra. A swift change of heart is itself strong indication that the plea was entered in haste and confusion; furthermore, withdrawal shortly after the event will rarely prejudice the Government's legitimate interests. By contrast, if the defendant has long delayed his withdrawal motion, and has had the full benefit of competent counsel at all times, the reasons given to support withdrawal must have considerably more force. United States v. McCoy, supra, 477 F.2d at 551; United States v. Youpee, supra, 419 F.2d at 1343; Callaway v. United States, supra, 367 F.2d at 142. The movant's reasons must meet exceptionally high standards where the delay between the plea and the withdrawal motion has substantially prejudiced the Government's ability to prosecute the case. United States v. Vasquez-Velasco, 471 F.2d 294 (9th Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2163, 36 L.Ed.2d 692 (1973); United States v. Harvey, 463 F.2d 1022 (4th Cir.), cert. denied, 411 U.S. 972, 93 S.Ct. 2162, 36 L.Ed.2d 696 (1972); United States v. Del Valle-Rojas, 463 F.2d 228 (9th Cir. 1972); United States v. Tabory, 462 F.2d 352 (4th Cir. 1972); United States v. Lombardozzi, 436 F.2d 878 (2d Cir.), cert. denied, 402 U.S. 908, 91 S.Ct. 1379, 28 L.Ed.2d 648 (1971); United States v. Stayton, 408 F.2d 559, 561 (3rd Cir. 1969); Pelletier v. United States, 121 U.S.App.D.C. 349, 350 F.2d 727 (1965). The most common form of prejudice is the difficulty the Government would encounter in reassembling far-flung witnesses in a complex case, but prejudice also occurs where a defendant's guilty plea removed him from an ongoing trial of co-defendants, who were then found guilty. 8A J. Moore, Federal Practice P 32.07(2) (2d ed. 1973). That withdrawal would substantially inconvenience the court is also a proper factor for consideration. Everett v. United States, supra, 119 U.S.App.D.C. at 65, 336 F.2d at 984; Pelletier v. United States, supra.
 
 
 97
 III. THE STANDARD APPLIED TO APPELLANTS' MOTIONS
 
 
 98
 By way of asserting their legal innocence, appellants advance several "defenses" to the indictment. They also provide reasons, of a sort, for suppressing these "defenses" at trial and delaying public assertion until eight months after pleading guilty. Even if the "defenses" now asserted by appellants had legal merit, a question we do not reach, it is our view that appellants' reasons for delaying their assertion are insufficient to require granting the withdrawal motion, particularly in light of appellants' provisional sentencing under 18 U.S.C. § 4208(b). See Part II-A supra. We accordingly conclude that Judge Sirica operated well within the borders of a sound and reasoned discretion in denying appellants' motions.
 
 
 99
 Appellants claim they pleaded guilty, suppressing their "defenses," because they honestly, though mistakenly, believed that "national security" considerations required their silence. In testing the adequacy of this explanation, we must look to the circumstances of the case. See Part II-B supra.
 
 
 100
 These guilty pleas were not ill-considered or offered in haste. In its opening statement the prosecution had outlined an overwhelming case against appellants. The pleas were accepted only after an extraordinarily elaborate procedure, stretching over four days, conducted largely in camera, and involving two competent and loyal attorneys. Neither counsel, prosecutor, nor judge exerted the slightest pressure on appellants to induce them to plead guilty; indeed the judge and attorney Rothblatt clearly bent every effort to dissuade appellants from this course. Rothblatt was obviously prepared and willing to present the "lack of criminal intent" defense which appellants now advance in support of their motions. By discharging Rothblatt, appellants rejected that tactic in the most resolute and dramatic fashion conceivable.
 
 
 101
 Appellants' withdrawal motion did not come until eight months after the pleas had been entered and their co-defendants, Liddy and McCord, had been convicted. For that reason, it is very likely that withdrawal of the pleas would substantially prejudice legitimate prosecution interests. The pleas interrupted in mid-testimony a trial of unusual complexity. Though no important witness has, apparently, died in the interim, there would be numerous practical difficulties in reassembling the witnesses and evidence for trial.
 
 
 102
 You do not assemble a case of this kind for trial twice * * *. When a plea is taken in the middle of trial, it has to be taken with the utmost deliberation simply because the public's right is going to be compromised if there is something wrong with the plea-taking.
 
 
 103
 United States v. Lombardozzi, supra, 436 F.2d at 881. Besides the practical difficulties of reassembling this case for trial, intervening events have worked to further prejudice any future prosecution. First, of course, the trial of appellants' co-defendants continued with attendant publicity, after the court accepted appellants' guilty pleas. Out of a concern for just such publicity, Judge Sirica carefully selected and sequestered the original jury; prospective jurors for a trial now of appellants presumably will have been exposed to this publicity covering the facts of this case, thus making the jury selection problem more difficult. Second, after the guilty pleas were entered, appellants were granted "use immunity" so that they might testify concerning the break-in before the grand jury and before congressional committees. Had the Government known that appellants intended to revoke their pleas, it would very likely have abstained from securing their immunization, for the trial of pre-immunized defendants is obviously, and quite properly, a very difficult, if not impossible, task.
 
 
 104
 We also consider it important that appellants' withdrawal motion is premised on claims directly contrary to the representations which appellants made to Judge Sirica during the plea-taking procedure. He asked them if they had ever been employed by the CIA, and they lied that they had not. He asked them if they were pleading guilty for some reason of loyalty, coercion, or inducement, and they lied that they were not. He asked their motives for participating in the break-in, and they retreated into generalities and half-truths. By definition, a motion to withdraw a plea constitutes a formal disavowal, but this case goes well beyond that. Appellants willfully abused and misled the court on matters of critical public importance. To grant a plea withdrawal under such circumstances would require a reason of genuinely compelling force.
 
 
 105
 Appellants' proffered reason does not meet any such test. Appellants do not allege that any Government official urged them to plead guilty for "national security," or any other, reasons. Their affidavits contain no allegation that the "Government" unconstitutionally coerced or induced their pleas. Contrast North Carolina v. Alford, supra, 400 U.S. at 31, 91 S.Ct. 160; McMann v. Richardson, supra, 397 U.S. at 772, 90 S.Ct. 1441; Brady v. United States, supra, 397 U.S. at 747-48, 90 S.Ct. 1463. If appellants had alleged and could demonstrate that some Government official had deceived them about their "patriotic duty" to remain silent, withdrawal of their pleas might be proper. Compare United States v. Tateo, 214 F.Supp. 560, 566-67 (S.D.N.Y.1963). But appellants claim only that various "circumstances" chiefly Hunt's guilty plea gave them the subjective impression that someone or some agency in the Government wished them to plead guilty.[14] There is not even a direct claim that Hunt told them as much; even if he had, the "Government" cannot be held responsible for actions taken, or rumors spread, by appellants' co-defendants. See United States v. Fernandez,supra, 428 F.2d at 580.
 
 
 106
 In a case such as this, involving possible prejudice to legitimate prosecution interests, a flagrant abuse of judicial processes by the appellants, and provisional sentencing under 18 U.S.C. § 4208(b), we do not think it is a sufficient reason, to merit withdrawal of the guilty pleas, that appellants may in fact have labored under a subjective impression that " national security" considerations required their silence at trial. If subjective impressions, however irrational and unfounded, were enough, any defendant could claim them and thus secure tactical advantages by pleading guilty and delaying his withdrawal motion to a point where retrial would be onerous or impossible for the Government. In our view, the proper question in this case is not whether appellants entertained the erroneous belief that silence was their duty, but whether this belief was, in an objective sense, reasonable in the circumstances. See United States ex rel. Curtis v. Zelker,466 F.2d 1092, 1098 (2d Cir. 1972), cert. denied, 410 U.S. 945, 93 S.Ct. 1405, 35 L.Ed.2d 612 (1973). That the belief was a mistaken one does not mean that it was necessarily unreasonable. But see United States ex rel. LaFay v. Fritz, 455 F.2d 297, 303 (2d Cir.), cert. denied, 407 U.S. 923, 92 S.Ct. 2471, 32 L.Ed.2d 809 (1972) (suggesting that even a reasonable, though mistaken, belief that coercive circumstances were present at time of pleading would not render a guilty plea constitutionally infirm), and Townes v. Peyton,404 F.2d 456, 461 (4th Cir. 1968), cert. denied, 395 U.S. 924, 89 S.Ct. 1778, 23 L.Ed.2d 241 (1969) (holding that a defendant's belief that coercive circumstances were present at the time of his guilty plea must have "at least some foundation in fact" to justify vacation of his conviction). But we have no doubt whatever as to the unreasonableness of appellants' belief.[15]
 
 
 107
 The guilty pleas were entered after the prosecution, in its opening argument and through presentation of initial witnesses, had outlined a virtually airtight case that Hunt and Liddy had engineered the Watergate Break-in for purely partisan reasons. After hearing all this, it was patently unreasonable for appellants to continue believing that they had been part of a legitimate "national security" enterprise requiring their silence at trial. It was equally unreasonable, after hearing this evidence and testimony, for appellants to rest upon their subjective beliefs and fail to test them against reality. Either personally or through their counsel, appellants could obviously have sought out responsible Government officials to ascertain whether, in fact, the "national security" was at stake. That the Department of Justice was pursuing the prosecution put the appellants on sufficient notice that full disclosure at trial was not contrary to the national interest; at the very least, appellants had the burden of determining otherwise by directing inquiries to responsible officials in the CIA, or the State Department, or the Defense Department, or the White House. Instead, appellants chose to rely on impressions gathered from the plea decision of a co-defendant. This was unreasonable.
 
 
 108
 The simplest, and most proper, course was for appellants to bring their apprehensions directly to the attention of Judge Sirica. Appellants now contend that they thought a federal judge was not to be trusted with "national security" information. Here again, appellants are relying on their own subjective impression. It would be utterly destructive of the judicial system if a defendant were to be permitted, without any predicate in reasonableness, to minimize the significance of a misrepresentation to the court by an assertion of his belief in some value perceived as higher than the court's. We are not talking here of examples drawn from history where men will at times deliberately break the law in furtherance of what they conceive to be a higher moral or patriotic goal, but who concede that they have broken the law. Nor is this a case where the defendant seeks to undercut his statements to the court on the basis of what he had falsely been told by his attorney was the position of the judge. United States v. Simpson, 141 U.S.App.D.C. 8, 436 F.2d 162 (1970). The appellants before us had the benefit of vigilant and sophisticated counsel who, presumably, understood the uses of in camera procedures for handling information of a sensitive nature. See, e. g., United States v. United States District Court, 407 U.S. 297, 320-21, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). It would be no excuse if appellants had refused to confide fully in their counsel. United States v. Giuliano, supra, 348 F.2d at 222. But in fact appellants make no claim of hiding their true concerns from Rothblatt and Newmyer. In any event, appellants themselves met in camera with the judge during the plea-taking procedure and had ample opportunity to seek out his advice.
 
 
 109
 In sum, appellants had every chance to discover that their alleged subjective fears and beliefs were unfounded. Yet they insisted on remaining ignorant of their true situation and on "playing games" with the court. Everett v. United States, supra, 119 U.S.App.D.C. at 65, 336 F.2d at 984. We can perceive no reasonable excuse for this course of action.
 
 
 110
 Thus we find that appellants' guilty pleas were voluntary and knowing; that on allocution appellants deliberately and repeatedly deceived the court; that withdrawal of the pleas eight months after they were entered would prejudice the Government; that appellants' supposed national security reasons for their guilty pleas were based on entirely subjective beliefs, supported only by their allegations; and that these beliefs, if indeed held, were patently unreasonable.[16] While appellants now claim their legal innocence based primarily on their assertion that they believed their burglary was authorized for national security reasons, we need not decide whether their newfound defenses have legal merit.[17] Instead, the findings listed above mandate a strict application of the fair and just standard, and only the most compelling explanation by appellants could turn Judge Sirica's ruling into an abuse of discretion. By that standard, appellants' explanation plainly fails. We hold that Judge Sirica's denial of appellants' withdrawal motions, made after their provisional sentencing under 18 U.S.C. § 4208(b), does not constitute an abuse of discretion under the standard of fairness and justice.IV. CONCLUSION
 
 
 111
 Aware of the public importance of these cases, we have given appellants' claims the closest and most thorough attention. It is our considered conclusion that neither appellants' alleged subjective misimpressions at the time of pleading nor their alleged mistakes of fact and law at the time of the break-in constitute legally adequate grounds to require withdrawal of their guilty pleas. This is not to say that these various misimpressions and mistakes must be ignored by the judiciary; if credited, they make out sound reasons for mitigating appellants' punishment. As we noted at the outset, appellants were only the "foot soldiers" of this conspiracy. But this, quite plainly, Judge Sirica also understood. In sentencing appellants he imposed penalties significantly less onerous than those visited upon their co-defendants, their immediate superiors in the enterprise. If further clemency is deemed warranted, a motion to reduce sentence under Rule 35, Fed.R.Crim.P., is always available.
 
 
 112
 Affirmed.
 
 BAZELON, Chief Judge (concurring):
 
 113
 I concur in the Court's opinion that Barker, Martinez, Sturgis and Gonzalez have not presented this Court with any cognizable reason which could justify withdrawal of their guilty pleas.[1] The Court in its decision does not reach the defendants' contention that a reasonable belief in official authorization of their venture an allegedly reasonable mistake of law constitutes a legal defense to their convictions.[2] Since this contention raises fundamental questions about the nature of criminal responsibility which are addressed by the dissents and which are of central importance to the criminal justice system, I am impelled to add a comment on this proposed defense.[3] As a general matter, reasonable mistakes of law do not constitute a defense to criminal actions. However, I entertain serious doubts about the continued validity of this rule and do not think the rule should preclude the responsibility defense asserted in this case.
 
 I.
 
 114
 The proper beginning point for a discussion of the proposed defense is the nature of criminal responsibility. Under what conditions should criminal sanctions operate on a wrongdoer? As will be developed below, the law in its specifics refuses to give a consistent answer. When asked the general question, however, the modern response of the law is perhaps most confidently and eloquently stated by Roscoe Pound:[4]
 
 
 115
 Historically, our substantive criminal law is based on a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.
 
 
 116
 One might immediately notice that the concept of a "free" choice to do wrong is merely a conclusion. It says nothing about how free the actor must be or what constitutes a choice. To understand the meaning of the concept, we must look to the concept it purportedly rejects and consider the extent to which it is successful in manifesting this rejection.
 
 
 117
 The concept that the criminal sanction operates only on the free choice to do wrong was once not accepted at all and is still today accepted only in part. In early English more correctly Anglo-Germanic tribal law, criminal liability was established by the simple commission of a forbidden act.[5] The actor's intent was irrelevant since the law punished the act itself. An accidental killing was as much a murder as an intentional killing. Under the influence of canonist law, particularly as interpreted by Bracton,[6] the common law began in the late 13th and early 14th centuries to abandon this view.[7] That process continues up to this day.
 
 
 118
 The extent to which the concept of "absolute" criminal liability criminal liability imposed on the basis of an act and nothing else remains in the law today may be seen by a short review of current doctrine. First, of course, there is the requirement of actus reus cognizable criminal activity must include a physical act.[8] Second, in the 19th century, the various legislatures of England and the American states enacted so-called "public welfare" offenses for which criminal liability was largely absolute.[9] Third, and most relevant to the issue in this case, the law ordains that certain elements of a crime otherwise transformed by the modern view are established by the mere commission of the proscribed act regardless of the subjective intent of the actor.
 
 
 119
 To fully explicate these last stated "exceptions" to the modern view, we must be aware of the polar position to the early English absolute liability rule, a position which present law only distantly approaches. If the law were totally committed to proscribing only the free choice to do wrong, it would permit a wide-ranging inquiry into the subjective motivation of the particular act in dispute and into whether the law should consider that motivation a legally "free choice" to do wrong. To take some contemporary, not-so-random examples of what that might mean: does a poverty-stricken and otherwise deprived black youth from the central city area freely choose to do wrong when he kills a Marine who taunted him with a racial epithet?,[10] or indeed, when he steals or uses drugs?; does a "modern Jean Val Jean", stealing to feed his family, freely choose to do wrong?;[11] does a narcotics addict freely choose to do wrong when he buys drugs for his own use?[12] does a super-patriotic citizen steeped in cold war ideology freely choose to do wrong when he burglarizes the home of an individual whom he suspects of treasonous activity?
 
 
 120
 We are uneasy in contemplation of these situations; the law reflects this by reducing the scope of the inquiry into criminal responsibility by use of conclusive presumptions. The law in its most demanding view of criminal responsibility establishes that if an individual specifically intends to commit an act and if that act is proscribed by law, therefore the individual freely chose to do wrong.[13] But, of course, there is no necessary or even empirical as far as we have or could have evidence on the proposition connection between the intent to commit the act and an intent to freely do wrong. The concept of the "vicious will" is reduced to the presumptively vicious will. Furthermore, the law in most instances does not even require this intention to commit the act. It is enough that the act was committed and from that the law presumes intent unless the actor can demonstrate the circumstances were such that he was under an honest or reasonable misapprehension of the salient facts surrounding the act.[14] Finally, in limited circumstances the law punishes despite even a perfectly reasonable misapprehension of fact.[15]
 
 
 121
 The law's unwillingness to depart from the concept of absolute liability may be explained by the arguments traditionally advanced in support of the rule that ignorance or mistake of law is not a defense,[16] the particular form of absolute liability in issue here. Those traditional arguments are three. First is that most concisely advanced by Jerome Hall:[17]
 
 
 122
 To permit an individual to plead successfully that he had a different opinion or interpretation of the law would contradict the . . . postulates of a legal order. For there is a basic incompatibility between asserting that the law is what certain officials declare it to be . . . and asserting, also, that . . . the law is . . . what defendants or their lawyers believed it to be. A legal order implies the rejection of such contradiction.
 
 
 123
 On its face this argument would seem to ignore the distinction between justification for an act, which does indeed confirm its legality, and excuse for an act, which assumes illegality of the act but excuses the principal from criminal sanction because he did not freely choose to do wrong.[18] The latter in principle implies no validation of the act. Indeed, it is in its nature an express rejection of any such view. Hall's argument also could not be that the law imposes an affirmative duty to discover what the law is since "it is very clear that the guilt of failing to obey (this duty) would bear no proportion to that of disobeying the principal command if known, yet the failure to know would receive the same punishment as the failure to obey the principal law."[19]
 
 
 124
 Hall's argument assumes more substance when viewed in light of the second traditional argument usually attributed to Justice Holmes:[20]
 
 
 125
 The true explanation of the rule is the same as that which accounts for the law's indifference to a man's particular temperament, faculties, and so forth. Public policy sacrifices the individual to the general good. . . . It is no doubt true that there are many cases in which the criminal could not have known that he was breaking the law, but to admit the excuse at all would be to encourage ignorance where the law-maker has determined to make men know and obey. . . .
 
 
 126
 Holmes is not speaking of encouraging ignorance of the law-breaker but of encouraging ignorance of others. A failure to punish an actor might not be inconsistent with concepts of moral blameworthiness but very well might undermine the central purpose of the criminal law "to induce external conformity to rule."[21]
 
 
 127
 Holmes properly applies his argument in light of the purposes of the criminal law. The law in imposing absolute liability is not concerned with individual justice to the wrongdoer but with the interests of the injured party or his surviving kin and with the general reaction in society (both potential wrongdoers and those sympathetic with the injured party) to a failure to punish the act. The subtle question of the wrongdoer's intent is certainly of marginal interest to these citizens and their perception of the seriousness with which the criminal law accomplishes its purposes. Furthermore, by placing the wrongdoer in custody he may be prevented from committing more innocent, yet reprehensible acts in the future. The purpose of the criminal law is to protect society from harmful acts and if this interest were unbounded by other social interests there could be no limit to the amount or occasion of criminal punishment if it caused some marginal perception of a decrease in the incidence of harmful acts.[22] In light of this purpose of the criminal law the existence of excusing conditions might seem anomalous indeed since it is the individuals who most likely will benefit from an excusing condition that need the greatest amount of "deterrence."
 
 
 128
 The law does not fully accept this position and, to my mind, rightly so as the following countervailing arguments suggest. It does not seem realistic to assume that a purely objective criminal sanction will deter harmful acts by those who by definition did not think their actions were proscribed by law or otherwise lacked the free choice not to perpetrate those harmful acts. This is not merely an empirical statement, as the assertion that an absolute sanction will increase deterrence is not, since no evidence upon which the truth or accuracy of these propositions does exist or could exist. To determine the guilt or innocence of one person on the basis of the effect of that determination on others seems inconsistent with the concept that human beings should not be used as means to an end, but are ends in themselves.[23] Furthermore, to determine the guilt or innocence of an individual on the basis of a prediction of future dangerousness involves the making of assumptions about individuals without a sound empirical basis,[24] and would thus be inconsistent with modern notions of due process.[25] To effect retribution upon an individual without consideration of his state of mind seems too barbarous for discussion and in any event the law has moved beyond retribution as a prime justification for the criminal sanction.[26]
 
 
 129
 The question thus posed by these competing lines of argument is the extent to which the law accepts the concept of the free choice to do wrong as the basis for criminal liability. Holmes correctly recognized this fundamental question when he stated:[27]
 
 
 130
 If punishment stood on the moral grounds which are proposed for it, the first thing to be considered would be those limitations in the capacity for choosing rightly which arise from abnormal instincts, want of education, lack of intelligence, and all the other defects which are most marked in the criminal classes.
 
 
 131
 There is, to be sure, somewhat of a "regrettable peremptoriness of tone"[28] to this statement inconsonant with modern sensibilities, but it phrases the question as bluntly as it should be phrased. Holmes rejects the notion that the law is enacted and administered solely on the moral grounds he has noted. However, few today would seriously dispute Judge Tuttle's observation that "the only way the law has progressed from the days of the rack, the screw and the wheel is the development of moral concepts . . . ."[29] There is no reason to believe that this development ended in 1881. Thus, it may be seen that the tension between the two bodies of argument discussed above produces a delicate accommodation between interests of social order and individual rights, between vengeance and moral concepts of guilt. The law does not resolve these arguments. They exist in a perpetual but shifting balance producing disparate and at times illogical answers to various issues of criminal responsibility. The balance to be struck at any one point in time must not be gleaned from logical analysis of these arguments alone, but from conventional morality the commonly held views of the people in the American community as viewed through their legal and political tradition.[30]
 
 
 132
 The third traditional argument against a defense of mistake of law is more directly a concern of judges alone. It was stated by John Selden: "Ignorance of the law excuses no man; not that all men know the law, but because it is an excuse every man will plead, and no man can tell how to confute him."[31] The gravamen of this argument is that the state of our knowledge is insufficient to detect the difference between a genuine mistake and a feigned mistake. It expresses as well as can be expressed a fear that opening up the law to potentially difficult and unfamiliar information will destroy its orderliness and lead to manipulation of its rules. However, the argument is ultimately unpersuasive for reasons best expressed by Justice Holmes.[32]II.
 
 
 133
 The tension between the arguments in favor of absolute liability and the arguments in favor of liability based only on the free choice to do wrong has produced some movement toward recognition of a defense of mistake of law in limited circumstances. The issue really posed by defendants' contention is whether these "exceptions" might be extended to cover the proposed defense of Barker, Sturgis, Martinez and Gonzalez. This question is not to be resolved by an a priori choice among the arguments discussed in Part I above. Rather such an extension requires a process of close analogy between the proposed exception defendants would create and the presently recognized exceptions to the concept of absolute liability. If no significant distinctions emerge from this comparison, we would be justified in recognizing the defense if, of course, we were satisfied that result was consistent with the conventional morality. It is in this manner that the doctrine of stare decisis channels and controls judicial discretion without embedding legal rules in concrete.
 
 
 134
 I begin by comparing the defense proposed by Barker et al. with the so-called "mistake of fact" defense, which is merely an extension of the notion that accidental commission of a crime is a defense to most criminal charges. The justification offered for the distinction between mistakes of fact and law is that mistakes of fact are particular to the incident and often cannot be foreseen and prevented through the exercise of reasonable diligence.[33] However valid this distinction might be when applied to ignorance of the existence of a particular law, it certainly has much less validity when applied to reasonable mistakes in the application of legal principles to a particular factual situation. The distinction between "law" and "fact" in such circumstances is tenuous indeed as our experience in the field of administrative law and in defining the scope of jury questions would indicate. For example, if a person mistakenly believes another person is acting "negligently" or "recklessly", is his mistake upon which we may assume he has predicated a criminal action one of fact or law? The problem created by this question has seemingly resulted in the extraordinary holding that a mistaken claim of private right of ownership is a mistake of fact.[34]
 
 
 135
 Against this background, the leading case of People v. Weiss, 276 N.Y. 384, 12 N.E.2d 514 (1938) assumes a different significance. To be sure, Weiss can be distinguished on the basis of legislative intent. But what is the principle upon which this legislative intent is based? In Weiss the principle motivating the legislature and which the court itself reasons out is that a mistake concerning the defendant's lawful authority negatives the requisite criminal intent. The statute itself is a recognition of a mistake of law defense and thus is itself a source of law as much certainly as a case.[35] Whether the principle of the statute is to be applied beyond its immediate intent is simply a question of whether the principle otherwise persuades us or may be distinguished from the situation sub judice. The fact that Section 1250 of the New York Penal Law in effect in 1938 is not operative in the District of Columbia in 1972 is not sufficient ground to distinguish its principle.[36]
 
 
 136
 The issue thus framed is whether Weiss, when viewed against the background of the attenuated distinction between fact and law, convinces us that the defendants have alleged a legally cognizable defense. First, it would seem that their defense is factually indistinguishable from Weiss and does involve a case where the distinction between fact and law is more "nice than obvious"[37] in that it depends on the authority of one who could reasonably be viewed as a government agent.[38] Judge Wilkey's dissent presents the factual material in support of this proposition. Second, it would seem that the mistake of fact defense, at least when concerned with a reasonable mistake,[39] is firmly settled in common morality. The limited exception proposed by the defendants would not, it would appear, significantly depart from the principle of conventional morality which finds recognition in the defense of mistake of fact. Furthermore, I have previously stated my view that the criminal law should be opened up to new behavioral information to better approximate, in limited situations, the ideal that the law punishes only the free choice to do wrong.[40] I, therefore, agree with the dissents to the extent they find that the defendants have alleged a valid defense.
 
 III.
 
 137
 Even if I did not agree with the dissents on this point, I would still think that, but for their waiver by plea of guilty, the defendants should not be precluded from asserting their invalid defense to the jury. There are many "escape valves" in the law which permit largely unreviewable discretion for certain officials to mitigate harshness caused by the law's inability to meet its highest ideals, including the ideal of punishing only the free choice to do wrong. Those escape valves are sentencing discretion,[41] prosecutorial discretion,[42] pardon and parole discretion,[43] and jury nullification discretion.[44] The first three forms of discretion have a long tradition of recognizing mens rea defenses as grounds for mitigation of punishment or for vindication of the offender.[45] Indeed, the early common law view was that an individual who accidentally killed another was guilty of murder but was entitled to a pardon as of right![46] This "minimalist" approach[47] to the problem of criminal responsibility has found approval in this Court.[48] In a previous opinion, I have indicated that jury nullification is a permissible escape valve and should be forthrightly recognized as such.[49] Since the Court is en banc, I would adhere to those views.
 
 
 138
 Despite these views, I remain convinced that the convictions should be affirmed on the basis of the Court's opinion.
 
 MacKINNON, Circuit Judge (dissenting):
 
 139
 The majority opinion accurately recounts the facts and aptly states many of the relevant points of law. I concur in its conclusion that appellants' motions to withdraw their guilty pleas are to be judged by the "fair and just" standard. Majority Op., Part II. However, it is my opinion that the majority errs in its application of that standard to the present case.
 
 I.
 
 140
 The majority bases its decision on appellants' eight-month delay in asserting their defenses by moving to withdraw the guilty pleas, the unreasonableness of their beliefs that national security reasons prevented them from raising their defenses at trial, the fact that they deceived the court on allocution, and the prejudice to the Government if it must retry appellants at this late date. I shall answer each argument in turn.
 
 
 141
 The eight-month delay is explainable. It took that long for appellants to obtain sufficient information to realize that they were uninformed on critical facts when they entered the plea. Pleas entered in ignorance of material facts are not knowingly entered. It took the United States Government even longer to uncover certain material facts. Some facts that were very material to these defendants and to the validity of their pleas of guilty did not surface until about November 5, 1974, a year after the trial court on November 7, 1973, denied appellants' motions to withdraw their pleas. I refer to the discovery of Hunt's November 14, 1972, memorandum to his then attorney, William O. Bittman.[1] This piece of evidence alone might be sufficient to prove that appellants' pleas were involuntary since they were induced by the improper payment of money to others and by an unlawful conspiracy to obstruct justice.
 
 
 142
 Appellants allege that they believed at the time they entered their guilty pleas that "national security" concerns prevented them from disclosing their defense relating to the authority for their acts. They claim to have developed this belief by observing the actions of their co-defendant, Hunt, and correlating these observations with their knowledge of the expected behavior of espionage agents when captured on an unsuccessful mission. The majority opinion concludes that any beliefs they may have developed in this way were refuted by the fact that they were being prosecuted by the Government and by the Government's proof at trial that the break-in had only domestic purposes. To the contrary, these facts were consistent with their belief that the Government was unable to disclose their true purpose and thus was compelled to prosecute and conceal national security matters by proving only domestic purposes.
 
 
 143
 The majority opinion finds that appellants acted unreasonably by not contacting other Government officials in order to confirm their beliefs. However, "footsoldiers" such as appellants could hardly be expected to know which officials would be privy to national security matters. It certainly seems reasonable that they would rely instead upon a signal from their supervisor who had provided their previous orders. The majority's position indicates a lack of understanding of the discipline of spies and the great force of character of appellants.
 
 
 144
 The majority opinion argues that appellants should be held responsible for failing to apprise the court of their beliefs in camera and finds their deliberate deception of the trial court on allocution to be an additional reason to deny withdrawal of the guilty pleas. A federal judge is not necessarily any more to be trusted with, or authorized to receive, top secret material affecting national security than is any other unauthorized person.[2] In any event, the important factor is the reasonableness of appellants' belief that disclosure to the court was also prohibited. The contention that appellants should have known enough to disclose their national security concerns to the court in camera (Majority Op., --- U.S.App.D.C. at ---, 514 F.2d at 225) is overly fanciful and is exactly the type of knowledge that this court has traditionally not required of defendants in other criminal cases. In its response to the earlier proposed plea bargains and by various other actions, the trial court had made it clear that it was seeking to cause a full disclosure of all facts surrounding the break-in. This was exactly what appellants believed they had a duty to prevent. In light of their beliefs at the time, it would hardly have been reasonable for them to approach the court with their concerns regarding "national security." Their refusal to answer truthfully on allocution was simply a further implementation of what they believed to be their duty as captured agents.
 
 
 145
 The inconvenience to the Government in being required to renew its prosecution of appellants is certainly a weak reed on which to base the denial of the withdrawal motions especially in a criminal case. The convenience of the Government is of no higher dignity than appellants' rights to present a valid defense to a criminal charge. The possibility of intervening prejudicial publicity and the taking of immunized testimony will of course create certain difficulties at a renewed trial, but the courts have well-developed mechanisms for dealing with such problems. Rather than causing the loss of evidence or witnesses, the delay has permitted the development of large amounts of evidence which will enable both the Government and appellants to better prepare their case for trial. Finally, if the defenses raised by appellants are recognized, a second trial might be unnecessary. Where the possibility exists that a criminal defendant has valid defenses which were not raised as a result of a guilty plea, the mere fact that the Government may find a retrial somewhat more difficult than the original trial should not by itself justify denial of presentencing motions to withdraw the plea.
 
 
 146
 One further point needs exposure the contention that appellants' guilty pleas cannot be withdrawn because they were entered with the advice of counsel, albeit against the advice of appellants' prior counsel, and because they had a facial appearance of being voluntary. As the majority notes, Judge Sirica made a very exhaustive and thorough inquiry into the voluntariness of the pleas. In response to his inquiries, Judge Sirica received answers which indicated to him, and which at the time would have led any judge to believe, that appellants' pleas were voluntary. The judge's conduct in this respect cannot be faulted in any way. However, time and circumstances have revealed appellants' involvement with men who had reason to encourage guilty pleas (even purchase guilty pleas, it is alleged) in an effort to suppress facts which might have surfaced at a trial. Also appellants entered their pleas and answered Judge Sirica's questions in ignorance of the accuracy of Hunt's factual representations and the pressures brought to bear upon Hunt and the other co-defendants whose lead they were accustomed to follow.
 
 
 147
 The Government's arguments also demonstrate a manifest inconsistency. It presently is prosecuting others for obstructing justice in improperly securing these very guilty pleas and simultaneously it insists that these four victims of such obstructive tactics entered voluntary pleas, though it is admitted they were unaware of subtle, allegedly improper pressures which may have induced those pleas. The Government cannot have it both ways. It cannot both assert that the defendants in United States v. Mitchell, et al.[3] obstructed justice by unlawfully causing appellants to enter guilty pleas in this case and refuse to recognize that such unlawful conduct caused the guilty pleas in these cases to be entered unknowingly and involuntarily.
 
 
 148
 While the average citizen may not have chosen to follow appellants' course of action in this situation, to my mind it was not unreasonable for persons with appellants' background and training to believe that they were involved in a national security affair and that it was their duty to go to prison to avoid disclosure of what they knew concerning it. Their actions in court were consistent with and can be explained by this belief. They acted to withdraw their guilty pleas only after sufficient evidence had been produced to conclusively demonstrate to them that their belief had been erroneous. Applying the "fair and just" standard, as formulated by the majority, to the facts of this case, I conclude that this is a proper case for the court to permit withdrawal of a guilty plea when a legally valid defense is asserted.
 
 
 149
 The majority found it unnecessary to reach the legal validity of appellants' asserted defenses. As I dissent from the conclusions with respect to waiver of these defenses by delay and misconduct, I now turn to a consideration of their merits.
 
 II.
 
 150
 Barker, Martinez, Sturgis and Gonzalez, four refugees from the terror of Castro's Cuba, allege in their affidavits that they were led to believe by Hunt that they were to work for "a secretly sponsored government intelligence agency" seeking to photograph documents containing "financial information . . . indicating Cuban communist money was going into the Democratic campaign . . . ."[4] Hunt, their senior officer in the abortive CIA-sponsored invasion of the Bay of Pigs, had an office in the White House at the time the operation was conceived. In order legally to accept or solicit money directly or indirectly from a foreign government, the Democratic Party would have to be registered with the Attorney General as an "organization subject to foreign control which engages in political activities"; failure to register would be a crime punishable by imprisonment for not more than five years or a fine of not more than $10,000, or both. 18 U.S.C. § 2386.[5] The Democratic Party was not registered under this statute. Thus Hunt's representations, on their face, plausibly conveyed to the appellants that they were legitimately attempting to assist the United States Government in uncovering evidence of criminal violations of its national security laws involving a foreign power.
 
 
 151
 Each appellant alleges he believed that he was participating in "an authorized government intelligence operation." (Emphasis added.) Such a conclusion would be reasonable for anyone dealing with a person who has a White House office regarding a matter involving national security. Barker states that he relied upon Hunt's representations as to "his authority" (his White House office certainly corroborated this conclusion) and the fact that the operation "had been secretly sponsored by a government intelligence agency of this country . . . ."[6] Martinez alleges he was led to believe that "this was a government operation."[7] He was also on a CIA retainer at the time. Because both men had previously been employed by the Government to make a surreptitious entry into Dr. Fielding's office in California, an operation prompted by Daniel Ellsberg's alleged violation of national security laws in the so-called "Pentagon Papers" case, the credence given by Barker and Martinez to Hunt's representations was understandable. Similarly, Sturgis alleges in his affidavit that he believed the Watergate operation had been "secretly sponsored by a government intelligence agency of this country" and that "this was an approved agency operation."[8] After the break-in, he remained convinced "that the operation he had participated in was an authorized government intelligence operation."[9] Gonzalez' affidavit is substantially the same as that of Sturgis. Appellants assert that this mistake as to their authorization would be a defense to the crimes charged.
 
 
 152
 Mistake of fact is a valid defense to a criminal charge when the defendant's acts would not be criminal if the facts were as he supposed them to be.[10] It is possible to characterize appellants' mistake as a mistake of fact i. e., a mistake as to the fact that all necessary authorization for their activities had been obtained.[11] The affidavits demonstrate that these men presumed they were acting for the Government in a duly authorized and approved intelligence activity.[12] Their reliance on their superiors was broad enough to include a belief that all necessary approval and authorization from government agencies, including the courts, had been obtained. Nothing in the record indicates that they were aware that all legal requirements had not been met. Our courts regularly authorize and approve wire tapping, eavesdropping and surreptitious entries in similar situations, and tactics such as appellants employed are used by government agents even in the investigation of common crimes. A recent record in this court documents confidential court orders which authorize government agents to "Intercept wire communications (etc. and to) install and maintain an electronic eavesdropping device within the (room of a building at a specific address) to intercept (certain specified) oral communications . . . concerning (certain) described offenses. Installation of the above described eavesdropping device may be accomplished by any reasonable means, including surreptitious entry or entry by ruse" (i.e. by burglary minus criminal intent. Cf. D.C.Code § 22-1801). The same statute under which courts authorize such wire tapping and bugging explicitly affirms "the constitutional power of the President to take such measures as he deems necessary . . . to obtain foreign intelligence information deemed essential to the security of the United States . . . ."[13] This is a clear recognition by Congress that the President possesses additional power and authority in this area. Information that Castro's communist regime was contributing to the Democratic National Committee would be "foreign intelligence information" within the meaning of the statute.
 
 
 153
 The New York Court of Appeals decision in People v. Weiss, 276 N.Y. 384, 12 N.E.2d 514 (1938), is indistinguishable from the present case and is the leading case for the proposition that a mistake as to the authority of an apparent official is a defense in a criminal case. There a man purporting to be a detective and displaying a state secret service badge approached two citizens and requested assistance in the arrest of an individual he described as a murderer. In good faith and in the belief that they were performing their duty, both citizens assisted the stranger in the arrest and detention of a man who proved to be entirely innocent. The citizens were charged with kidnapping, and the trial court refused the proffer of evidence of their good faith mistake. The Court of Appeals reversed the trial court on this evidentiary ruling, stating:
 
 
 154
 If in good faith they believed that they were acting within the law, there could have been no intent to act "without authority of law." Their belief or disbelief indicates intent or lack of it, Wallace v. United States, 162 U.S. 466, 477, 16 S.Ct. 859, 40 L.Ed. 1039, and they were entitled to testify in respect to their intent based upon their belief, People v. Flack, 125 N.Y. 324, 335, 26 N.E. 267, 11 L.R.A. 807; Dehn v. Mandeville, 68 Hun. 335, 337, 22 N.Y.S. 984.
 
 
 155
 No matter how doubtful the credibility of these defendants may be or how suspicious the circumstances may appear, we cannot say as matter of law that, even in so strong a case as this for the prosecution, the jury was not entitled to consider the question whether defendants in good faith believed that they were acting with authority of law. We are, therefore, constrained to reverse the judgment of conviction and order a new trial for the purpose of submitting that question of fact to the jury.
 
 
 156
 12 N.E.2d at 515-16 (emphasis added); see also 1 Wharton's Criminal Law and Procedure § 157 (1974 Cumm.Supp.). The facts in Weiss suggest that a warrant for the arrest of the alleged murderer could previously have been obtained, but the court did not require the defendants to assert or prove that they had asked the spurious policeman if he had taken that step. Weiss is solid authority for the conclusion that appellants' reliance on their superiors for authorization of their activities would present a valid mistake of fact defense.
 
 
 157
 Appellants' affidavits, which on appeal must be accepted, set forth sufficient grounds for a reasonable belief in the fact that they were performing a legitimate, approved and authorized government operation: their prior associations with Hunt, his connection with the White House and the CIA, Martinez' retainer by the CIA, and the furnishing of identification documents by the CIA, all lent credibility to this belief. Thus appellants had reasonable grounds for a good faith reliance on Hunt's factual representations. To require a greater showing of good faith is to change the law on mistake of fact.
 
 
 158
 It may be argued that appellants were mistaken as to the fact of their authorization but still lack a defense since they engaged in activity which could not be legally authorized. However, any determination that warrantless bugging of a domestic organization could never be legally sanctioned would be a post hoc conclusion. Ever since the Presidency of Franklin Delano Roosevelt, and possibly since the time of President Wilson,[14] the Government has construed the law to permit warrantless electronic surveillance as a lawful and reasonable exercise of the presidential (executive) power to safeguard the national security from domestic as well as foreign threats. Not until June 19, 1972, two days after the Watergate break-in, did the Supreme Court for the first time reject this claim and use of executive power. See United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).[15] These four men can hardly be held to a prophetic knowledge of constitutional law and to a standard not met by any President or Attorney General or other individual in the executive branch of the Government since the New Deal era.[16]
 
 
 159
 Although the foregoing argument may establish the existence of a valid defense, it is unnecessary to engage in the relatively difficult determination whether appellants' mistake as to the authorization for their actions is a mistake of fact. As a general rule, ignorance of the law is no excuse to a criminal offense. However, this general rule concerning mistake of law does not apply where a specific intent is essential to constitute the crime charged and a reasonable mistake of law negates the existence of such intent.[17] The general rule is likewise inapplicable in a case where the law is not settled, is obscure or is susceptible of more than one reasonable construction.[18]
 
 
 160
 Appellants pled guilty to burglary, possession of listening and wire tap devices, attempting to intercept oral and wire communications, and conspiracy to commit these offenses.[19] The crime of burglary requires that an entry be made with the specific intent to commit a crime. Since the activities following the entry would not have been a crime if the authorization appellants believed existed actually existed, their mistake of law would negate the required specific intent. The remaining offenses require "willfulness" which may also be negated by a bona fide mistake of law. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933); Yarborough v. United States, 230 F.2d 56 (4th Cir.), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956). Thus even assuming that appellants' mistake was one of law rather than of fact, i. e., a mistaken belief that authorization for national security wire tapping of a domestic organization could legally be obtained, that mistake could negate a necessary element of each offense charged and would therefore be a legally valid defense. It is of course unnecessary for us to determine at this point whether appellants' asserted defenses will ultimately prove to be good defenses to the charges since it is sufficient for withdrawal of the guilty pleas that appellants merely raise defenses which will be legally valid if proven at trial to exist.
 
 
 161
 The present case may also fall within the exception to the general rule where the law is unsettled or obscure. It is an understatement to assert that the law regarding wire tapping in national security cases was not settled at the time of the Watergate break-in. Presidents and Attorneys General had participated in such activity for over thirty years and had uniformly asserted its validity. There was no opinion by the Supreme Court to the contrary until two days after the instant offenses.
 
 III.
 
 162
 One United States District Judge in this circuit has already considered and determined what effect and influence some of the misrepresentations and pressures referred to above had on two of the appellants. On July 31, 1974, Judge Gesell adjudged sentences upon Barker and Martinez for their role in the Fielding (Ellsberg) break-in in Los Angeles. See United States v. Ehrlichman, Liddy, Barker and Martinez, U.S. District Court, District of Columbia, Criminal No. 74-116. He summed up the relationship of these two "footsoldiers" to their superiors in a sentence:
 
 
 163
 "You were duped by high Government officials."
 
 
 164
 Sentencing Transcript, U.S. District Court, District of Columbia, Criminal No. 74-116, July 31, 1974, p. 10. The court then suspended any sentence and placed Barker and Martinez on probation for a three-year period. Judge Gesell's finding that these men were duped seems equally applicable to their roles, and to those of Sturgis and Gonzalez, in the Watergate break-in. The two clandestine operations had much in common and all the participants in the Ellsberg operation also participated in the Watergate operation under much the same inducement. That "dupes" could possess the criminal intent necessary to support charges of burglary and conspiracy is conceivable, but on these facts it is highly improbable. The finding that they were "duped" is practically equivalent to finding that they did not possess the requisite criminal intent. An even greater leap of faith is required to find that guilty pleas entered by "dupes" under potentially great associational, moral and economic pressure were voluntary. The only "fair and just" conclusion is to allow appellants to withdraw their pleas and assert their defense of mistake in a second trial. The defense may prove unsuccessful, but that decision does not properly lie with this court at this time.
 
 
 165
 It is apparent that the majority fails to recognize the high character and estimable motives of these four individuals. These men are super-patriots; they have been and remain willing to martyr themselves in the liberation of Cuba from communist rule. They have acted from the purest of motives and in the utmost good faith. These men did not intend to steal. They sought only intelligence oral conversations and photographs of letters and documents which they were to take on the premises. The burglary (surreptitious entry and by ruse)[20] is part and parcel of the authorization for most bugging and wire tapping operations. See discussion at page 9 supra.
 
 
 166
 Both the majority and the prosecutor recognize that these offenses are essentially political. While "custom and practice" is no defense, the political-criminal nature of the charges and the apparent prevalence of such intelligence activity should be parameters in the equation by which the criminal intent of the appellants is judged.[21] What the majority does here, in effect, by failing to recognize the validity of their asserted defenses, is to hold these appellants criminally responsible for not specifically inquiring whether Hunt had obtained the written authorization required by the Act of June 19, 1968,[22] or determining that they were operating in a project that was within the recognized exemptions of that statute.[23] This demands of them a prescient knowledge of constitutional law and of our legal system. Hunt's representations reasonably conveyed the impression that the Watergate operation was duly authorized and approved. Greater reliance is not required to support a claim of mistake of fact or to come within the recognized exception to mistake of law.
 
 
 167
 At the very least appellants are entitled to an evidentiary hearing on their allegations, which was denied them. See Majority Op., --- U.S.App.D.C., p. ---, 514 F.2d, p. 248.
 
 
 168
 I accordingly dissent.
 
 APPENDIX
 
 169
 _______ng
 
 THE WHITE HOUSE WASHINGTON
 
 170
 CONFIDENTIAL MAY 21, 1940
 
 MEMORANDUM FOR
 THE ATTORNEY GENERAL
 
 171
 I have agreed with the broad purpose of the Supreme Court decision relating to wire-tapping in investigations. The Court is undoubtedly sound both in regard to the use of evidence secured over tapped wires in the prosecution of citizens in criminal cases; and is also right in its opinion that under ordinary and normal circumstances wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights.
 
 
 172
 However, I am convinced that the Supreme Court never intended any dictum in the particular case which it decided to apply to grave matters involving the defense of the nation.
 
 
 173
 It is, of course, well known that certain other nations have been engaged in the organization of propaganda of so-called "fifth columns" in other countries and in preparation for sabotage, as well as in actual sabotage.
 
 
 174
 It is too late to do anything about it after sabotage, assassinations and "fifth column" activities are completed.
 
 
 175
 You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices direct to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens.
 
 
 176
 (s) F. D. R.
 
 
 177
 OFFICE OF THE ATTORNEY GENERAL WASHINGTON, D.C.
 
 July 17, 1946
 
 178
 The President,
 
 
 179
 The White House.
 
 My dear Mr. President:
 
 180
 Under date of May 21, 1940, President Franklin D. Roosevelt, in a memorandum addressed to Attorney General Jackson, stated:
 
 
 181
 "You are therefore authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigating agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies."
 
 
 182
 This directive was followed by Attorneys General Jackson and Biddle, and is being followed currently in this Department. I consider it appropriate, however, to bring the subject to your attention at this time.
 
 
 183
 It seems to me that in the present troubled period in international affairs, accompanied as it is by an increase in subversive activity here at home, it is as necessary as it was in 1940 to take the investigative measures referred to in President Roosevelt's memorandum. At the same time, the country is threatened by a very substantial increase in crime. While I am reluctant to suggest any use whatever of these special investigative measures in domestic cases, it seems to be imperative to use them in cases vitally affecting the domestic security, or where human life is in jeopardy.
 
 
 184
 As so modified, I believe the outstanding directive should be continued in force. If you concur in this policy, I should appreciate it if you would so indicate at the foot of this letter.
 
 
 185
 In my opinion, the measures proposed are within the authority of law, and I have in the files of the Department materials indicating to me that my two most recent predecessors as Attorney General would concur in this view.
 
 
 186
 Respectfully yours,
 
 
 187
 /s/TOM C. CLARK Attorney General
 
 July 17, 1947 (sic)
 
 188
 I concur.
 
 
 189
 /s/ HARRY S. TRUMAN
 
 
 190
 _______Y S
 
 ADMINISTRATIVELY CONFIDENTIAL
 THE WHITE HOUSE WASHINGTON
 June 30, 1965
 
 191
 MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES
 
 
 192
 I am strongly opposed to the interception of telephone conversations as a general investigative technique. I recognize that mechanical and electronic devices may sometimes be essential in protecting our national security. Nevertheless, it is clear that indiscriminate use of these investigative devices to overhear telephone conversations, without the knowledge or consent of any of the persons involved, could result in serious abuses and invasions of privacy. In my view, the invasion of privacy of communications is a highly offensive practice which should be engaged in only where the national security is at stake. To avoid any misunderstanding on this subject in the Federal Government, I am establishing the following basic guidelines to be followed by all government agencies:
 
 
 193
 (1) No federal personnel is to intercept telephone conversations within the United States by any mechanical or electronic device, without the consent of one of the parties involved. (except in connection with investigations related to the national security).
 
 
 194
 (2) No interception shall be undertaken or continued without first obtaining the approval of the Attorney General.
 
 
 195
 (3) All federal agencies shall immediately conform their practices and procedures to the provisions of this order.
 
 
 196
 Utilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem, which raises substantial and unresolved questions of Constitutional interpretation. I desire that each agency conducting such investigations consult with the Attorney General to ascertain whether the agency's practices are fully in accord with the law and with a decent regard for the rights of others.
 
 
 197
 Every agency head shall submit to the Attorney General within 30 days a complete inventory of all mechanical and electronic equipment and devices used for or capable of intercepting telephone conversations. In addition, such reports shall contain a list of any interceptions currently authorized and the reasons for them.
 
 
 198
 /s/ LYNDON B. JOHNSON
 
 
 199
 _______ON
 
 DEPARTMENT OF JUSTICE
 November 3, 1966
 MEMO NO. 493
 TO: All United States Attorneys
 FROM: Ramsey Clark
 Acting Attorney General
 
 200
 * * * Present practice, adopted in July 1965 in conformity with the policies declared by President Johnson on June 30, 1965 for the entire Federal establishment, prohibits the installation of listening devices in private areas (as well as the interception of telephone and other wire communications) in all instances other than those involving the collection of intelligence affecting the national security. The specific authorization of the Attorney General must be obtained in each instance when this exception is invoked. Intelligence data so collected will not be available for investigative or litigative purposes. (Emphasis added.)
 
 WILKEY, Circuit Judge (dissenting):
 
 201
 Judge Wright's opinion for the majority dramatically and accurately describes the four Cuban-American appellants as "the foot soldiers of the Watergate Break-in." That characterization, in the context of this case, naturally prompts the question: How much do the "foot soldiers" customarily know of the plans and purposes of their High Command? This question epitomizes the issue which confronted Judge Sirica when the appellants sought to withdraw their pleas of guilty, and is at the core of their appeal here.
 
 
 202
 As "foot soldiers," they took no part in planning the Watergate break-in and were informed only vaguely of its purpose. Their willingness to enlist in the operation and help carry it out under these conditions derived primarily from their staunch faith in one man, E. Howard Hunt. Revered in Miami's Cuban-American community as an active participant in the fight to liberate Cuba, Hunt carried high White House and CIA credentials. The appellants had no reason to doubt his assertion that he was part of a special intelligence unit, or to question his authority to order clandestine operations for "national security" reasons. Long experience with the CIA, and in secret missions directed against the Castro regime, had taught the appellants the importance of complete reliance on, and obedience to, their supervisor. They were accustomed to operate on a "need-to-know" basis. It did not occur to them to second-guess Hunt's decisions, let alone question his authority.
 
 
 203
 On 15 January 1973, following Hunt's lead, the appellants pleaded guilty to all counts charged against them in connection with the break-in. It was clear to them that neither Hunt nor the government wanted the "national security" origins of this or other operations in which they had participated disclosed; thus, it was their duty not to raise a defense based upon their belief in the authorized nature of the break-in. On 14 September 1973, prior to final sentencing but after the Senate Watergate hearings of that summer had exposed the true origins of the break-in, and the motivation of the principals the appellants moved to withdraw their guilty pleas. Their grounds were essentially two: (1) they had a legally valid defense to the charges against them, based on their mistake as to Hunt's authority;[1] (2) their guilty pleas were entered involuntarily, because based upon a belief that national security considerations required their silence. The appellants submitted extensive affidavits in support of their motion. On 7 November 1973, without an evidentiary hearing on the appellants' factual assertions and without opinion,[2] Judge Sirica denied the withdrawal motions.
 
 
 204
 The majority, with the exception of Chief Judge Bazelon, do not reach the question whether the appellants have a valid defense. They hold instead that, even if the appellants can prove their innocence, under the circumstances Judge Sirica did not abuse his discretion in denying the motion. This is hard to accept.
 
 
 205
 Although the decision whether to allow the withdrawal of a guilty plea is always discretionary with the trial judge,[3] the federal courts have consistently held that presentence motions should be granted whenever such appears "fair and just."[4] I agree with the majority's conclusion that this is the proper standard by which to judge the withdrawal motion filed in the instant case. Yet, under this standard, the most important factor to be weighed is whether the movant has tendered a valid defense.[5] As the majority summarizes the case law, "where the motion does assert legal innocence, presentence withdrawal should be rather freely allowed."[6]
 
 
 206
 The reason for this rule of great liberality in granting presentence withdrawal motions is evident. No due process guarantee is more cherished than the right of the individual to a trial, in which he may confront his accusers and present a defense to the criminal charges against him. Where a defendant's motion asserts a legally valid defense, only the most compelling of societal interests can justify a court in denying that motion and knowingly sending a possibly innocent man to prison. There are few cases where such a man ought not be allowed to withdraw his guilty plea, before sentencing, under the "fair and just" standard.
 
 
 207
 As Part II of this opinion explains in detail, the appellants in the instant case have presented a potentially successful defense, amply supported by affidavit, to the charges against them. Thus, they have fulfilled the most important requirement for withdrawal of their guilty pleas. The majority takes the position, however, that regardless whether the appellants are in fact innocent of the crimes attributed to them, they must be held to their earlier pleas because they have not presented adequate justification for delaying the assertion of their innocence. It is to this position that I must register a strong dissent. On the facts of this case it is clear beyond doubt why they delayed or were delayed until September 1973 in asserting their innocence. It appears equally clear to me that fairness and justice require that the appellants' withdrawal motions be granted.
 
 
 208
 I. THE ADEQUACY OF APPELLANTS' REASONS FOR DELAYING ASSERTION OF THEIR DEFENSES
 
 
 209
 The majority begins its argument with the unquestionably correct observation that a guilty plea is a "grave and solemn" action,[7] not to be taken lightly or whimsically retracted. If an assertion of legal innocence were always sufficient justification for withdrawal, the majority contends, defendants who entered their guilty pleas for "tactical" reasons could capriciously decide to change their tactics and present their defense to the jury at any time prior to sentencing. In order to provide a check to such "game-playing" with the court and to ensure that the submission of a guilty plea does not become a mere formality, the majority concludes:
 
 
 210
 (A) court, in addressing a withdrawal motion, must consider not only whether the defendant has asserted his innocence, but also the reason(s) why the defenses now presented were not put forward at the time of original pleading.[8]
 
 
 211
 These reasons for "delaying" must then be weighed against countervailing state interests to determine whether allowing withdrawal would be "fair and just" under the circumstances of the individual case.
 
 
 212
 The majority essentially advances two reasons why the appellants should not be allowed a trial in which to assert their defenses.[9] The first is the prejudicial effect the delay between guilty plea and withdrawal motion has had on the Government's ability to prosecute its case.[10] The second is the appellants' deliberate concealment from Judge Sirica during voir dire of their true reasons for pleading guilty. Equipped with these elements of "possible prejudice to legitimate prosecution interests" and "flagrant abuse of judicial processes," the majority assesses the appellants' reasons for delaying the assertion of their innocence and determines that those reasons are inadequate under the circumstances to justify withdrawal of their guilty pleas.
 
 
 213
 The majority's analysis is faulty in at least three regards. First, although the majority weighs the appellants' initial reason for not asserting their innocence viz., their belief that national security considerations required their silence it ignores entirely the reason for the eight-month delay in presenting their defense viz., that it was not until the late summer of 1973 that the appellants could have had enough facts to be assured that the break-in was conceived and executed for purely political purposes. Second, the majority exaggerates both the degree to which the delay has prejudiced the Government's ability to prosecute this case and the extent to which the appellants' dissemblance with Judge Sirica abused judicial processes. Third, the "reasonableness" standard the court sets up for testing the appellants' mistaken belief if, as appears, it is a detached "reasonable man" standard is not only wholly inappropriate on the facts of this case but of questionable validity as applied to all presentence withdrawal motions.
 
 
 214
 A. Appellants' Reasons for Delaying Assertion of Their Defenses
 
 
 215
 When the majority opinion speaks of the appellants' "delay" in presenting their defenses, it uses the term in two senses: first, to describe their initial decision to plead guilty rather than assert their innocence; second, to describe the eight-month gap between their guilty pleas and their withdrawal motions. When the opinion assesses the reasons for the "delay," however, it presents only the explanation for the first decision. No rationale is given for the appellants' determination after eight months to attempt to present their defenses. The impression is left that the "delay" in this latter sense was the product simply of a capricious change in tactics by the appellants.[11]
 
 
 216
 In view of the fact that the prejudice to the Government's ability to prosecute which may have resulted from the eight-month hiatus between plea and motion is the primary argument advanced by the majority for denial of withdrawal, the question whether that delay had a rational basis is of no small moment. The appellants' position gains considerable strength if the inconvenience to the Government is countered not only by an explanation for their original decision to remain silent but also by an entirely consistent reason for allowing eight months to lapse before attempting to change their plea.
 
 
 217
 According to appellants' affidavits,[12] they were convinced at the time of their trial that the break-in had been a clandestine operation sponsored and approved by a legitimate Federal government intelligence agency. They pled guilty because they believed national security interests precluded them from disclosing the nature of their activities, and because they interpreted the guilty plea of their supervisor, Hunt, as a directive that they follow the same course of action. Few facts about the operation were revealed in the months immediately following their pleas of 15 January 1973 which could have given them reason to believe their assessment was incorrect. The Executive's public condemnation of the break-in and disavowals of sponsorship, far from weakening the appellants' position, were consistent with it:
 
 
 218
 What occurred after we were arrested at the Watergate continued to evidence in my mind that what we had engaged in had been a government intelligence operation. When one is apprehended in such an operation one of two things happen. Either you go to jail because the government denies the entire thing or you are not incarcerated because the government makes secret arrangements or publicly acknowledges responsibility for the operation. Those who have been apprehended have no choice in that decision. If the government does not acknowledge responsibility then assistance is provided in the form of expenses, attorneys, and financial help for the families.[13]
 
 
 219
 True to the appellants' perception, attorneys and financial aid were provided them, through Mrs. Hunt, despite the Executive's denial of any responsibility for the operation.[14]
 
 
 220
 On 23 March 1973, when the appellants were provisionally remanded to the custody of the Attorney General for an in-depth study to assist the court in imposing sentence,[15] Judge Sirica read to the courtroom a letter to him from defendant James McCord. In pertinent part, it follows:
 
 
 221
 Certain questions have been posed to me from your honor through the probation officer, dealing with details of the case, motivations, intent and mitigating circumstances.
 
 
 222
 I will state the following to you at this time which I hope may be of help to you in meting out justice in this case:1. There was political pressure applied to the defendants to plead guilty and remain silent.
 
 
 223
 2. Perjury occurred during the trial in matters highly material to the very structure, orientation, and impact of the government's case, and to the motivation and interest of the defendants.
 
 
 224
 3. Others involved in the Watergate operation were not identified during the trial, when they could have been by those testifying.
 
 
 225
 4. The Watergate operation was not a CIA operation. The Cubans may have been misled by others into believing that it was a CIA operation. I know for a fact that it was not.[16]
 
 
 226
 Although this letter fell like a bombshell on the public,[17] it would appear to have supported, more than weakened, the appellants' view that the Executive had required their guilty pleas in order to protect the integrity of a highly sensitive national security matter. The perjury of witnesses and concealment of the involvement of others was certainly consistent with that belief. That the appellants may have been mistaken in thinking the CIA itself had sponsored the operation was not news to them. McCord had asserted as much to the appellants privately before the trial.[18] That CIA tools and identification papers were used for both the Ellsberg and Watergate break-ins,[19] however, indicated to the appellants that those operations at least enjoyed the CIA's cooperation,[20] and buttressed their belief that "he (Hunt) was part of a national security intelligence agency that had greater jurisdiction than both the FBI and CIA."[21] McCord's letter to Judge Sirica, then, was certainly not grounds for the appellants to abandon their position.
 
 
 227
 Moreover, although the Executive officially condemned all attempts to cover up the source of Hunt's authority and the nature of his activities, it was not until 27 April 1973 that the fact of the Ellsberg break-in, an affair closely connected in the minds of the appellants with the Watergate break-in, was revealed to the public.[22] Barker and Martinez had engaged in the former operation in complete reliance on Hunt's representation that it was an authorized national security matter.[23] On 22 May 1973 President Nixon issued a statement, partially reproduced in the margin,[24] which deplored the Ellsberg break-in, but confirmed the appellants' belief that it was the product of a highly secret White House unit, independent of both the CIA and FBI, and authorized by the President "to stop security leaks and to investigate other sensitive security matters." Hunt had recruited the appellants for the Watergate break-in with the assurance that, like the Ellsberg break-in, it involved a highly sensitive question of national security. The President, in his 22 March statement, expressly asserted that the intelligence activities of the "Special Investigation Unit" "had no connection" with the break-in of the Democratic headquarters; but, in view of the participation of the same core group of individuals in both operations, the appellants understandably could have continued to disbelieve the President's disclaimers.
 
 
 228
 From the latter part of May through the first week of August 1973, however, a steady stream of witnesses described to the Senate Select Committee on Presidential Campaign Activities the political climate inside the White House before the 1972 elections and the lengths to which some individuals were willing to go to ensure a smooth re-election for the President. In particular, the Committee, and the public, were informed in detail of the genesis of "Operation Gemstone," characterized in the Committee's Report as "a comprehensive political intelligence-gathering program for CRP (i. e. the Committee to Re-elect the President)."[25] Liddy, Hunt, and McCord, according to the testimony, were all involved with Project Gemstone; and it was out of this program that plans for the Watergate operation arose.[26] The message, after three months of testimony, was clear: if the Executive had attempted to confine the scope of investigation into the break-in, it was not for sensitive national security reasons, but for purely political purposes.
 
 
 229
 Nevertheless, neither Liddy nor Hunt had testified before the Senate Committee during the first stage of its hearings. Incriminating as the testimony had been, it was surely a difficult decision for the disillusioned appellants finally, on 15 September 1973, to move that the District Court allow them to withdraw their guilty pleas.[27] The conclusion that they had been seriously misled that their patriotic silence had not helped the country, but only hurt them could no longer be avoided.
 
 
 230
 When the majority decries the appellants' eight-month delay in seeking withdrawal, therefore, it cannot ignore the events which transpired between the January plea and the September motion. The facts behind the genesis of the Watergate break-in were revealed and are still being revealed with excruciating slowness. It was not until after the end of Phase I of the Senate hearings that the appellants could be certain their initial assessment was wrong. When this highly important factor is placed in the balance, whatever prejudice has resulted to the Government from the eight-month delay becomes much more justifiable. Particularly in view of the fact that no irreparable damage was done to the Government's case, as the next section will explain, the scale of "fairness" and "justice" would appear to tip decidedly in favor of the appellants.
 
 
 231
 B. The Interests Militating Against Acceptance of Appellants' Motions
 
 
 232
 The majority essentially advances two reasons why it would not be "fair and just" to allow the appellants to withdraw their guilty pleas. The first is that the delay between plea and withdrawal motion has substantially prejudiced the Government's ability to prosecute its case. Unquestionably, the delay has inconvenienced the Government. Witnesses and evidence will have to be reassembled for trial and a jury selected. Also, the prosecution will have to show in presenting its case that it has not utilized testimony given by the appellants to the grand jury and to congressional committees pursuant to their receipt of "use immunity."[28] That these requirements have worked a substantial prejudice to the Government's interest, however, is doubtful.
 
 
 233
 Reassembling the case for trial would not appear inordinately difficult. The Government does not contend any witnesses have died or that evidence has been destroyed. Indeed, the balance of advantage is quite the other way: since the time the appellants entered their guilty pleas a great deal of new evidence has come to light. Moreover, the majority exaggerates the difficulty of selecting an impartial jury. It is true that prospective jurors may have been exposed to the publicity surrounding the facts of the original trial; but that publicity was not of the sort which could have predisposed their judgment on the primary issue which would be involved in a new trial. Neither Liddy nor McCord, the only two defendants who went through a full trial, based his defense on a belief that he had been engaged in an authorized national security operation. Additionally, it may be questioned whether at any point during the eight months between the appellants' guilty pleas and their withdrawal motions the public's attention was focused on the participation of the four appellants here, the "foot soldiers" of the break-in. The on-going concern of the media was with the involvement in the affair of high government officials, rather than the motivation of these four recruits.
 
 
 234
 Finally, that the appellants were granted "use immunity" in order to testify before the grand jury and the appropriate congressional committees does not prevent the prosecution from using any and all evidence against the defendants which it could have used in the original trial, and all evidence which it can show is derived from sources independent of the protected testimony.[29] To be required to make such a showing obviously places a burden on the prosecution it would rather avoid, but such inconvenience certainly does not rise to the level of significant prejudice to the prosecution's case. Indeed, it would appear that, far from causing the Government to lose evidence, the eight-month delay has provided both the Government and the appellants with a wealth of new evidence which would greatly enhance the truth-determining process. If the Government is interested in ascertaining the true circumstances of the appellants' involvement, a trial now would be vastly superior to one held in January of 1973.
 
 
 235
 Thus, it is clear that while the appellants' delay in asserting their defenses has in some respects inconvenienced the Government, the prosecution's case has suffered no substantial prejudice. Particularly when balanced against the strong interest in not sending possibly innocent men to jail, the Government's rationale for denying the appellants the opportunity to present their defenses is unpersuasive.
 
 
 236
 The majority's second argument for holding the appellants to their guilty pleas is even more unconvincing. According to the majority, it is important that "appellants' withdrawal motion is premised on claims directly contrary to the representation which appellants made to Judge Sirica during the plea-taking procedure."[30] Since they "willfully abused and misled the court," they should not now be allowed to recant.
 
 
 237
 In the first place, it should be observed that all motions to withdraw guilty pleas are effectively motions to allow the defendant to disclaim his earlier position. Certainly, it tries the patience of trial judges to be told one day that a defendant does not feel he has defenses adequate to support a plea of innocence and the next day that he does have such defenses. Nevertheless, because of the critical constitutional importance of the defendant's right to assert his innocence, even when Rule 11 procedures have been fully complied with, the standard for allowing the withdrawal of a guilt plea remains very lenient.[31]
 
 
 238
 More important, however, in the circumstances of this case, is the fact that the appellants' dissemblance with Judge Sirica was completely in keeping with their perceived duty to keep secret the national security aspects of the Watergate operation. Their purpose was not malicious; they could gain no tactical advantage by it. Viewed from this perspective, the majority's description of the appellants' misdeeds takes on an entirely new light:
 
 
 239
 He (Judge Sirica) asked them if they had ever been employed by the CIA, and they lied that they had not. He asked them if they were pleading guilty for some reason of loyalty, coercion, or inducement, and they lied that they were not. He asked their motives for participating in the break-in, and they retreated into generalities and half-truths.[32]
 
 
 240
 Undeniably, this evasive action by the appellants is important, but not, as the majority contends, because it shows bad faith in their dealings with the court. Rather, it provides persuasive evidence of their good faith belief that national security considerations necessitated their silence. As Barker's affidavit explains:
 
 
 241
 My belief that this was a government operation which was not supposed to be disclosed was reinforced by the questioning by the Court at the time our guilty pleas were entered. In particular, the Court inquired of us whether we had ever worked for the Central Intelligence Agency. For Judge Sirica to ask me to respond in open Court to that question signalled to me that he had not been informed by the government of this fact, was not supposed to know and that I was not supposed to reveal that any more than I was supposed to reveal the nature of the operation itself. I viewed this matter as being the same as regarding Mr. Ellsberg and his case. It was not my position to make any disclosure as to this operation to say nothing of revealing the existence of the Fielding office entry. The government knew about both and the decision as to disclosure was that of the government, not mine.[33]
 
 
 242
 Further evidence that the motive of the appellants was not to mislead the court, but simply to reveal nothing which the "government" did not wish disclosed, is provided by their blanket responses to Judge Sirica's skeptical questioning.[34] They were not artful liars. At one point, Judge Sirica went so far as to state that he did not believe Mr. Barker, when the latter disclaimed knowledge of the origin of the group's expense money.[35] Unquestionably, the judge was exasperated; that he was misled is doubtful.
 
 
 243
 Nor can it be said that the appellants "abused" the judicial process, in the culpable sense of the word. They did not lie to the court for their own ends, or to protect a private individual or group of individuals. If the majority accepts, as it must, appellants' allegation that they believed they were acting at the direction of the government itself, then it should also accept that the appellants lied only to protect the public. It would appear to run counter to both the letter and the spirit of the "fair and just" standard to use the appellants' public-spirited, though mistaken, action as a reason for denying them now the opportunity to prove their innocence.
 
 
 244
 In sum, when balanced against the appellants' fundamental right to a trial, the two rationales advanced by the majority for denying the appellants' motion are far from compelling. The Government has been inconvenienced by the delay, but not substantially prejudiced. The District Court has suffered some aggravation over the appellants' early refusal to reveal all they "knew" about the break-in. Given the appellants' motive, however, it cannot fairly be said that they "abused" the judicial process. Nevertheless, as will be discussed in the next section, it is upon this weak foundation that the majority bases its primary argument for denying the appellants' withdrawal motion.
 
 
 245
 C. The "Reasonableness" of the Appellants' Reason for Delaying the Assertion of Their Defenses
 
 
 246
 The gravamen of the majority's position is contained in the following paragraph:
 
 
 247
 In a case such as this, involving possible prejudice to legitimate prosecution interests, a flagrant abuse of judicial processes by the appellants, . . . we do not think it is a sufficient reason, to merit withdrawal of the guilty pleas, that appellants may in fact have labored under a subjective impression that "national security" considerations required their silence at trial. If subjective impressions, however irrational and unfounded, were enough, any defendant could claim them and thus secure tactical advantages by pleading guilty and delaying his withdrawal motion to a point where retrial would be onerous or impossible for the Government. In our view, the proper question in this case is not whether appellants entertained the erroneous belief that silence was their duty, but whether this belief was, in an objective sense, reasonable in the circumstances. . . . That the belief was a mistaken one does not mean that it was necessarily unreasonable. . . . But we have no doubt whatever as to the unreasonableness of appellants' belief.[36]
 
 
 248
 First, it should be noted that the majority does not here set up a standard by which to measure the validity of all presentence withdrawal motions. (It could hardly be otherwise, given the strictness of the standard.) Rather, as the italicized language at the beginning of the paragraph makes clear, the majority finds this test of "objective reasonableness" justified only because of the alleged prejudice to the Government and abuse of the District Court present in this particular case. I have already discussed in detail the weakness of both these rationales for denying appellants' motion. They are wholly inadequate bases for such a stringent standard. As will be discussed in more detail below, such a standard might be appropriate for judging postsentence withdrawal motions; but it can never be justified in presentence situations.
 
 
 249
 The majority obfuscates the issue by appearing to argue that the only alternative to a test of objective reasonableness is to allow "subjective impressions, however irrational and unfounded" to dictate withdrawal. Unquestionably, there is a legitimate judicial interest in preventing defendants from whimsically withdrawing their pleas, or submitting a motion purely to gain a tactical advantage over the Government. It would appear, however, that, at least in the vast majority of presentence situations, the necessary control can be provided by a test of subjective, as opposed to objective, reasonableness. Under such a test, a judge does not have to accept a defendant's explanation for desiring to withdraw his plea unless the defendant can show that the erroneous belief upon which he premised his plea was reasonable for him under the circumstances.
 
 
 250
 This standard, of subjective reasonableness, does of course require the proof of sufficient facts to convince the trial court that it was reasonable for a man of the defendant's background and experience to make such a mistake. The court does not have to accept as the basis for a withdrawal motion all "subjective impressions, however irrational and unfounded." The majority's fear, therefore, that, without a test of objective reasonableness, defendants could easily gain tactical advantages over the government by inventing stories to support withdrawal is unwarranted. Equally important, once having determined that the defendants' mistake was subjectively reasonable under the circumstances, the trial judge is not bound thereby to grant the defendant's motion. The court must still balance the extent to which that mistake affected the voluntariness of the defendant's original plea against the prejudice the Government will suffer if unexpectedly required to try the case, in order to determine if withdrawal is "fair and just."
 
 
 251
 The fundamental difference between this approach and that of the majority is that, once having established the bona fide nature of the defendant's error, the focus is placed on the degree to which that error rendered the defendant's plea involuntary. The greater the coercive effect of the original circumstances, as legitimately perceived by the defendant, the stronger must be the prejudice to the Government to warrant denial of the defendant's withdrawal motion. To my mind, this balancing process is the only approach which is compatible with the "fair and just" standard.[37]
 
 
 252
 The voluntariness of a guilty plea is archtypically a subjective question. If a defendant would not have pled guilty but for his mistake, his action was not voluntary. That a perfectly "reasonable man" would not have made the same error or entered the same plea under the circumstances does not render the defendant's plea any more voluntary. It would seem to me violative of the basic premises of the "fair and just" standard to hold a possibly innocent man to an involuntary guilty plea because he failed to act as would a detached, "reasonable" citizen in the same situation.
 
 
 253
 This is not to say that the "reasonable man" standard may never be appropriate in evaluating withdrawal motions. Under Rule 32(d) of the Federal Rules of Criminal Procedure, postsentence withdrawal motions may be granted only to prevent "manifest injustice." This stringent rule comports with the strong public policy supporting the "stability" of final judgments[38] and discourages motions which are effectively attacks on the judge's sentencing decision.[39] United States ex rel. Curtis v. Zelker,[40] cited by the majority as its principal support for use of an objective standard to judge withdrawal motions, involved just such a postsentence request. Indeed, the defendant there did not seek to have his judgment vacated until seven years after he had been sentenced to a term of twenty years to life.[41] Equally important, the defendant was convicted in state court, not federal court. His motion, therefore, came in the form of a petition for habeas corpus filed in district court. The court of appeals, reviewing the district court's decision, was concerned only with determining whether minimal constitutional standards had been met in this situation. It is difficult to conceive of a case where the defendant's burden of justifying his delay in asserting his innocence could be greater. The radical difference of Curtis from the case at bar is readily apparent.
 
 
 254
 The other cases cited by the majority, United States ex rel. LaFay v. Fritz[42] and Townes v. Peyton,[43] also involved habeas petitions in the federal courts seeking to vacate state court convictions on constitutional grounds. Moreover, in LaFay the basis for the defendant's alleged mistake was a promise by his lawyer as to the type of sentence which would be imposed. It is settled constitutional law, however, that a defendant's plea is not rendered involuntary by his lawyer's misjudgment of law,[44] or misassessment of sentence,[45] so long as his counsel is competent. Thus, even an objectively reasonable error by a defendant in this situation is insufficient to justify setting aside a guilty plea.[46] In Townes, the defendant's constitutional claim was based on a generalized fear that the judicial system was biased against him. Again, this claim was not raised until long after sentencing; and the defendant alleged no facts with which to support his belief. The court held that under these circumstances, a federal writ would not issue.
 
 
 255
 The instant case does not involve a post-sentence claim requiring application of the "manifest injustice" rule. Nor is this court called upon to overturn a state court judgment on constitutional grounds. Rather, we are presented with a presentence motion, entered in a federal court, governed by the "fair and just" standard. Under these circumstances, the stringent test of "objective reasonableness" is wholly inapposite.
 
 
 256
 Under my position stated above, it remains to show, first, that it was reasonable for the appellants, with their particular experience and background, to believe national security considerations required their silence and, second, that this belief rendered their guilty pleas involuntary. If the appellants' error was indeed "reasonable," and basic to their pleas, it requires governmental and judicial interests of truly compelling force to justify denying their withdrawal motion under the "fair and just" standard. I have already made clear my belief that the interests ascribed to the Government and the trial court by the majority opinion fall far short of the level of prejudice necessary to cut off the appellants' right to a trial.
 
 1. The Context of the Appellants' Belief
 
 257
 It is impossible fully to appreciate how the appellants could have believed in January 1973 that their silence was required without understanding their background and prior experience in government operations. All were, and are, bitter opponents of the Castro regime in Cuba. They blame the Communists for the loss of their homes and livelihood. They exhibit a single-minded dedication to the cause of eradicating Communism in Cuba and preventing the spread of Communism to this country. They were willing in 1972 to give their full cooperation to any government operation which they believed was directed against traitors to this country or aiders and abettors of the Castro regime. This was their patriotic duty, and they performed it unquestioningly.
 
 
 258
 All but Gonzalez had taken part in the Bay of Pigs affair. Barker and Martinez were in the employment of the CIA even before that operation, and continued working for the agency thereafter. (Indeed, Martinez was still working for the CIA and receiving a monthly salary up until the night of his arrest in connection with the break-in.) They have known each other for over thirty years. Gonzalez is a long-time friend of Martinez's and was familiar with the CIA connections of his colleagues. He and Sturgis both had worked clandestinely against the Castro regime since its inception. They form a closeknit group, bound by ties of personal friendship and common interest. Above all, they are loyal loyal to each other, and to the cause of fighting Communism, in this country as well as in their native land.
 
 
 259
 E. Howard Hunt is a figure of no little renown in Miami's Cuban-American community. Only Barker knew him personally before 1971, but as "Eduardo" apparently many, including the other appellants, knew of his efforts as a CIA official to help liberate Cuba. Hunt was the supervising agent for the CIA in connection with the Bay of Pigs invasion and Barker's immediate supervisor. His credentials as a government agent with top-security clearance were impeccable.
 
 
 260
 Hunt renewed his contact with Barker in April of 1971 and told him he now held a high position in the White House. Barker confirmed that fact in the summer of 1971 in Washington, when he visited Hunt at the Executive Office Building, where his office was located. Barker knew Hunt was supposedly "retired" from the CIA, but in Barker's mind this fact carried little significance. Thus, in August of 1971, when Hunt solicited Barker's aid to help him in a matter of "national security," "involving a traitor to this country who had been giving information to the Russian Embassy," Barker readily agreed. Before the now-famous Fielding-Ellsberg break-in, Hunt informed Barker that "he was part of a national security intelligence agency that had greater jurisdiction than both the FBI and the CIA." Hunt discussed the possibility that this intelligence agency might serve as a nucleus for renewed efforts to liberate Cuba.
 
 
 261
 Barker and Martinez (who was among those solicited to effect the Ellsberg break-in) were given no details of the operation. This was consistent with their belief that it was a highly sensitive national security operation. As mere operatives, it was unnecessary, indeed foolhardy, for them to know more. Their belief in the authorized nature of the affair was reinforced by Hunt's confirmation that the equipment, disguises, and fake identification papers used in the operation had been provided by the CIA.
 
 
 262
 The Watergate operation itself enjoyed similar authorization in the minds of the appellants. They were told only that Hunt had information that Cuban Communist money was going into the Democratic campaign and that they were to photograph documents which would be analyzed to obtain evidence of this fact. Again, fake identification papers were provided by the CIA. The appellants had no reason to doubt Hunt's authority. Not only was he a well-known CIA official and personal friend of Barker's, but he had advance knowledge of events to which Barker believed only a high-ranking intelligence officer would have access: viz., the resignation of Mr. Helms as Director of the CIA, and the mining of Haiphong Harbor.
 
 
 263
 After their arrest, as was noted earlier in this opinion, the appellants received treatment entirely consistent with their belief that they had been engaged in a government intelligence operation. Rather than acknowledge responsibility for the operation, the Executive denied any involvement. Surreptitious assistance was provided the appellants in the form of expenses, attorneys, and financial help for their families.
 
 
 264
 The government's apparent desire to keep its role in the break-in secret indicated to the appellants that as little as possible of what they regarded as the true nature of the operation was to be revealed. When Hunt told Barker he had decided to plead guilty and that they did not have any defense, their belief that this was the government's position was confirmed:
 
 
 265
 This represented to me a final decision that there would be no disclosure at trial as to the true nature of the operation we had engaged in and that the plan which was to be followed was for us to plead guilty. . . .[47]
 
 
 266
 Given the appellants' past experience with clandestine operations, and their complete reliance on Hunt's instructions throughout their relationship with him, that they should have felt compelled to stifle their defenses and plead guilty is certainly understandable. They knew they had a good defense. Their lawyer, Rothblatt, believed so strongly that a defense based on a lack of criminal intent would succeed that he refused to plead them guilty. Yet Hunt had told them they had no defense. In their minds, the signal was clear: the government wanted the national security aspects of the operation, and the activities of the top-secret intelligence agency of which Hunt was an official, kept under wraps. If their leader was prepared to go to jail to protect that information, certainly they were loyal and dedicated enough to follow his lead.
 
 
 267
 The majority argues that the defendants belief was "patently unreasonable" in several respects. I have observed already that it is improper in this case to judge the appellants' belief by a test of "objective reasonableness." To the extent that "patently unreasonable" means unreasonable from the standpoint of a detached "reasonable man," the majority's argument has been answered. To the extent, however, that it means wholly irrational, or subjectively unreasonable, a response is necessary.
 
 
 268
 The majority points first to the fact that the guilty pleas were entered only after the prosecution had outlined a strong case against Hunt and Liddy to the effect that they had planned the break-in for purely partisan purposes in its opening argument. "After hearing all this, it was patently unreasonable for appellants to continue believing that they had been part of a legitimate national security enterprise requiring their silence at trial."[48] As far as the appellants were concerned, however, the prosecution had simply outlined the facts as they would have appeared to anyone who did not know the "true" reasons for the break-in. If the case against them, based on a theory of pure political intrigue appeared "virtually watertight," it was just as well because no one would suspect that their mission in fact related to highly sensitive national security information. The appellants had no way of knowing at this time (two months after the 1972 election) that the Executive's desire was not to protect the integrity of sensitive foreign intelligence information, but rather to cover up the involvement in the affair of high White House officials. This situation became clear, as was discussed earlier, only after the Senate Hearings had exposed the truly "unbelievable" genesis of the Watergate affair.
 
 
 269
 Second, the majority asserts that it was unreasonable for the appellants not to seek out "responsible Government officials" "in the CIA, or the State Department, or the Defense Department, or the White House" to ascertain whether, in fact, the "national security" was at stake.[49] This suggestion displays a grave misunderstanding on the part of the majority of the defendant's situation. Hunt had told them he worked for an agency with "greater jurisdiction than both the FBI and the CIA." Obviously, a limited number of officials would be privy even to the existence of such an agency, let alone its clandestine operations. Through long experience with the CIA, Barker and Martinez knew that even within an intelligence agency the number of individuals who were informed of an operation often was strictly, and understandably, limited. If they directed an inquiry to the wrong person, they might breach the security, and thereby destroy the efficacy, of related operations. As Martinez explained with regard to the Ellsberg break-in:
 
 
 270
 (D)ue to compartmentalization which exists in intelligence units and in particular, in the CIA, I was not sure whether my CIA supervising agent was supposed to know about my participation in these national security intelligence operations. . . . As a result, I broached the name of Mr. Hunt with my supervising agent sometime around the time of the Fielding office entry. The subsequent response I received from my supervising agent indicated to me that he had not been informed by his superiors and accordingly, that I was not supposed to disclose any information about these operations to him.[50]
 
 
 271
 Barker and Martinez were trained agents. Sturgis and Gonzalez had long worked in clandestine intelligence operations. They knew the value of secrecy and the danger of leaks. They were accustomed to depend entirely on the representations and authority of those delegated to lead them. They were disciplined. It misconstrues their background and character entirely to argue that they not only should have questioned Hunt's decision, but also carried any doubt they had to a variety of federal agencies for discussion.
 
 
 272
 The same misconception lies at the heart of the majority's third, and most important, contention viz., that the appellants should have informed Judge Sirica of their "national security" concerns. According to the majority:
 
 
 273
 It would be utterly destructive of the judicial system if a defendant were to be permitted, without any predicate in reasonableness, to minimize the significance of a misrepresentation to the court by an assertion of his belief in some value perceived as higher than the court's. . . . (A)ppellants themselves met in camera with the judge during the plea-taking procedure and had ample opportunity to seek out his advice.[51]
 
 
 274
 First, it bears repeating that, in the only sense which I consider compatible with the "fair and just" standard, the defendant's belief had ample "predicate in reasonableness." Second, I find a disturbing self-righteousness in the majority's implication that no citizen ought to contemplate values higher than those of a federal court. Certainly the Supreme Court does not feel it would be "utterly destructive of the judicial system" not to entrust federal judges with secret "national security" material. In EPA v. Mink[52] the Court interpreted the Freedom of Information Act[53] not to allow judicial review of government security classifications, or even the in camera inspection of classified documents in order to separate secret and nonsecret matter.[54] Congress has since revised the statute to give federal judges this power;[55] but the point is that it is certainly not surprising that a defendant could believe a judge was not among those with authority to know the most closely guarded security information.
 
 
 275
 Particularly in this case, where Judge Sirica's questioning revealed to the appellants that the government had not even informed him Barker and Martinez worked for the CIA let alone that they had taken part in the Ellsberg break-in it was perfectly understandable that the appellants would not have entrusted him with their knowledge. It appeared to them the government did not think it desirable that the judge should know even rudimentary facts about their intelligence operations. Moreover, Judge Sirica, during voir dire, made quite clear his desire to bring to light all the facts surrounding the break-in.[56] This was precisely what the appellants considered was their duty to prevent.
 
 
 276
 In sum, in light of their background in intelligence work and their relationship with Hunt, the appellants' belief that the government did not want the "national security" aspects of the Watergate operation disclosed was reasonable, and their failure to make their belief known to Judge Sirica or other "responsible officials" was justified under the circumstances as they then believed them to be.
 
 
 277
 2. The Voluntariness of the Appellants' Plea
 
 
 278
 The question of the degree to which the appellants' belief affected the voluntariness of their plea is readily answered. Their belief effectively dictated their plea. Not only did the government's apparent desire deprive them of their only valid defense, but Hunt had made clear that a guilty plea was mandated under the circumstances. The appellants obviously did not want to go to prison, but they felt they had no choice. Theirs was the paradigm of an involuntary plea. That it was entered with the advice of competent counsel, and after extensive questioning by Judge Sirica, does not change its involuntary nature.[57] The appellants did not make a reasoned decision based on the chances of success at trial of their "national security" defense. They simply accepted that a guilty plea was required of them because the assertion of that defense was incompatible with the necessity for silence. It was not until eight months later, when the actual genesis of the Watergate operation had been revealed in full, that the appellants could make a reasoned decision. Then they moved the District Court to allow them a trial.
 
 
 279
 Given the involuntary nature of the appellants' guilty plea, and the relative weakness of the governmental and judicial interests opposing its withdrawal, I would hold that the District Court abused its discretion under the "fair and just" standard when it denied the appellants' motion.
 
 
 280
 II. THE LEGAL MERIT OF APPELLANTS' PROFFERED DEFENSE
 
 
 281
 The majority held that the appellants' defenses were waived regardless of their merit.[58] As I dissent from this view, and as the assertion of a valid defense is critical to the leniency of the standard applied to a presentence withdrawal motion, it is necessary for me to address the question of the legal merit of the appellants' assertion of innocence. I conclude that the appellants' principal defense, based upon their mistake as to the authorized nature of the break-in, constitutes a legally valid defense to the charges against them.[59] Their withdrawal motion should have been judged accordingly.
 
 
 282
 It is a commonplace of criminal law that an honest "mistake of fact" negates criminal intent, when the defendant's acts would not constitute a crime if the facts were as he supposed them to be.[60] Conversely, a "mistake of law" is generally held not to excuse the commission of an offense, even though the defendant was unaware his action was prohibited.[61] The frequent difficulty of distinguishing "law" from "fact," as well as the reluctance of modern courts to hold individuals criminally liable when they acted with honest and innocent purpose, however, has led to some erosion of the principle that "everybody is presumed to know the law"[62] When presented with a mistake on the borderline between law and fact, or a case in which the imposition of strict liability would be particularly unjust, the courts have tended either to characterize the defendant's error as factual in nature or to find a way to declare an exception to the "mistake of law" doctrine.
 
 
 283
 Chief Judge Bazelon, although concurring in the majority opinion, has taken the position that the appellants' belief in the official authorization of their venture constitutes a valid defense to the charges against them. He makes the argument, based on general precepts of criminal mens rea, that recognition of an exception to the "mistake of law" doctrine in this case would not depart significantly from the principle of conventional morality which allows a defense for mistake of fact. Judge MacKinnon, dissenting from the majority opinion, takes a somewhat different approach. He argues that the appellants' error in relying on Hunt's representations should simply be characterized at the outset as one of fact i. e., "a mistake as to the fact that all necessary authorization for their activities had been obtained."
 
 
 284
 I agree with both my colleagues that generally a citizen should have a legal defense to a criminal charge arising out of an unlawful arrest or search which he has aided in the reasonable belief that the individual who solicited his help was a duly authorized officer of the law. I am troubled, however, by the breadth of the language in Chief Judge Bazelon's opinion. That the distinction between "law" and "fact" is often more "nice than obvious" does not mean it is nonexistent.
 
 
 285
 Judge MacKinnon's approach, although appealing under the unique facts of this case, I suggest also plays too loose with the law-fact distinction. An error as to the legality of a particular activity, even if based upon the assurances of a government official, has always been treated as a mistake of law in Anglo-Saxon jurisdictions. Although a great many commentators, and a growing number of courts, have argued that an exception to the mistake of law doctrine should be recognized in the case of reliance on the authority of a government official, none has suggested that it qualifies for treatment under the rubric of mistake of fact. As will be discussed more fully below, traditionally a defendant has been allowed a mistake of fact defense only when he was in possession of facts, albeit erroneous, about his activity which, if true, would have rendered it legal. If he is not in the possession of such facts, but relies instead entirely on the erroneous assertions of a government official or private individual as to the legality of the activity, his mistake is one of law.
 
 
 286
 The case of People v. Weiss,[63] discussed at some length in the opinions of my colleagues, provides a good vehicle for examining the analytical approach I think should be applied to the case at bar. The defendants in Weiss were convicted of kidnapping, for assisting one whom they believed a detective to arrest and confine an innocent individual they were told was a murderer. They appealed the trial court's refusal to allow the proffer of a defense based on the defendants' good faith belief that their actions were legally authorized i. e., a "mistake of law" defense (which of course would be proved by facts). The New York Court of Appeals observed first that under that state's law one element of the crime of kidnapping was that the defendant have "acted without authority of law."[64] The court then reasoned:
 
 
 287
 If in good faith they believed that they were acting within the law, there could have been no intent to act "without authority of law." Their belief or disbelief indicates intent or lack of it, (cite), and they were entitled to testify in respect to their intent based upon their belief, (cites).
 
 
 288
 No matter how doubtful the credibility of these defendants may be or how suspicious the circumstances may appear, we cannot say as a matter of law that, even in so strong a case as this for the prosecution, the jury was not entitled to consider the question whether defendants in good faith believed that they were acting with authority of law. We are, therefore, constrained to reverse the judgment of conviction and order a new trial for the purpose of submitting that question of fact to the jury.[65]
 
 
 289
 Preliminarily, it should be made clear that Weiss is legally distinguishable from the case sub judice on statutory grounds. As interpreted by the court of appeals, a defendant could be convicted of kidnapping under the New York statute only if he seized a person with the knowledge that his action was illegal. By thus defining the crime, the court established that any condition which negatived that required state of mind should result in an acquittal. A mistake of law which had this effect, then, could give a valid defense.[66] None of the crimes which remain charged to the appellants in the instant case, however, has as an element the specific criminal intent to act in a manner known to be illegal.[67] To be sure, conspiracy and burglary are crimes of "specific intent," in that each requires a particular intention in addition to the intentional doing of the actus reus itself,[68] but this kind of mental state should not be confused with the requirement of an intent to violate the law. In the case of conspiracy, generally, "an agreement to do an act that, unknown to the parties, is a crime, is criminal."[69] Mistake of law is no excuse.[70] Similarly, burglary requires only an entry into an area "with intent to break and carry away any part thereof or any fixture or other thing attached to or connected with the same, or to commit any criminal offense."[71] There is no requirement that the actor realize the illegality of his intended action, so long as it actually is unlawful. A mistake on that score, therefore, is not normally recognized as a defense.
 
 
 290
 As Chief Judge Bazelon correctly observes, however, the technical distinguishability of the decisive issue in Weiss from that presented in the instant case does not destroy the utility of Weiss as a measure of this case. Assuming arguendo that the New York court had not had before it a statute which in terms made a mistake of law defense available, the question becomes whether a cogent decision allowing a defense based on mistake could have been rendered nonetheless. In effect, the defendants in Weiss made two mistakes. The first was in believing that the individual who solicited their assistance was a detective. This can safely be characterized as a mistake of fact. Their second error was in believing that the bogus detective had the authority to arrest the individual pointed out to them. This mistake, depending on the circumstances, could have been one either of fact or of law.
 
 
 291
 A detective, or any other officer of the law, has legal authority to make an arrest only if it meets the "reasonableness" standard of the Fourth Amendment. This requires at least probable cause and, depending on the situation, a judicial warrant. To base a successful defense on mistake of fact, the defendants in Weiss would have had to show that the seizure and confinement of the individual involved would have been legal under the facts as they believed them to be. As far as the opinion of the New York Court of Appeals reveals, however, the defendants believed nothing about the individual whom they helped apprehend other than that he was a murderer. This unsupported conclusion was clearly inadequate to support a finding of probable cause. Nor did the defendants labor under the mistaken impression that the detective had a valid warrant for the arrest of the "murderer."[72] They were the victims not of mistake of fact therefore, but of ignorance of fact. Such ignorance has never been a defense.[73]
 
 
 292
 Similarly, the appellants in the instant case were ignorant of sufficient facts about the Watergate operation to argue that the break-in would have been legal if the facts had been as they believed them to be. They relied not on what they knew about the operation, but on what they knew about Hunt. It was upon his position and authority that their belief in the legality of their action was based. Assured of Hunt's integrity and high rank in the government, the appellants accepted his judgment as their own. In truth, however, as a legal matter Hunt had neither probable cause nor a warrant (if such was legally required) for a search. His judgment (or what the appellants believed to be his judgment) as to the lawfulness of the break-in was erroneous. His mistake (or disregard) of law became their mistake of law.
 
 
 293
 The question remains whether, assuming the defendants in Weiss were misled by a mistake of law, they could have based a valid defense thereon (independent of the element of knowledge contained in the statute). I believe that they might have.[74] All of the arguments for allowing a defense of mistake of law to the citizen who acts in reliance on the authority of a public official apply most strongly to a case where the official is a police officer or agent who has enlisted the aid of a citizen to help him in the performance of his appointed task.[75] We should be most reluctant criminally to punish the public-spirited individual who freely performs his civic duty especially in a day when noninvolvement appears the watchword of citizens at the scene of a crime. This does not mean that protection need be afforded every person who asserts a belief, however irrational, that he acted at the behest of an officer of the law. A balance may be struck here by requiring that the citizen's mistake as to the officer's authority be reasonable.[76] All the circumstances surrounding the incident in question would enter into such a determination, including the kind of operation the citizen was asked to take part in and, in cases where the "officer" was not such in reality, the objective manifestations of his office. It is not clear from the description of the New York Court of Appeals whether the defendants in Weiss could have met such a test.
 
 
 294
 It is this question which I consider decisive on the issue of the validity of the defense asserted by the appellants in the instant case. If they honestly and reasonably believed the operation was lawful, their mistake of law should give them a valid defense in this context. We need not determine here whether in fact the appellants' mistake was reasonable, but only whether, as a matter of law, a jury could find that it was reasonable.
 
 
 295
 There is a wealth of evidence in this case that the appellants honestly and reasonably believed they were engaged in a top-secret national security operation lawfully authorized by a government intelligence agency. According to their affidavits, Hunt was widely known in Miami's Cuban-American community as a CIA agent; indeed he was Barker's "supervisor" for the Bay of Pigs invasion. Martinez had long been on CIA retainer, and Sturgis has taken part in the Bay of Pigs affair and other "clandestine operations" against the Castro regime. Gonzalez was fully apprised of his colleagues' CIA connections. Further, Hunt had an office at the White House. He engaged Barker (along with Martinez and Liddy) for the Ellsberg break-in, which apparently had official authorization, in order to gather information on "a traitor to this country who had been giving information to the Russian Embassy." They used CIA tools and equipment for the operation. Subsequently Hunt arranged to have the appellants stand guard at the casket of former FBI Director J. Edgar Hoover. As to the Watergate break-in, they were told that its purpose was to seek "financial information . . . indicating Cuban communist money was going to the Democratic campaign." Hunt said he had information to that effect. If true, this was clearly an important national security matter. The appellants had no reason to doubt Hunt's authority, or the reliability of his information. They had had only his representation for the Ellsberg break-in, and probably little more for the Bay of Pigs invasion. He was employed by the Executive, had inside information concerning government affairs, and had supervised authorized clandestine operations in the past. Certainly a juror could find that the appellants' mistake of law was reasonable under these circumstances.
 
 
 296
 It may be objected that no reasonable man could believe a search of an office was valid without prior judicial warrant. To this there are two responses. The first is that the appellants did not know whether Hunt had a warrant. They assumed, like the defendants in Weiss, that he had whatever authorization was required. In view of Hunt's impeccable credentials as a government agent, their assumption was certainly justified under the circumstances.
 
 
 297
 The second response is that, as a matter of law, it is presently a subject of no little controversy whether indeed a warrant is required for a foreign intelligence search of the type the appellants believed they were conducting.[77] The "national security" exemption to the warrant requirement, long espoused by the Executive branch as a necessary concomitant to the President's constitutional power over the exercise of our country's foreign affairs,[78] has recently been affirmed by both the Fifth and Third Circuits.[79] They determined that the Fourth Amendment requirement of prior judicial approval does not apply to surveillances authorized by the Executive for the purpose of gathering foreign intelligence information. No court, in a case directly on point, has denied the President this prerogative. The Supreme Court, in several recent decisions requiring officials to obtain a warrant before engaging in electronic surveillance, has been careful to note that its rulings did not reach national security cases involving foreign powers or their agents.[80]
 
 
 298
 I express no opinion here on the merits of this question. But in view of the fact that the weight of authority favors an exemption to the warrant requirement for the kind of intelligence gathering in which the appellants believed they were engaged, it was certainly understandable that they did not insist upon a warrant. If it be objected that the Supreme Court's decision in United States v. United States District Court,[81] holding that a prior warrant was required for a domestic security surveillance, should have put the appellants on guard that a warrant might be legally required for the Watergate operation, it suffices to observe that that opinion was rendered two days after the break-in. Moreover, it represented a sharp reversal of almost three decades of Executive assumption of special authority in the field of domestic, as well as national, security.[82] Clearly, a reasonable layman working for the government would have been justified in relying upon Executive pronouncements in this area. And it is as laymen, not as lawyers as "foot soldiers," not as generals that the appellants' knowledge and responsibility are to be judged.
 
 
 299
 Thus, I conclude that the appellants have presented a valid defense to the charges against them. As the Government presented no compelling reason why the appellants' presentence withdrawal motion should be denied, I would find that the District Court abused its discretion under the "fair and just" standard. I would direct the District Court to grant the motion and proceed with trial on the merits.
 
 
 300
 Even if it be accepted that the action of the majority here in affirming the District Court's decision is correct on the law, this does not mean that the appellants' motion to withdraw their guilty pleas should not be reconsidered by the District Court. Not only the appellants but also the Special Prosecutor's Office have acquired new and critical evidence about the Watergate operation since the appellants entered their guilty pleas in January 1973. Not all of that information was made available in the months between January and September 1973; much evidence came out thereafter. For the reasons of "fairness and justice" set forth in this dissent, I suggest that the Special Prosecutor ought to reconsider his opposition to the appellants' efforts to obtain a trial in which they would have for the first time an opportunity to present their defenses. In the broad interest of fairness and justice I believe he should either act on his own or support a renewed motion by the appellants before the District Court for withdrawal of their pleas.
 
 
 
 [1]
 Appellants also claim that their guilty pleas to Counts 3, 4, 5, and 7 were improperly coerced by the District Judge's refusal to accept their compromise plea, agreeable to the Government, to Counts 1, 2 and 6 alone. For this contention, appellants rely on United States v. Ammidown, 162 U.S.App.D.C. 28, 497 F.2d 615 (1973). As the judge imposed concurrent sentences on all counts, we need not reach this contention. Instead, we hereby vacate appellants' sentences on Counts 3, 4, 5, and 7. See United States v. Greene, 160 U.S.App.D.C. 21, 33-34, 489 F.2d 1145, 1157-58 (1973)
 
 
 [2]
 Appellant in No. 73-2252, 165 U.S.App.D.C. ---, 509 F.2d 334, decided Dec. 12, 1974
 
 
 [3]
 Appellant in No. 73-2199, --- U.S.App.D.C. ---, 514 F.2d 271, also decided today
 
 
 [4]
 Appellant in No. 73-1562, 165 U.S.App.D.C. ---, 506 F.2d 1293, decided Oct. 10, 1974, No. 73-1564, 165 U.S.App.D.C. ---, 569 F.2d 428, decided Dec. 12, 1974, & No. 73-1565, --- U.S.App.D.C. ---, 510 F.2d 669, decided Nov. 8, 1974
 
 
 [5]
 The counts charged against appellants, and to which they pleaded guilty, were as follows:
 Count 1: Conspiracy to commit the crimes charged in the other counts, a violation of 18 U.S.C. § 371 (1970).
 Count 2: Burglary, consisting of entry into the DNC to steal property of another, a violation of 22 D.C.Code § 1801(b) (1973).
 Count 3: Burglary, consisting of entry into the DNC with intent to intercept "wire and oral communications," as defined by 18 U.S.C. § 2510 (1970), a violation of 22 D.C.Code § 1801(b).
 Count 4: Endeavoring to intercept oral communications within the DNC, a violation of 18 U.S.C. § 2511 (1970).
 Count 5: Endeavoring to intercept wire communications within the DNC, a violation of 18 U.S.C. § 2511.
 Count 6: Unlawful possession of devices for intercepting oral communications, a violation of 23 D.C.Code § 543(a) (1973).
 Count 7: Unlawful possession of device for intercepting wire communications, a violation of 23 D.C.Code § 543(a).
 See note 1 supra.
 
 
 [6]
 Each affidavit makes this statement
 
 
 [7]
 Barker Affidavit at 6
 
 
 [8]
 Id
 
 
 [9]
 Each affidavit makes this statement
 
 
 [10]
 Brief for the United States at 11
 
 
 [11]
 By order of this court on December 28, 1973, appellant Barker was released from prison pending this appeal. Appellant Sturgis was released pending this appeal by this court's order of January 18, 1974. The two other appellants have been released on parole
 
 
 [12]
 Fed.R.Crim.Proc., Rule 32(d)
 (d) Withdrawal of Plea of Guilty. A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea.
 
 
 [13]
 18 U.S.C. § 4208(b):
 (b) If the court desires more detailed information as a basis for determining the sentence to be imposed, the court may commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maximum sentence of imprisonment prescribed by law, for a study as described in subsection (c) hereof. The results of such study, together with any recommendations which the Director of the Bureau of Prisons believes would be helpful in determining the disposition of the case, shall be furnished to the court within three months unless the court grants time, not to exceed an additional three months, for further study. After receiving such reports and recommendations, the court may in its discretion: (1) Place the prisoner on probation as authorized by section 3651 of this title, or (2) affirm the sentence of imprisonment originally imposed, or reduce the sentence of imprisonment, and commit the offender under any applicable provision of law. The term of the sentence shall run from date of original commitment under this section.
 
 
 [14]
 Thus, while appellants may have been "duped" by their co-conspirators into committing their crimes, see United States v. Ehrlichman, Criminal No. 74-116, Sentencing Tr. at 10 (D.D.C. July 31, 1974) (Gesell, J.), appeal pending, D.C. Cir. No. 74-1882, there is not the slightest hint or allegation that they were duped into offering their guilty pleas. Appellants allege absolutely no overt pressure, from Government officials or anyone else, for them to plead guilty. There is no reason to believe the decision was other than entirely their own
 That appellants may have participated in the break-in as "dupes" is a consideration properly within the trial judge's sentencing discretion. That factor was expressly considered by Judge Gesell in sentencing appellants Barker and Martinez in United States v. Ehrlichman, supra (Judge Gesell also considered the sentences Barker and Martinez received for their related crimes in this case), and apparently considered by Judge Sirica, who sentenced appellants to less severe terms than those imposed on their co-defendants, the higher-ups in the conspiracy.
 
 
 [15]
 While Judge Wilkey taxes us for using a standard of objective reasonableness in assessing appellants' explanation of their guilty pleas, Judge Wilkey's dissent, --- U.S.App.D.C. at --- - ---, 514 F.2d at 256-258, our approach is really not different from his. It is only our conclusions that differ. We all agree that the reasonableness of the movant's explanation of why he allegedly mistakenly pleaded guilty must be balanced against the prejudice to the Government in bringing the case to trial. --- U.S.App.D.C. at ---, 514 F.2d at 257. See --- U.S.App.D.C. at ---, 514 F.2d at 221 supra. Judge Wilkey chose first to assess the reasonableness of appellants' explanation and then to balance that reasonableness against the prejudice to the Government. We have assessed the factors in the opposite order, which, of course, is a difference of no matter. Nonetheless, that difference is the basis for Judge Wilkey's critique
 Since Judge Wilkey first considers the reasonableness of appellants' explanation, in the absence of prejudice to the Government, he properly considers the broadest definition of reasonableness subjective reasonableness. Certainly if withdrawal would cause no prejudice to the Government, any explanation that was subjectively reasonable would likely be sufficient for withdrawal. See --- U.S.App.D.C. at --- - ---, 514 F.2d at 221-223 supra. Having found appellants' explanation to meet the minimal standard of subjective reasonableness, Judge Wilkey then discounts the prejudice to Government interests in this case. Thus he argues that appellants' supposedly subjectively reasonable explanation is sufficient to justify withdrawal.
 We have approached the issue differently, although our theoretical premises are not different from Judge Wilkey's. We first assessed prejudice to the Government. In this case we found not only prejudice, but also flagrant abuse of the judicial process, and the complicating circumstance of provisional sentencing. See --- U.S.App.D.C. at --- - ---, 514 F.2d at 223-224 supra. As prejudice to the Government mounts, the movant's explanation of the reasons for his supposedly mistaken plea must necessarily become increasingly more convincing in order to justify withdrawal. At some point, only explanations of at least objective reasonableness are of sufficient weight to justify withdrawal. So we find it to be here. Since an explanation of subjective reasonableness would not outweigh the countervailing factors here, analysis of appellant's alleged purely subjective reasonableness is pointless. We find below that appellants have not successfully explained away their guilty pleas under a standard of objective reasonableness, so the balance tilts against allowing withdrawal in this case.
 We should note in passing, however, that although objective reasonableness is a higher standard than subjective reasonableness, it is by no means a high standard. Its purpose is merely to rule out bizarre and unreasonable explanations for plea withdrawal in cases where the Government would suffer significant prejudice. In most, if not all, of the presentence withdrawal cases cited above, see --- U.S.App.D.C. at ---, 514 F.2d at 221 supra, the movant could easily have met this standard.
 
 
 [16]
 Judge Wilkey accuses us of analyzing only appellants' asserted reasons for entering their original guilty pleas, and ignoring the reasons that possibly prompted appellants to make their withdrawal motion eight months later. Judge Wilkey's dissent, --- U.S.App.D.C. at --- - ---, 514 F.2d at 250-251. Analysis of the former reasons is of the greatest importance in applying the "fair and just" standard, since by so doing the court can assure itself that the plea was not entered for tactical reasons, and can determine whether the plea was truly voluntary and knowing. See --- U.S.App.D.C. at ---, 514 F.2d at 221 supra. Analysis of the latter reasons is generally of far less concern, except insofar as it relates those reasons to the reasons for the original guilty plea (e. g., discovery of new evidence unknown to the movant at the time of his plea). In this case, however, where we find appellants' asserted exculpatory reasons for entering pleas to have been unreasonable, and thus insufficient to justify their withdrawal motion, the reasons that later might have prompted appellants to make their motion become of no concern at all. That appellants' original unreasonable beliefs may have become progressively more unreasonable is of no import
 Thus Judge Wilkey's and Judge MacKinnon's lengthy recitations of the events during the eight-month period between guilty pleas and withdrawal motion, Judge Wilkey's dissent, --- U.S.App.D.C. at --- - ---, 514 F.2d at 250-254, Judge MacKinnon's dissent, --- U.S.App.D.C. at --- - ---, 514 F.2d at 237-238, while accurate, are entirely beside the point. Moreover, it should be noted that, insofar as he explains the effect of these events on appellants' original asserted belief in the national security justification for their pleas, Judge Wilkey is engaging in pure speculation. Appellants have provided in their affidavits absolutely no explanation of how they came to be disabused of their national security notions; indeed, throughout appellants' motion papers there is but one oblique reference to "(s)ubsequent events." Memorandum in support of motion to withdraw guilty pleas at 2, JA at 5. Instead, and properly, appellants' affidavits are addressed to the reasons why they originally chose to plead guilty when supposedly in possession of an allegedly valid defense. We have examined those professed reasons, presented in detail by appellants, with care. Since we find those reasons, all highly subjective and unsupported by factual evidence, to be patently unreasonable, if indeed they were held, we have no occasion to engage in needless speculation about what might have prompted appellants to this same conclusion.
 
 
 [17]
 Judge Wilkey finds "hard to accept" our holding that "even if the appellants can prove their innocence, under the circumstances Judge Sirica did not abuse his discretion in denying the motion." Judge Wilkey's dissent, --- U.S.App.D.C. at ---, 514 F.2d at 248 (emphasis in original). It is, however, fundamental hornbook law that a defendant who pleads guilty foregoes his opportunity to prove his innocence. Cf. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). If a guilty plea can be withdrawn merely because the defendant would like to regain that opportunity, the plea becomes meaningless. As we have made clear above, however, a guilty plea is an act of great significance, and withdrawal is not automatically granted simply because the defendant now decides he would rather go to trial. Of course, whenever withdrawal is denied, it is denied "even if the (defendant) can prove (his) innocence."
 But while we necessarily deny withdrawal in this case although appellants might have been able to convince a jury of their innocence, it should be observed that in sending these men back to prison, we do not assume they are innocent. These men have all pleaded guilty. Their guilty pleas were accepted, and their withdrawal denied, because of the strong evidence of their guilt and the inadequacy of any alternative explanation of their guilty pleas. The pleas could not have been accepted if the court did not find they had a basis in fact. Rule 11, Fed.R.Crim.P. Appellants allege no violation of Rule 11, and, indeed, we have seen the extraordinary thoroughness with which Judge Sirica pursued the question of appellants' culpability. We have found that the pleas were voluntary and knowing, that is, that appellants were not coerced in any way to plead guilty, that they understood the charges against them, and that they freely pleaded guilty to those charges. In making their withdrawal motion, appellants alleged an alternative explanation of why they pleaded guilty. We have found that explanation to be so unreasonable as to be worthy of no cognizance in assessing the voluntariness of their original guilty pleas. Lastly, the national security defense that appellants would assert if they were granted a trial has been rejected as a matter of law by the only court that has considered it. United States v. Ehrlichman, D.D.C., 376 F.Supp. 29 (1974). While denial of a withdrawal motion is always troubling, since it denies the movant the opportunity of a trial by a jury of his peers, there must be occasions when withdrawal is so unmerited that to allow it would be to deprive guilty pleas of all meaning. We find this to be such an occasion.
 
 
 [1]
 There is a stronger case for waiver by plea of guilty here than was present in United States v. Sambro, 147 U.S.App.D.C. 75, 454 F.2d 918 (1971). Since the Court is en banc, I would adhere to my dissenting views expressed in Sambro but consider the case sub judice as distinguishable. It is distinguishable because here the government did not make any representation to these defendants that any particular effects would occur or not occur upon a plea; nor did the government represent to them that they had a duty to remain silent. Even if we might take the extra step of holding the government responsible for the sense of duty or "code" by which the defendants apparently felt bound, we cannot vitiate their plea bargain on that basis. The Court's opinion is conclusive on the issue. I emphasize one point which is particularly persuasive to me. The District Court and the defendants' attorney both very carefully sought to disabuse the defendants of any notion that they were required to plead guilty and also sought to uncover their motive in pleading guilty. These efforts were unsuccessful. In light of the diligent efforts of their attorney and the careful interrogation by the District Judge, one must conclude that the defendants' pleas were voluntary. They made a bargain with the government and were under no apprehensions as to what that bargain meant. Under North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), we must enforce that bargain
 
 
 [2]
 This contention is apparently directed against all counts in their indictment but seems most appropriate in light of the offenses charged in Counts 3, 4, 5, and 7. The Court vacates these four counts pursuant to the so-called Hooper doctrine as enunciated in United States v. Greene, 160 U.S.App.D.C. 21, 489 F.2d 1145, 1157-58 (1973), cert. denied, --- U.S. ---, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974). I objected to the use of the Hooper doctrine in Greene, 489 F.2d at 1174 (Statement of Bazelon, C. J.) and do not approve of its use in this case
 
 
 [3]
 Compare United States v. Cox, 165 U.S.App.D.C. ---, 509 F.2d 390, 393 (1974) at 1 (Leventhal, J., concurring)
 
 
 [4]
 R. Pound, Introduction, F. Sayre, Cases on Criminal Law (1927), quoted in Morissette v. United States, 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 96 L.Ed. 288 (1952). For similar statements, see United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139, 1151, cert. denied 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) (Statement of Wilkey, MacKinnon & Robb, JJ.); id. at 1241 (Statement of Wright, Bazelon, Robinson & Tamm, JJ.); United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 985 (1972) (en banc); Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50, 54 (1966) (en banc) citing Driver v. Hinnant, 356 F.2d 761, 764 (4th Cir. 1966); Lee v. Dangar, Grant & Co. (1892) 2 Q.B. 337, 347-49 (C.A.); 4 W. Blackstone, Commentaries 20-21, 27 (1854); 3 E. Coke, Institutes of the Laws of England 56 (1797)
 
 
 [5]
 2 W. Holdsworth, A History of English Law 50-54, 258-59 (4th ed. 1936); 3 id. at 310-14, 371-75. See also N. Hurnard, The King's Pardon for Homicide Before A.D. 1307, at 68-130 (1969); T. Plunknett, A Concise History of the Common Law 444-45, 463-65 (1956) and authorities cited; 1 F. Pollack & F. Maitland, The History of English Law 52-55 (2d ed. 1923)
 
 
 [6]
 2 W. Holdsworth, supra note 5, at 258-59
 
 
 [7]
 3 id. at 372-75. See also O. Holmes, Jr., The Common Law 40-51 (1881)
 
 
 [8]
 See G. Williams, The Criminal Law General Part 1-2 (2d ed. 1961). Similarly criminal liability is gradated in part on the basis of resulting harm, regardless of the actor's intent, as in inchoate crimes. See Schulhofer, Harm and Punishment: A Critique of Emphasis on the Results of Conduct in the Criminal Law, 122 U.Pa.L.Rev. 1497 (1974)
 
 
 [9]
 See Morissette v. United States, 342 U.S. 246, 252-59, 72 S.Ct. 240, 96 L.Ed. 288 (1952); Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55 (1933)
 
 
 [10]
 This was the situation in United States v. Alexander & Murdock, 152 U.S.App.D.C. 371, 471 F.2d 923, 928, cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1973). For other incidents of criminal activity based in part on racial animosity, see United States v. Robertson, 165 U.S.App.D.C. ---, 507 F.2d 1148 (1974); Brief for the United States at 3-4; United States v. Harris, 164 U.S.App.D.C. ---, 505 F.2d 477 (1974)
 
 
 [11]
 This was the alleged situation in Everett v. United States, 119 U.S.App.D.C. 69, 336 F.2d 979 (1964)
 
 
 [12]
 This was the situation in United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139 (D.C.Cir.), cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973). See also Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966) (en banc)
 
 
 [13]
 The classic formulation is Justice Holmes' in Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047 (1907)
 
 
 [14]
 The central problems in this area relate to concepts of "diminished responsibility." It is established that at least a reasonable mistake of fact relating to the circumstances of an act negates criminal responsibility. See G. Williams, supra note 8, at 140-42; R. Perkins, Criminal Law 939-44 (2d ed. 1969); J. Hall, General Principles of Criminal Law 361-68 (2d ed. 1960) and authorities cited therein. The issue arises whether the effect of alcohol, drugs or even physical and mental duress so affects the operation of an individual's perception of the facts as to render him not criminally responsible. See United States v. Alexander and Murdock, 152 U.S.App.D.C. 371, 471 F.2d 923, 948-52 & n. 69, cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1973) (Bazelon, C. J., dissenting on this point) and authorities cited. See also People v. Wolff, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 595 (1964); Model Penal Code §§ 2.08-09, 4.02 (Prop. Official Draft 1962)
 
 
 [15]
 This occurs in absolute liability crimes, see note 9 supra, and in certain elements of otherwise contingent liability crimes, such as in statutory rape, bigamy and felony murder. See Packer, Mens Rea and the Supreme Court, 1962 Supreme Court Rev. 107, 140-42. Of course, the law also recognizes absolute liability to the extent it does not take full account of duress, necessity of circumstances, intoxication or addiction, and indeed mistake of law. See Fletcher, The Individualization of Excusing Conditions, 47 So.Cal.L.Rev. 1269, 1273-99 (1974). See also examples cited in notes 10-12 supra
 
 
 [16]
 One might quickly dispose of the argument that everybody is "presumed to know the law". As an empirical matter, there is insufficient evidence that the individual citizen knows either what the law is or how it should be applied in particular circumstances. See G. Williams, supra, note 8, at 289-90, quoting the observation by Maule, J. that "everybody is presumed to know the law except His Majesty's judges, who have a Court of Appeal set over them to put them right."
 
 
 [17]
 J. Hall, supra note 14, at 383, applied in Hopkins v. State, 193 Md. 489, 498, 69 A.2d 456, 460, appeal dismissed, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950)
 
 
 [18]
 See Fletcher, supra note 15, at 1298-99; Ryu & Silving, Error Juris: A Comparative Study, 24 U.Chi.L.Rev. 421, 433 (1957)
 
 
 [19]
 O. Holmes, supra note 7, at 48
 
 
 [20]
 Id. See also United States v. Calley, 46 C.M.R. 1131, 1184 (Army Ct. of Mil.Rev.), aff'd, 22 U.S.C.M.A. 534, 541-44 (1973); Beverly's Case, 4 Co.Rep. 1236, 76 Eng.Rep. 1118 (K.B. 1603) (Coke, J.)
 
 
 [21]
 Id. at 49. Cf. the subsidiary justification of prevention of mob violence discussed in Schulhofer, supra note 8, at 1511-14
 
 
 [22]
 Cf. Furman v. Georgia, 408 U.S. 238, 395-96, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C. J., dissenting); id. at 453-56, at 92 S.Ct. (Powell, J., dissenting)
 
 
 [23]
 O. Holmes, supra note 7, at 43, discussing I. Kant, The Philosophy of Law, pt. 2, § 49, at 195-97 (W. Hastie trans. 1887), Cf. F. Zimring & G. Hawkins, Deterrence 38 (1973): "Why should his grief pay for their moral education."
 
 
 [24]
 Cf. Furman v. Georgia, 408 U.S. 238, 355, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J. concurring); Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095, 1101-07 (1969); Dershowitz, Preventitive Confinement: A Suggested Framework for Constitutional Analysis, 51 Texas L.Rev. 1277 (1973); Morris, The Future of Imprisonment: Toward a Punitive Philosphy, 72 Mich.L.Rev. 1161, 1164-73 (1974). See also Schulhofer, supra note 8, at 1588-99
 
 
 [25]
 Cf. Cleveland Bd. of Educ. v. La Fleur, 414 U.S. 632, 644-48 (1974) and cases cited therein. See also Baxstrom v. Herald, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973)
 
 
 [26]
 See Furman v. Georgia, 408 U.S. 238, 342-45, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J. concurring); id. at 452-54, 92 S.Ct. 2726 (Powell, J. dissenting); Williams v. New York, 337 U.S. 241, 247-48, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Cf. H. Packer, The Limits of the Criminal Sanction 37-39, 62 (1968)
 
 
 [27]
 O. Holmes, supra note 7, at 45
 
 
 [28]
 Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920)
 
 
 [29]
 Novak v. Beto, 453 F.2d 661, 672 (5th Cir. 1971), rehearing en banc denied, 456 F.2d 1303 (5th Cir.), cert. denied sub nom. Sellars v. Beto, 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972) (Tuttle, J. dissenting)
 
 
 [30]
 See O. Holmes, supra note 7, at 50-51 (the balance is reflected in the concept of the "reasonable man"); cf. Furman v. Georgia, 408 U.S. 238, 295-300, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J. concurring); id. at 360-70, 92 S.Ct. at 2788-2793 (Marshall, J. concurring); id. at 385-90, 92 S.Ct. at 2801-2804 (Burger, C. J. dissenting); id. at 434-43, 92 S.Ct. at 2826-2830 (Powell, J. dissenting); United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113, 1142-43 (1972) (Bazelon, C. J. concurring in part, dissenting in part); Wellington, Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication, 83 Yale L.J. 221, 243-54, 285-311 (1973)
 
 
 [31]
 J. Selden, Table Talk-Law 61 (3d ed. 1716). For similar statements of this argument, see United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139, 1181-85, cert. denied, 414 U.S. 980 (1973) (Leventhal, J.); People v. O'Brien, 96 Cal. 171, 176, 31 P. 45, 47 (1892)
 
 
 [32]
 If justice requires the fact to be ascertained, the difficulty of doing so is no ground for refusing to try. . . . Furthermore, now that parties can testify, it may be doubted whether a man's knowledge of the law is any harder to investigate than many questions which are gone into. The difficulty, such as it is, would be met by throwing the burden of proving ignorance on the lawbreaker
 O. Holmes, supra note 7, at 48. The argument that the fact of knowledge of the law is too difficult to be ascertained often reflects a distrust of the powers of the jury, Thomas v. The King, 59 Commonw.L.Rep. 279, 309 (High Ct. of Austr. 1937) (Dixon, C. J.). Compare United States v. Moore, 158 U.S.D.C. 375, 486 F.2d 1139, 1181-85, cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) (Leventhal, J.) with United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113 (1972) (Leventhal, J.). As for Holmes' argument that mistake of law might be an affirmative defense, I would argue that such a contention is inconsistent with In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). See United States v. (La Vance) Greene, 160 U.S.App.D.C. 21, 489 F.2d 1145, 1174-80 (1973), cert. denied, --- U.S. ---, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974) (Statement of Bazelon, C. J.). However, it would seem that the difficulties of proving knowledge of the law require that the defendant bear the burden of going forward on the issue, with the ultimate burden only resting on the government.
 
 
 [33]
 See J. Hall, supra note 14, at 376; 1 M. Hale, Pleas of the Crown 42 (1680); Keedy, Ignorance and Mistake in the Criminal Law, 22 Harv.L.Rev. 75, 78 (1908)
 
 
 [34]
 See Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); Scott v. State, 29 Ala.App. 110, 192 So. 288 (1939); authorities cited and discussed, G. Williams, supra note 8, at 304-05, 306-44
 Another area in which the similarity of mistakes of fact and mistakes in the application of the law to certain facts has caused some attenuation of the distinction between fact and law is bigamy. The prevailing American rule is that even a mistake of fact is not a defense to a charge of bigamy. See Anno., 56 A.L.R.2d 915 (1957). However, those courts which have eroded this strict absolute liability have in some instances permitted a reasonable mistake as to the legal validity of a divorce to be admitted as a defense. See People v. Vogel, 46 Cal.2d 798, 299 P.2d 850 (1956); Long v. State, 44 Del. 262, 65 A.2d 489 (1949); R. v. Gould, (1966) 2 Week.L.Rep. 643 (C.A.); The King v. Carswell, (1926) N.Z.L.Rep. 321 (C.A.); Thomas v. The King, 59 Commonw.L.Rep. 279 (High Ct. of Austr. 1937); cases cited Anno., supra, at 933-38. Cf. Forbes v. Brownell, 149 F.Supp. 848, 851 (D.D.C.1957). See also Alexander v. United States, 78 U.S.App.D.C. 34, 136 F.2d 783, 784 (1943) (dictum). The scholarly criticism directed in support of this result has focused on the tenuous distinction between a mistake of fact and of law in such circumstances. See J. Hall, supra note 14, at 400-01; G. Williams, supra note 8, at 178-83; cf. R. Perkins, supra note 14, at 945-48.
 The so-called "claim of right" cases and the bigamy cases have led some commentators to suggest that a mistake as to purely "civil" law is exculpatory while a mistake as to the "criminal" law is not. See G. Williams, supra at 344-45. The Model Penal Code, §§ 3.04(1), 309(1)(b), Commentary at 18, 76-77 (Tent. Draft No. 8 1958), accepts this distinction but makes absolutely clear that a mistake as to the legal requisites of a search or arrest is a mistake as to criminal law.
 One area of law in which mistake of law is apparently recognized as a defense concerns inchoate crimes which are not "mala in se." It has been held that such a mistake is a defense to a charge of conspiracy. See Landen v. United States, 299 F. 75 (6th Cir. 1924); Mitchell v. State, 248 Ala. 169, 27 So.2d 36 (1946). Cf. Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945) (solicitation crime apparently requires knowledge of the illegality of the solicited acts). See also the leading cases of People v. Powell, 63 N.Y. 88 (1875); Commonwealth v. Gormley, 77 Pa.Super. 298 (1921); Commonwealth v. Benesch, 290 Mass. 125, 194 N.E. 905 (1935). This rule has been criticized in dictum, United States v. Mack, 112 F.2d 290, 292 (2d Cir. 1940), and in dissent, Keegan v. United States, supra 325 U.S. at 506, 65 S.Ct. 1203 (Stone, C. J. dissenting). It has been trimmed back by holdings that the government need not prove actual knowledge of the law in question, this knowledge being inferred from facts and circumstances. See United States v. Thaggard, 477 F.2d 626, 631-32 (5th Cir. 1973); Cruz v. United States, 106 F.2d 828, 830 (10th Cir. 1939). See also the critical discussion in United States v. Boardman, 419 F.2d 110, 114-15 (1st Cir. 1969); United States v. Spock, 416 F.2d 165, 178 n. 29 (1st Cir. 1969). The rule to the extent it is valid, is limited to prosecutions for inchoate crimes and not prosecutions for completed crimes. Compare Okamoto v. United States, 152 F.2d 905 (10th Cir. 1945) with Warren v. United States, 177 F.2d 596, 600 (10th Cir. 1949), cert. denied, 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584 (1950).
 The harshness of the rule that mistake of law is not a defense is also one factor responsible for the parallel rule that penal statutes should be strictly construed in favor of the accused. See United States v. Bass, 404 U.S. 336, 347-48 (1971); United States v. Moore, 163 U.S.App.D.C. ---, 505 F.2d 426, 427 (1974) cert. granted, --- U.S. ---, 95 S.Ct. 1116, 43 L.Ed.2d 392 (1975). Compare this rule of construction with Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1958).
 
 
 [35]
 See Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966) (en banc); Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, 455 (D.C.Cir. 1966); cf. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390-92, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); Note, The Legitimacy of Civil Law Reasoning in the Common Law: Justice Harlan's Contribution, 82 Yale L.J. 258 (1972)
 
 
 [36]
 In any event, it may be seriously doubted whether the court's ruling in Weiss was as much predicated upon actual legislative intent as a presumed legislative intent implied by the court in the exercise of its own policy making discretion. The statutory language "without lawful authority" could easily bear a meaning limited to an objective determination that the defendants in fact did have authority for their actions, as Judge Crane in dissent and the appellate division below apparently held. Cf. G. Williams, supra note 8, at 28-29. The court thus presumes a legislative intent to depart from the settled rule that mistake of law is no defense from the bare statutory language. Surely, the court's implicit reasoning is that its result is a better approximation of the true principle of criminal liability in such circumstances than the rule that mistake of law is no defense. Compare the reasoning in Weiss with State v. Stern, 526 P.2d 344, 348-52 (Wyo.1974) and authorities cited therein
 There are a number of difficulties with Weiss which need not be fully explored. Its significance in the development of modern notions of criminal responsibility may be seen by a brief consideration of the common law background of the case. See generally Wilgus, Arrest Without a Warrant, 22 Mich.L.Rev. 673, 685-98 (1924). Of particular interest is the rule recognized by the Model Penal Code, § 3.07(4)(a), Commentary at 64-65 (Tent. Draft No. 8 1957); cf. id. § 3.03(3)(b), that a private person called to the aid of a police officer is justified in using force if he entertains an honest belief that the officer who calls his aid is acting lawfully. See Jefferson v. Yazoo & M.V.R.R., 194 Miss. 729, 11 So.2d 442 (1943); State v. Ditmore, 177 N.C. 592, 99 S.E. 368 (1919); La Chance v. Berlin St. Ry. Co., 79 N.H. 291, 109 A. 720 (1919); Purdy v. State, 60 Texas Cr.App. 130, 131 S.W. 558 (1910); Firestone v. Rice, 71 Mich. 377, 38 N.W. 885, 15 Am.St.R. 266 (1888); McMahan v. Green, 34 Vt. 69, 80 Am.Dec. 665 (1861). But see Mitchell v. State, 12 Ark. 50, 54 Am.Dec. 253 (1851); Elder v. Morrison, 10 Wend. (N.Y.) 128, 25 Am.Dec. 548 (1833). This rule applies only if the officer is known as such and is acting in an official capacity. See Cincinnati, N. O. & Tex. P. Ry. Co. v. Cundiff, 166 Ky. 594, 179 S.W. 615, 1916C Ann.Cas. 513 (1915); Hooker v. Smith, 19 Vt. 151, 47 Am.Dec. 679 (1847). Cf. the Good Samaritan "mistake of fact" defense discussed in United States v. Kartman, 417 F.2d 893, 895-96 & n. 5 (9th Cir. 1969); United States v. Grimes, 413 F.2d 1376 (7th Cir. 1969). This "call to aid" rule is explicitly recognized as an exception to the rule that mistake of law is not a defense, this latter rule being a restriction on the police officer himself. Model Penal Code, § 3.09(1)(b) (Tent. Draft No. 8 1958). Weiss, if viewed as an extension of a general "call to aid" rule, as its facts suggest, indicates a breakdown in the strict distinction between mistakes of fact and of law when applied to the heavily fact-laden law of search and seizure or arrest, an area of law also on the borderline between "civil" and "criminal" law. See also Pierson v. Ray, 386 U.S. 547, 555-57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1347-48 (2d Cir. 1972).
 
 
 [37]
 Local 761, Electrical Workers v. NLRB, 366 U.S. 667, 674 (1961)
 
 
 [38]
 The defendants' mistake of law is largely a mistake as to Hunt's authority i. e. whether he had reasonable grounds for ordering the burglary. As is implicitly suggested by the "call to aid" rule suggested in note 36, supra, a mistake as to the lawful authority of a government official, which is what Hunt allegedly presented himself as, is sufficiently close to a mistake of fact and sufficiently similar to a mistake as to civil law a mistaken "claim of right" as it were that exculpation should be permitted. See also United States v. Calley, 22 U.S.C.M.A. 534, 541-44 (1973); G. Williams, supra note 8, at 301. Compare id. at 160-63 (suggests that ignorance of the law may cause ignorance of facts which would have been known if the defendants had known the law)
 This analysis is buttressed by reference to the fact that these defendants were formerly citizens of a nation which arguably did not adhere to Anglo-American concepts of permissible search and seizure. In common law contract doctrine, a mistake as to foreign law was considered a "mistake of fact" and grounds for equitable intervention. See E. H. Taylor, Jr. & Sons v. First Nat'l Bank, 212 F. 898, 902 (6th Cir. 1914) (dictum); Miller v. Bieghler, 123 Ohio St. 227, 174 N.E. 774 (1931); cases cited and discussed Anno., 73 A.L.R. 1260 (1931). In the Federal Republic of Germany, a mistake as to German law by a foreigner is considered a defense to criminal charges. See H. Jescheck, Lehrbuch des Strafrechts 298-99 (1969).
 
 
 [39]
 See Long v. State, 44 Del. 262, 65 A.2d 489 (1949); People v. Hernandez, 61 Cal.2d 529, 39 Cal.Rptr. 361, 393 P.2d 673 (1964); United States v. Short, 4 U.S.C.M.A. 437 (1954); cf. O. Holmes, supra note 7, at 50-51
 That exculpation on the basis of reasonable mistakes of law is consistent with conventional morality may be seen in decisions of the Bundesgerichthof or Supreme Court of the Federal Republic of Germany on this subject. The discussion that follows is drawn from Judgment of March 18, 1952, 2 BGHSt 194; H. Jescheck, Lehrbuch des Strafrechts 294-306 (1969); Ryu & Silving, supra note 18, at 450-58, 461-65. Originally, the Supreme Court of the Reich had held that mistake as to civil law, not the law defining the elements of the crime for which the individual is being prosecuted, was exculpatory but that a mistake as to criminal law was not exculpatory. In the 1952 decision cited above, the Bundesgerichthof found this distinction untenable and rejected it in favor of a rule that all reasonable mistakes of law were exculpatory. Mistakes of fact, it found, were different and if made honestly and in good faith were exculpatory. As to the requirement of reasonableness in mistakes of law, the Bundesgerichthof had this to say:
 (The defendant) must . . . , in everything he is about to undertake, call to his consciousness whether it agrees with the dictates of the legal (order). He must dispel doubts by thought and inquiry. This requires an exertion of conscience; the degree (of exertion) is determined by the circumstances of the case and by the life environment and occupation of the individual. If, notwithstanding exertion of conscience as thus expected, he could not acquire the insight into the wrongfulness of his conduct, the error was invincible and the act unavoidable. . . . In this case, no blame of guilt can be raised against him.
 Compare Judgment of Oct. 6, 1953, Juris.Rund. 188 (BGHSt), discussed Ryu & Silving, supra at 457 with cases cited note 10 supra. Cases decided after the Judgment of March 18, 1952, seem to take a very liberal view of mistake of fact, to include as mistakes of fact all mistakes as to law which do not directly concern the definition of the elements of the offense.
 
 
 [40]
 See United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139, 1260 (D.C.Cir.), cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed. 224 (1973) (Bazelon, C. J. concurring in part, dissenting in part); United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 1022-34 (1972) (Bazelon, C. J. concurring in part, dissenting in part); United States v. Alexander and Murdock, 152 U.S.App.D.C. 371, 471 F.2d 923, 948-51, cert. denied, Murdock v. U. S., 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1973) (Bazelon, C. J. concurring in part, dissenting in part). See also United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113, 1138 (1972) (Bazelon, C. J. concurring in part, dissenting in part); United States v. Robertson, 165 U.S.App.D.C. ---, 507 F.2d 1148 (1974)
 
 
 [41]
 As Judge MacKinnon notes in his dissent, Judge Gesell has exercised his sentencing discretion in favor of these very defendants due to the fact that they were "duped" by government officials. Other famous examples of the use of sentencing discretion in mens rea type defenses include the case of R. v. Dudley & Stephens, (1884) 14 Q.B.D. 273, discussed Malin, In Warm Blood: Some Historical and Procedural Aspects of Regina v. Dudley and Stephens, 34 U.Chi.L.Rev. 387 (1967), and the bigamy case of R. v. Wheat & Stocks, (1921) 2 K.B. 119, discussed in Weigall, Mens Rea and Bigamy, 16 Austr.L.J. 3 (1942)
 
 
 [42]
 See generally United States v. Ammidown, 162 U.S.App.D.C. 28, 497 F.2d 615 (1973)
 
 
 [43]
 See Ex parte Grossman, 267 U.S. 87, 120-21, 45 S.Ct. 332, 69 L.Ed. 527 (1925); State v. Leak, 5 Ind. 359, 363 (1854); 2 Hawkin's Pleas of the Crown, ch. 37, § 8, at 533 (8th ed. J. Curwood 1824)
 
 
 [44]
 See United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113, 1142 (1972) (Bazelon, C. J. concurring in part, dissenting in part)
 
 
 [45]
 See 3 W. Holdsworth, supra note 5, at 312-13, 371-72
 
 
 [46]
 See N. Hurnard, supra note 5
 
 
 [47]
 See Fletcher, supra note 15, at 1307
 
 
 [48]
 See United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139, 1185-86, 1203-05, cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) (Statement of Leventhal & McGowan, JJ.). Part of the minimalist approach is a reliance on the legislature to resolve any issue raised by the suggested development of judicially created and judically administered principles. That is, the doctrine of stare decisis causes previous judicial decisions to be embedded in concrete subject only to legislative action
 
 
 [49]
 United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113, 1138 (1972) (Bazelon, C. J. concurring in part, dissenting in part). See also Note, Towards Principles of Jury Equity, 83 Yale L.J. 1023 (1974)
 
 
 [1]
 This was first printed in the November 5, 1974, issue of The Washington Post, Washington, D. C., at A-12, and has been the subject of testimony in the recent trial of the obstruction of justice charges, n. 3 infra. We take judicial notice thereof. Fletcher v. Evening Star Newspaper Co., 77 U.S.App.D.C. 99, 133 F.2d 395 (1942); Hipp v. Hipp, 191 F.Supp. 299 (D.D.C.1960). The account reads:
 Following is the text of a memorandum written by Watergate defendant E. Howard Hunt Jr. Nov. 14, 1972, five months after the break-in, pressing the Nixon administration for pardons and hush money. The memo, initially given to Hunt's attorney, William O. Bittman, was introduced yesterday by prosecutors at the conspiracy trial.
 REVIEW AND STATEMENT OF PROBLEM
 The seven Watergate defendants and others not yet indicted, bugged DNC offices initially against their better judgment, knowing that Larry O'Brien was seldom there, and that many items of interest were being moved to Florida. Furthermore, the defendants pressed an alternate plan to bug O'Brien's Fontainebleau convention suite, before occupancy, a low-risk high-gain operation which was rejected.
 The seven defendants again protested further bugging of DNC Headquarters on June 16-17, the intercepted conversations by then having shown clearly that O'Brien was not using his office. Again, objections were overridden and the attempt was loyally made even though money for outside guards was struck from the operational budget by Jeb Magruder. In fact the entire history of GEMSTONE was characterized by diminishing funding coupled with increasing demands by those who conceived and sponsored the activity.
 If initial orders to bug DNC Headquarters were ill-advised, the defendants' sponsors compounded the fiasco by the following acts:
 
 
 [1]
 Indecisiveness at the moment of crisis
 
 
 [2]
 Failure to quash the investigation while that option was still open
 
 
 [3]
 Allowing Hunt's safe to be opened and selected contents handed to the FBI
 
 
 [4]
 Permitting an FBI investigation whose unprecedented scope and vigor caused humiliation to families, friends and the defendants themselves
 
 
 [5]
 Granting immunity to Baldwin
 
 
 [6]
 Permitting defendants to fall into the hands of a paranoid judge and three self-admitted liberal Democrat prosecutors
 
 
 [7]
 Failure to provide promised support funds on a timely and adequate basis; continued postponements and consequent avoidance of commitments
 
 
 [8]
 An apparent wash-hands attitude now that the election has been won, heightening the sense of unease among all defendants who have grown increasingly to feel that they are being offered up as scapegoats ultimately to be abandoned
 Items for consideration:
 
 
 [1]
 Once the criminal trial ends, the DNC civil suit resumes. In his deposition John Mitchell may well have perjured himself
 
 
 [2]
 Pending are three investigations by congressional committees. The Democratic Congress is not going to simply let the Watergate affair die away
 
 
 [3]
 The media are offering huge sums for defendants stories. For example, an offer to one defendant for his "autobiography" now stands at $745,000
 
 
 [4]
 The Watergate bugging is only one of a number of highly illegal conspiracies engaged in by one or more of the defendants at the behest of senior White House officials. These as yet undisclosed crimes can be proved
 
 
 [5]
 Immunity from prosecution and or judicial clemency for cooperating defendants is a standing offer
 
 
 [6]
 Congressional elections will take place in less than two years
 Defendants' Position
 The defendants have followed all instructions meticulously, keeping their part of the bargain by maintaining silence. They have not, until now, attempted to contact persons still in positions of responsibility in an effort to obtain relief and reassurance, believing pre-election security to be a primary consideration.
 The administration, however, remains deficient in living up to its commitments. These commitments were and are:
 
 
 [1]
 Financial support
 
 
 [2]
 Legal defense fees
 
 
 [3]
 Pardons
 
 
 [4]
 Rehabilitation
 Having recovered from post-election euphoria, the administration should now attach high priority to keeping its commitments and taking affirmative action in behalf of the defendants.
 To end further misunderstandings the seven defendants have set Nov. 27 at 5 p.m. as the date by which all past and current financial requirements are to be paid, and credible assurances given of continued resolve to honor all commitments. Half-measures will be unacceptable.
 Accordingly, the defendants are meeting on Nov. 25 to determine our joint and automatic response to evidence of continued indifference on the part of those in whose behalf we suffered the loss of our employment, our futures and our reputations as honorable men.
 The foregoing should not be misinterpreted as a threat. It is among other things a reminder that loyalty has always been a two-way street.
 
 
 [2]
 The Freedom of Information Act does not permit secret national defense and foreign policy material to be disclosed to a federal judge, even in camera. EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1972):
 We do not believe that Exemption 1 permits compelled disclosure of documents, such as the six here that were classified pursuant to this Executive Order. Nor does the Exemption permit in camera inspection of such documents to sift out so-called "nonsecret components."
 Id. at 81, 93 S.Ct. at 833.
 What has been said thus far . . . also negates the proposition that Exemption 1 authorizes or permits in camera inspection of a contested document bearing a single classification so that the court may separate the secret from the supposedly nonsecret and order disclosure of the latter.
 Id. at 84, 93 S.Ct. at 834.
 3 U.S. District Court, District of Columbia, Criminal No. 74-110.
 
 
 [4]
 Affidavit of Barker at 4, Appellants' App. at 15
 
 
 [5]
 18 U.S.C. § 2386(A) provides in part:
 An organization is "subject to foreign control" if:
 (a) it solicits or accepts financial contributions, loans, or support of any kind, directly or indirectly, from, or is affiliated directly or indirectly with, a foreign government or a political subdivision thereof, or an agent, agency, or instrumentality of a foreign government or political subdivision thereof . . ..
 
 
 [6]
 Affidavit of Barker at 1, Appellants' App. at 12
 
 
 [7]
 Affidavit of Martinez at 6, Appellants' App. at 25
 
 
 [8]
 Affidavit of Sturgis at 1, 3, Appellants' App. at 27, 29 (emphasis added)
 
 
 [9]
 Id. at 6, Appellants' App. at 32 (emphasis added)
 
 
 [10]
 1 Wharton's Criminal Law and Procedure § 157 (1957, 1975 Cumm.Supp.); Williams, Criminal Law: The General Part §§ 51 & 68 (2d ed. 1961); Perkins on Criminal Law 939-44 (2d ed. 1969); 21 Am.Jur.2d Criminal Law § 93 (1965). See also Stone v. United States, 167 U.S. 178, 189, 17 S.Ct. 778, 42 L.Ed. 127 (1897)
 
 
 [11]
 Appellants were allegedly mistaken not only as to the existence of official authorization for their operation, but also as to their status as government agents charged with uncovering rumored financial ties between the Democratic Party and Castro's regime in Cuba. On the facts here, it must be assumed that appellants could convince a jury that they had indeed entertained these mistaken beliefs at the time of the break-in. Hence no further reference to this mistake of fact is necessary
 
 
 [12]
 No brief need be held for those in this affair Liddy, Hunt and McCord who knew they were not conducting the Watergate operation on governmental authority, but the allegations in the affidavits, which we must here accept as true, indicate that appellants are in a different category
 
 
 [13]
 18 U.S.C. § 2511(3) provides:
 (3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power. (Added Pub.L. 90-351, title III, § 802, June 19, 1968, 82 Stat. 213 (and amended Pub.L. 91-358, title II, § 211(a), July 29, 1970, 84 Stat. 654.)).
 
 
 [14]
 It is reported that on May 13, 1915, in the aftermath of the sinking of the Lusitania, President Wilson authorized William J. Flynn, Chief of the U.S. Secret Service, to tap the telephones of the German Embassy and the private homes of the Ambassador and his attaches. William J. Flynn, Tapped Wires, Liberty, June 2, 1928, at 19; Colin Simpson, Lusitania 190 (1972). As to the possible use of surreptitious entry (burglary) at this time by the United States Government, see Lusitania, supra, 233-37 and citations to archival documents in nn. 1, 2 and 3, on the affair involving the burglary of the Austrian Consulate in Cleveland on July 18, 1915, and the theft of the papers of a chemist named Ritter von Rettegh who had given an affidavit concerning the possible existence of explosives aboard the Lusitania
 
 
 [15]
 The Supreme Court in United States v. United States District Court dealt only with the domestic aspects of national security surveillance:
 We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents.
 407 U.S. at 321-22, 92 S.Ct. at 2139.
 
 
 [16]
 The precise Presidential directives of Franklin D. Roosevelt, Harry S. Truman and Lyndon B. Johnson authorizing warrantless wire tapping, and part of a memorandum by then Acting Attorney General Ramsey Clark affirming the policy announced by President Johnson, are reproduced as an Appendix to this opinion
 
 
 [17]
 On the other hand, the general rule in criminal cases is that a mistake of law upon the part of the accused does not constitute justification for his act; that, if he deliberately and intentionally commits the prohibited act, it is criminal, regardless of his belief that his act was lawful; except in cases where ignorance of the law may disprove the existence of a required specific intent. (Emphasis added.)
 Townsend v. United States, 68 App.D.C. 223, 229, 95 F.2d 352, 358, cert. denied, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121 (1938). See also United States v. Squires, 440 F.2d 859, 863-64 (2d Cir. 1971); Long v. State, 5 Terry 262, 65 A.2d 489, 497 (Del.1949); United States v. One Buick Coach Automobile, 34 F.2d 318, 320 (N.D.Ind.1929); People v. Goodin, 136 Cal. 455, 69 P. 85, 86 (1902).
 
 
 [18]
 James v. United States, 366 U.S. 213, 221-22, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); California v. Latimer, 305 U.S. 255, 261, 59 S.Ct. 166, 83 L.Ed. 159 (1938); United States v. Murdock, 290 U.S. 389, 396, 54 S.Ct. 223, 78 L.Ed. 381 (1933); Burns v. State, 123 Tex.Cr. 611, 61 S.W.2d 512, 513 (1933)
 
 
 [19]
 The majority opinion vacates all but one count of burglary, one count of possessing listening devices and the conspiracy count. See Majority Op., nn. 1, 5
 
 
 [20]
 D.C.Code § 22-1801(b) provides:
 (b) Except as provided in subsection (a) of this section, whoever shall, either in the night or in the daytime, break and enter, or enter without breaking, any dwelling, bank, store, warehouse, shop, stable, or other building or any apartment or room, whether at the time occupied or not, or any steamboat, canalboat, vessel, or other watercraft, or railroad car or any yard where any lumber, coal, or other goods or chattels are deposited and kept for the purpose of trade, with intent to break and carry away any part thereof or any fixture or other thing attached to or connected with the same, or to commit any criminal offense, shall be guilty of burglary in the second degree. Burglary in the second degree shall be punished by imprisonment for not less than two years nor more than fifteen years.
 
 
 [21]
 The 1972 Presidential election was not the first to be plagued with political espionage. In an interview former President Nixon granted James J. Kilpatrick, printed in the Washington Star-News on Thursday, May 16, 1974, page A-1, col. 1, he revealed that J. Edgar Hoover, the Director of the Federal Bureau of Investigation (FBI), had apprised him of certain bugging operations:
 He (President Nixon) recalled how much he had resented it when he learned that his own offices had been bugged in his 1962 gubernatorial campaign. He also remembered 1968 with equal resentment. "There was not only surveillance by the FBI, but bugging by the FBI, and (J. Edgar) Hoover told me that my plane in the last two weeks (of the 1968 presidential campaign) was bugged."
 These bugging offenses apparently were not investigated by Congress or prosecuted.
 
 
 [22]
 18 U.S.C. § 2511 et seq. (1970)
 
 
 [23]
 18 U.S.C. § 2511(3), supra n. 13
 
 
 [1]
 In addition to their principal defense of lack of mens rea, the appellants also asserted defenses based on entrapment and selective prosecution
 
 
 [2]
 In the absence of an evidentiary hearing, or fact-finding by the District Court, this court must take as true the facts stated in the appellants' affidavits
 
 
 [3]
 Everett v. United States, 119 U.S.App.D.C. 60, 336 F.2d 979 (1964)
 
 
 [4]
 See, e. g., Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); United States v. Young, 424 F.2d 1276 (3rd Cir. 1970); Gearhart v. United States, 106 U.S.App.D.C. 270, 272 F.2d 499 (1959)
 
 
 [5]
 See United States v. Joslin, 140 U.S.App.D.C. 252, 434 F.2d 526 (1970); High v. United States, 110 U.S.App.D.C. 25, 288 F.2d 427, cert. denied, 366 U.S. 923, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961); Gearhart v. United States, 106 U.S.App.D.C. 270, 272 F.2d 499 (1959)
 
 
 [6]
 Majority Opinion, --- U.S.App.D.C. at ---, 514 F.2d at 220, citing United States v. Joslin, 140 U.S.App.D.C. 252, 434 F.2d 526 (1970); United States v. Young, 424 F.2d 1276 (3rd Cir. 1970); Kadwell v. United States, 315 F.2d 667 (9th Cir. 1963); Gearhart v. United States, 106 U.S.App.D.C. 270, 272 F.2d 499 (1959); Poole v. United States, 102 U.S.App.D.C. 71, 250 F.2d 396 (1957)
 
 
 [7]
 Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)
 
 
 [8]
 Majority Opinion, --- U.S.App.D.C. at ---, 514 F.2d at 221
 
 
 [9]
 The question whether the appellants' pleas procedurally were properly entered is not a factor in this case. Judge Sirica's lengthy inquiry into the validity of those pleas complied fully with the requirements of Rule 11. (If a plea has been entered contrary to Rule 11 procedures, as a rule it must be permitted to be withdrawn both before and after sentencing, regardless whether the defendant asserts a legally cognizable defense. See McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed. 418 (1969).)
 As the majority recognizes, however, even where a plea is properly entered, the standard for judging the acceptability of a withdrawal motion is very lenient, so long as the Government's interests have not been substantially prejudiced. (Majority Opinion, --- U.S.App.D.C. at ---, 514 F.2d at 222, citing United States v. Joslin, 140 U.S.App.D.C. 252, 434 F.2d 526 (1970) and Kadwell v. United States, 315 F.2d 667 (9th Cir. 1963).) Thus, the proper focus of inquiry in this case is on that prejudice, rather than on the thoroughness of the plea-taking procedure.
 
 
 [10]
 The majority appears at some points in its opinion to argue that the eight-month delay between plea and withdrawal motion in itself constitutes a factor which weighs against acceptance of the motions. The primary significance of the length of the delay, however, lies in whatever prejudice it has placed on the Government's ability to prosecute the case. In terms of balancing the interests of the appellants in withdrawing their pleas against those of the Government in blocking such withdrawal, therefore, the length of the delay cannot be considered an independent factor. Its "weight" is accorded ample recognition as the principal component of the element of prejudice to the Government
 
 
 [11]
 The majority argue in a footnote that the reasons for the appellants' eight-month delay in asserting their innocence are "of no concern at all" in this case, because the appellants' justification for having entered guilty pleas in the first place is inadequate. Majority Opinion, --- U.S.App.D.C. at --- - ---, n. 16, 514 F.2d at 225-226 n. 16. "That appellants' original unreasonable beliefs may have become progressively more unreasonable is of no import." Ibid. The fallacy in this position lies in the fact that the majority assert the length of the delay between guilty plea and withdrawal motion and concomitant prejudice to the Government's interest as their primary rationale for applying a stringent test of "objective reasonableness" to the appellant's original beliefs. See Majority Opinion at --- - ---, 514 F.2d at 223-224 and text at --- - ---, 514 F.2d at 219-222 infra. The majority make quite clear that if the appellants had requested withdrawal within a short period of time after entering their pleas, the standard for judging their reasons would have been quite low. Majority Opinion at ---, 514 F.2d at 222. It is patently inconsistent with this position to use a longer time period as the basis for a much tougher standard of review without considering factors which mitigate the delay, or excuse it altogether
 
 
 [12]
 See note 2 supra
 
 
 [13]
 Affidavit of Bernard L. Barker, App. at 16
 
 
 [14]
 Id. at 17
 
 
 [15]
 See Majority Opinion at --- - ---, 514 F.2d at 219-220
 
 
 [16]
 Tr. of Sentencing 3-5
 
 
 [17]
 See Sussman, The Great Cover-Up: Nixon and the Scandal of Watergate 176-79 (1974)
 
 
 [18]
 Affidavit of Bernard L. Barker, App. at 17
 
 
 [19]
 Id. at 14-16
 
 
 [20]
 Id. at 16
 
 
 [21]
 Id. at 13
 
 
 [22]
 Sussman, supra note 17, at 227
 
 
 [23]
 In August, 1971 Mr. Hunt came to Miami, Florida, met with me and asked me if I would be willing to help him on a matter of national security. He did not at that time tell me any details with respect to the operation itself but he did explain to me that it involved a traitor to this country who had been giving information to the Russian Embassy
 This operation and the subsequent operations were handled in a manner that was consistent in my mind with covert intelligence operations. I was not given any details of the operations, what the targets were or what our assignment was until shortly before the operations themselves. For example, I did not know that the office we were to enter was that of Dr. Fielding until after we had arrived in California and I believe it was also at that time that I was first informed by Mr. Hunt that the traitor he had referred to was Daniel Ellsberg.
 Affidavit of Bernard L. Barker, App. at 13-14.
 
 
 [24]
 (The theft of "The Pentagon Papers") posed a threat so grave as to require extraordinary actions
 Therefore during the week following the Pentagon Papers publication, I approved the creation of a Special Investigations Unit within the White House which later came to be known as the "plumbers". This was a small group at the White House whose principal purpose was to stop security leaks and to investigate other sensitive security matters. I looked to John Ehrlichman for the supervision of this group.
 Egil Krogh, Mr. Ehrlichman's assistant, was put in charge. David Young was added to this unit, as were E. Howard Hunt and G. Gordon Liddy. The unit operated under extremely tight security rules. Its existence and functions were known only to a very few persons at the White House. These included Messrs. Haldeman, Ehrlichman and Dean.
 At about the time the unit was created, Daniel Ellsberg was identified as the person who had given the Pentagon Papers to The New York Times. I told Mr. Krogh that as a matter of first priority, the unit should find out all it could about Mr. Ellsberg's associates and his motives. Because of the extreme gravity of the situation, and not then knowing what additional national secrets Mr. Ellsberg might disclose, I did impress upon Mr. Krogh the vital importance to the national security of his assignment. I did not authorize and had no knowledge of any illegal means to be used to achieve this goal.
 However, because of the emphasis I put on the crucial importance of protecting the national security, I can understand how highly motivated individuals could have felt justified in engaging in specific activities that I would have disapproved had they been brought to my attention.
 Consequently, as President, I must and do assume responsibility for such actions despite the fact that I at no time approved or had knowledge of them.
 The work of the unit tapered off around the end of 1971. The nature of its work was such that it involved matters that, from a national security standpoint, were highly sensitive then and remain so today.
 These intelligence activities had no connection with the break-in of the Democratic headquarters, or the aftermath.
 
 
 [9]
 Weekly Compilation of Presidential Documents, No. 21, at pp. 695-96 (May 22, 1973) (emphasis added)
 
 
 [25]
 1 Report of the Senate Select Committee on Presidential Campaign Practices, ch. 1, § 1(c)
 
 
 [26]
 Ibid
 
 
 [27]
 When Hunt finally appeared before the Senate Committee, on 24 September 1973, he testified as follows with respect to the motivation of the appellants in the Ellsberg and Watergate operations:
 Senator WEICKER. With respect to the three Cuban-Americans who participated in the Fielding-Ellsberg break-in, those three, in your opinion, did those men act reasonably in believing that the break-in was legal, based upon your apparent authority to direct them in such an operation?
 Mr. HUNT. Yes, sir.
 Senator WEICKER. With respect to the four Cuban-Americans who participated in the two Watergate Democratic National Committee break-ins, in your opinion, did these men act reasonably in believing that those break-ins were legal, based upon your apparent authority to direct them in such an operation?
 Mr. HUNT. Yes, sir.
 Senator WEICKER. Are you now willing to accept responsibility for the activity of those Cuban-Americans in those break-ins, based upon the authority you represented yourself to have to direct such operations?
 Mr. HUNT. Yes, sir.
 Senator WEICKER. And isn't it fair to say, Mr. Hunt, based upon such things as your past knowledge of the President's speech of May 8, 1972, on the Haiphong mining, your White House office, your accessibility to high levels of Government, your visit to the Executive Office Building and its agencies, that the Cuban-Americans acted reasonably in believing that those break-ins were legal and that you had the authority to direct them?
 Mr. HUNT. Yes, sir.
 Senator WEICKER. Well, I thank you very much, because at least we have started, I think, from the bottom up, if nowhere else, to ascertain some of the beliefs which motivated the matters that have come before this committee. I thank you for your candor.
 
 
 [9]
 Hearings Before the Select Committee on Presidential Campaign Activities of the United States Senate, 93rd Cong., 1st Sess., at 3787-88 (1973)
 
 
 [28]
 See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972)
 
 
 [29]
 Id. at 460, 92 S.Ct. 1170
 
 
 [30]
 Majority Opinion at --- U.S.App.D.C. at ---, 514 F.2d at 223
 
 
 [31]
 See note 9 supra
 
 
 [32]
 Majority Opinion at ---, 514 F.2d at 223
 
 
 [33]
 Barker Affidavit, App. at 18
 
 
 [34]
 See the representative excerpt in the Majority Opinion at ---, 514 F.2d at 215
 Similarly, the appellants' adamant refusal to allow attorney Rosenblatt to present a "lack of criminal intent" defense (based on their mistake in thinking the break-in was authorized) reveals not their bad faith in raising that defense now, but the strength of their original belief that national security considerations required their silence.
 
 
 [35]
 Tr. at 417
 
 
 [36]
 Majority Opinion at --- - ---, 514 F.2d at 224
 
 
 [37]
 The majority attempt to nullify the distinction between this approach and their own by arguing that we have simply assessed the relevant factors in opposite order. Majority Opinion at --- - ---, 514 F.2d at 224-225, n. 15. This argument misapprehends the basic difference in our positions. If I understand their approach, the majority would erect two sliding scales one measuring the strength of the prejudice to the Government if a withdrawal motion is granted, and the other gauging the strength of the defendants' reasons for delaying the assertion of his innocence. When the prejudice to the Government reaches a certain level on the first scale, withdrawal will only be allowed the defendant if his reasons attain a position of "objective reasonableness" on the second scale. No matter how greatly the defendant's erroneous belief may have affected the voluntariness of his plea, or how reasonable his mistake was for him, he will not be allowed to present his defense
 This is not my approach, regardless of the attempted order of analysis. The majority's statement that I would look first to the reasonableness of the defendant's belief is correct. That inquiry, however, is limited to a determination of the honesty, or subjective validity, of the defendant's error. (If his mistake has no credible basis, little prejudice to the Government need be found to justify denial of a withdrawal motion.) If it appears that the defendant reasonably believed, in the light of his experience and background, the facts which he asserts to support his motion, his reliance thereon is established as foundational to the balancing process which follows. Whether a detached reasonable man would have believed those facts is not germane. Rather, the balance is between the prejudice to the Government and the degree to which the defendant's mistake affected the voluntariness of his plea. This, in my estimation, is the proper measure of the "fairness and justice" of allowing the defendant to withdraw a mistaken guilty plea.
 
 
 [38]
 High v. United States, 110 U.S.App.D.C. 25, 27, 288 F.2d 427, 429, cert. denied, 366 U.S. 923, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961)
 
 
 [39]
 Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)
 
 
 [40]
 466 F.2d 1092 (2d Cir. 1972), cert. denied, 410 U.S. 945, 93 S.Ct. 1045, 35 L.Ed.2d 612 (1973)
 
 
 [41]
 Id. at 1097
 
 
 [42]
 455 F.2d 297 (2d Cir.), cert. denied, 407 U.S. 923, 92 S.Ct. 2471, 32 L.Ed.2d 809 (1972)
 
 
 [43]
 404 F.2d 456 (4th Cir. 1968), cert. denied, 395 U.S. 924, 87 S.Ct. 2083, 18 L.Ed.2d 1335 (1969)
 
 
 [44]
 Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970)
 
 
 [45]
 United States ex rel. Bullock v. Warden, Westfield State Farm, 408 F.2d 1326 (2d Cir. 1969), cert. denied, 396 U.S. 1043, 90 S.Ct. 688, 24 L.Ed.2d 686 (1970)
 
 
 [46]
 455 F.2d at 303 (Feinberg, J., concurring)
 
 
 [47]
 Affidavit of Bernard L. Barker, App. at 18
 
 
 [48]
 Majority Opinion, --- U.S.App.D.C. at --- - ---, 514 F.2d at 225
 
 
 [49]
 Id. at ---, 514 F.2d at 225
 
 
 [50]
 Martinez Affidavit, App. at 22. As a practical matter, it is difficult to conceive exactly how these four Cuban-Americans would go about contacting "responsible Government officials" of the CIA, State or Defense Departments, or the White House. Past which gate would they have been allowed to go?
 
 
 [51]
 Majority Opinion at --- U.S.App.D.C. at --- - ---, 514 F.2d at 225
 
 
 [52]
 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)
 
 
 [53]
 5 U.S.C. § 552 (1970). Section 552(b)(1) exempted from the forced disclosure requirement of the Act those matters "specifically required by Executive Order to be kept secret in the interest of national defense or foreign policy."
 
 
 [54]
 410 U.S. at 81-84, 93 S.Ct. 827
 
 
 [55]
 P.L. No. 93-502, 88 Stat. 1561 (1974)
 
 
 [56]
 During voir dire, Judge Sirica explained:
 I want you to be straightforward with these questions. I want you to come forward in a truthful manner, . . . it doesn't make any difference to this Court who you might mention or what it hurts or helps. . . .
 Tr. at 386.
 
 
 [57]
 Judge Bazelon's concurrence in the majority opinion places great weight on this factor:
 The District Court and the defendants' attorney both very carefully sought to disabuse the defendants of any notion that they were required to plead guilty and also sought to uncover their motive in pleading guilty. These efforts were unsuccessful. In light of the diligent efforts of their attorney and the careful interrogation by the District Judge, one must conclude that the defendants' pleas were voluntary. They made a bargain with the government and were under no apprehensions as to what that bargain meant. Under North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), we must enforce that bargain.
 Concurrence of Judge Bazelon, --- U.S.App.D.C. at --- n. 1, 514 F.2d at 227 n. 1 (emphasis added).
 In the Alford case, the Supreme Court held it is not constitutional error for a trial judge to accept a guilty plea from a defendant who disclaims his guilt, so long as "the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." 400 U.S. at 31, 91 S.Ct. at 164 (emphasis added). Without this freedom of choice, there can be no "bargain." Judge Bazelon appears to argue that because the appellants were advised they could plead innocent and instead "chose" to plead guilty, their plea was perforce voluntary. The appellants, however, believed they had a directive from their immediate superior to plead guilty. Only in the most mechanical sense can it be said that "footsoldiers" who obey the order of a superior officer have made a voluntary choice to do so. Concomitantly, if the appellants were counseled to take a course of action which, in their minds, would have required disobedience to their leader and disloyalty to their country, that alternative was never truly "open" to them. The Alford case, then, affords little support to Judge Bazelon's position. In every sense which has meaning in the context of withdrawal motions, the appellants' pleas did not represent a voluntary choice to waive assertion of their innocence.
 
 
 [58]
 Although eschewing a decision on the merits of the appellants' proffered defenses, the majority in a footnote makes the gratuitous observation that "the national security defense that appellants would assert if they were granted a trial has been rejected as a matter of law by the only court that has considered it. United States v. Ehrlichman, D.D.C., 376 F.Supp. 29 (1974)." Majority Opinion, --- U.S.App.D.C. at --- - ---, 514 F.2d at 226-227 n. 17
 As Part II of my opinion makes clear, however, the gravamen of the appellants' principal defense is not as was the case in Ehrlichman that warrantless searches are legal if conducted for national security purposes. Rather, the appellants contend that a citizen has a valid defense to criminal charges arising out of an unlawful search which he has aided in justifiable reliance on the authority and representations of a high government official. Therefore, even assuming, arguendo, that the Ehrlichman decision was correct, it is not controlling here.
 
 
 [59]
 Thus, I need not, and do not, reach their subsidiary defenses, based on entrapment and selective prosecution
 
 
 [60]
 1 Wharton's Criminal Law and Procedure § 157 (Cumm. Supp. 1974); Williams, Criminal Law: The General Part § 52-74 (2d ed. 1961); Model Penal Code § 2.04(1) (P.O.D. 1962)
 
 
 [61]
 Wharton's, supra note 60, at § 162; Williams, supra note 60, at c. 8; Hall & Seligman, Mistake of Law and Mens Rea, 8 U.Chi.L.Rev. 641, 642 (1962)
 
 
 [62]
 See generally Williams, supra note 60, at 293-345
 
 
 [63]
 276 N.Y. 384, 12 N.E.2d 514 (1938)
 
 
 [64]
 Id., at 387, 12 N.E.2d at 514
 
 
 [65]
 Id., at 389-90, 12 N.E.2d at 515-16
 
 
 [66]
 See Hall & Seligman, supra note 61 at 1
 
 
 [67]
 The pleas of guilty which the majority opinion allows to stand (Majority Opinion, --- U.S.App.D.C. at --- - --- n. 1, 514 F.2d at 211 n. 1) are to the following counts:
 Count One: Conspiracy to commit the crimes charged in the other counts. See 18 U.S.C. § 371.
 Count Two: Burglary, consisting of entry into the Democratic National Committee headquarters, with intent to steal the property of another. See 22 D.C.Code § 1801(b).
 Count Six: Unlawful possession of devices for intercepting oral communications. See 23 D.C.Code § 543(a)(1).
 See note 70 infra.
 
 
 [68]
 See Perkins on Criminal Law 629 (2nd ed. 1969)
 
 
 [69]
 Williams, supra note 60, at 678
 
 
 [70]
 It should be noted, however, that mistake of law has been recognized as a defense to conspiracy when the target offense was not "malum in se." See Perkins, supra note 68, at 630-31; Landen v. United States, 299 F. 75 (6th Cir. 1924); Mitchell v. State, 248 Ala. 169, 27 So.2d 36 (1946). Burglary is clearly "malum in se." It is possible, on the other hand, to view the D.C.Code offense of possession of eavesdropping devices as merely "malum prohibitum." If this view is correct, and the defendants were unaware that possession of eavesdropping devices is a crime, then they cannot be convicted of conspiracy to eavesdrop
 Of greater importance to this case, however, is the fact that, as with the kidnapping statute involved in Weiss (and unlike the statutes here prohibiting burglary and conspiracy), the D.C. statute prohibiting possession of eavesdropping devices may itself recognize a mistake of law defense. The statute is directed only at one who "wilfully possesses" an interception device. "(W)ilfull is a word of many meanings, its construction often being influenced by its context. . . . " Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). One commentator has made the following generalization:
 (W)hen found in a statute creating a civil offense (i. e., malum prohibitum) the word "wilful" means intentional as distinguished from inadvertent or negligent and does not imply anything in the nature of an evil intent or bad motive, whereas such additional element is required when the word is found in a common-law definition or in a statute dealing with a true crime.
 Perkins, supra note 68, at 780-81. The question of whether the offense involved here is a "true crime" (malum in se) or only a "civil offense" (malum prohibitum) is difficult of resolution. "Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set of comprehensive criteria for distinguishing between (the two types of offenses)." Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The possibility of five years imprisonment for a violation indicates a legislative intent that possession of eavesdropping devices be regarded as a "true crime." The fact, however, that such possession has not long been prohibited, and may still not be considered illegal in the mind of the public, argues that it should be treated as "malum prohibitim" only.
 With no discussion, the only court in this jurisdiction to construe the term "wilfully" in a statute similar to the D.C.Code provision concluded that it required that the defendant "knew his activity to be unlawful." United States v. Bast, 348 F.Supp. 1202, 1203 (1972). That decision referred to the prohibition, contained in 18 U.S.C. § 2512(1)(c), against placing an advertisement for an interception device in any publication. The United States Code provision closely parallels that of the D.C.Code. Both prohibit wilful advertisement as well as wilful possession of eavesdropping devices. Indeed, in the U.S. statute, the term "wilfully" is used only once, and modifies all activities prohibited by the statute. If "wilful" advertisement of an eavesdropping device means advertisement with knowledge of its unlawfulness, then "wilful" possession would appear to require the same kind of knowledge. The defendants' mistake in believing their activity was lawful, therefore, would, if honest, constitute a complete defense to that charge.
 
 
 [71]
 22 D.C.Code § 1801(b)
 
 
 [72]
 Even if the defendants had believed that the detective had a valid warrant, their mistake would have been one of law, in the absence of facts known to them which could support a proper judicial determination that an arrest warrant should issue. The situation in which a citizen relies on the authority of a judge, rather than a police officer, presents a stronger case for recognizing a defense based on mistake as to the lawfulness of his action. Reliance on the pronouncement of an attorney general or any other high state official also presents a stronger case. But if the citizen relies entirely on that authority, his mistake remains one of law, not of fact. This does not mean that no defense can be recognized in such a situation. It means only that such a defense must be viewed as an exception to the mistake of law doctrine, rather than an extension of mistake of fact protection
 
 
 [73]
 To illustrate, if a man is charged with kidnapping under a statute which prohibits enticing a girl under sixteen away from her parents, he should have a good defense, based on mistake of fact, if he honestly believed the girl was over sixteen. See State v. Suenen, 36 Idaho 219, 209 P. 1072 (1922) (dictum). If he did not know whether or not she was under sixteen, his ignorance of fact cannot excuse him. His action was not legal under the facts as he knew them. Any impression that he was acting innocently, therefore, rested on a mistake of law, even if he was assured erroneously by an employee of the government that his action was not prohibited. See Hopkins v. State, 193 Md. 489, 69 A.2d 456. (1950)
 
 
 [74]
 The Model Penal Code allows a "mistake of law" defense to a charge of unlawful use of force for a private person called to the aid of a police officer, if he honestly believes that the officer who calls his aid is acting lawfully. M.P.C. § 3.07(4)(a), Commentary at 64-65 (Tent. Draft No. 8 1958). This rule is explicitly recognized as an exception to the general rule that mistake of law is no defense. M.P.C. § 3.09(1)(b). Significantly, only a mistake of fact is a defense to a criminal prosecution for an unlawful arrest when a private person has come to the aid of another private person. In such a case, the Code requires not only that "(i) he believes the arrest is lawful" but also that "(ii) the arrest would be lawful if the facts were as he believes them to be." M.P.C. § 3.07(4)(b) (emphasis added)
 
 
 [75]
 In support of the proposition that a mistake of law engendered by reliance on the authority of a public official provides a valid defense in compelling circumstances, see Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), and United States v. Mancuso, 139 F.2d 90 (3rd Cir. 1943). Cf. United States v. Laub, 385 U.S. 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967) ("Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach. . . . and certainly not if the Government's conduct constitutes 'active misleading' . . ..")
 
 
 [76]
 This parallels the defense of a good faith, reasonable belief in the lawful nature of their conduct which has been afforded police officers in a civil suit under the Fourth Amendment for an unlawful arrest or search. See Bivens v. Six Unknown Federal Agents, 456 F.2d 1339, 1347-49 (1972)
 Significantly, if a mistake as to the authority of a government officer could be characterized as one of fact, rather than law, it would afford a defense no matter how unreasonable the defendant's perception. Although there is some authority to the effect that a mistake of fact must be reasonable to negate intent, (Wharton's, supra note 60, at 382 n. 19.) the better, and more widely held, view is that even an unreasonable mistake, if honest, constitutes a valid defense. (Williams, supra note 60, at 201; Model Penal Code, Tentative Draft No. 4, at p. 136 (Commentary on § 2.04(1) (1953).) In view of the strong public policy supporting the general principle that citizens disobey the law at their peril, whether they are cognizant of their disobedience or not, it would appear unwise to allow defendants a complete defense based on an irrational reliance on the authority of a government official.
 At the same time, there is a presumption of regularity in official action on which, I would argue, the individual citizen should be able to rely, when his reliance is reasonable. As one pair of commentators has put it, arguing in favor of a limited mistake of law defense, "in dealing with a defendant who has followed advice from an officer of the state, one aspect of our general policy is to make the community do this very thing in its dealings with the state, and a rule that no defense will be given under any circumstances to such a defendant will be self-defeating." (Hall & Seligman, supra note 2, at 676 (emphasis added).) Whether this argument is accepted as applied to all state action, it remains true that a limited defense based on a reasonable mistake as to authority can be justified under the rubric of "mistake of law," but is an analytic anomaly when placed in the category of "mistake of fact."
 
 
 [77]
 This court is currently considering this question en banc in the case of Zweibon v. Mitchell, et al., No. 73-1847 (filed 1 August 1973)
 
 
 [78]
 As early as 1940 President Roosevelt asserted the power to authorize warrantless surveillances on "national security" grounds specifically, against "persons suspected of subversive activities against the Government of the United States, including suspected spies." Memorandum from President Roosevelt to Attorney General Jackson, May 21, 1940, reproduced in United States v. United States District Court, 444 F.2d 651, 669-70 (6th Cir. 1971), aff'd, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (subsequent authorizations of Presidents Truman and Johnson also reproduced)
 
 
 [79]
 United States v. Brown, 484 F.2d 418 (5th Cir. 1973), cert. denied, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); United States v. Butenko, 494 F.2d 593 (3rd Cir.), cert. denied, Ivanov v. U. S., --- U.S. ---, 95 S.Ct. 147, 42 L.Ed.2d 147 (1974)
 
 
 [80]
 United States v. United States District Court, 407 U.S. 297, 321-22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Giordano v. United States, 394 U.S. 310, 313-14, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (concurring opinion of Stewart, J.); Katz v. United States, 389 U.S. 347, 358 n. 23, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)
 
 
 [81]
 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)
 
 
 [82]
 See note 78 supra